UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW KLOTSCHE              :

      Plaintiff                :          CIVIL ACTION NO.:
                          :          3:13CV955 (CSH)
vs.                        :

YALE UNIVERSITY, ET AL      :

      Defendants         :          MAY 28, 2014

## AFFIDAVIT OF DANIEL KILLEN

I, Daniel Killen, being duly sworn, depose and say that:

1.     I am over the age of eighteen years and believe in the obligation of an oath.

2.     I make this affidavit of my personal knowledge in my capacity as Director of Security Operations for Yale University.

3.     On January 9, 2013, I received an e-mail from Security Manager Richard Nucci regarding Security Officer Andrew Klotsche's performance that day.  A copy of the January 9, 2013 e-mail is attached hereto as Exhibit 1.

4.     On January 13, 2013, I received an e-mail from Security Manager Reginald Chavis regarding Andrew Klotsche's performance on January 9, 2013.  A copy of the January 13, 2013 e-mail is attached hereto as Exhibit 2.

5.     In their e-mails, Mr. Nucci and Mr. Chavis related that, when they conducted post checks on January 13, 2013, they could not locate Mr. Klotsche.  When they finally located him, they observed Mr. Klotsche sitting at a table in the basement of Branford College,

reading a book and taking notes.  Mr. Klotsche had removed his jacket and duty belt.  He had

not called out for a break.  Mr. Nucci and Mr. Chavis also discovered that Mr. Klotsche had

the keys to Branford College on his person, which was in violation of department policy.

6.     Mr. Chavis also indicated in his e-mail that Mr. Klotsche stated that he was not

concerned about being written up, because he would only receive a counseling or written

warning and would not be suspended without pay or terminated.

7.     On January 13, 2013, I received an e-mail from Mr. Nucci regarding Mr.

Klotsche's performance on January 11, 2013.  A copy of the January 13, 2013 e-mail is

attached hereto as Exhibit 3.

8.     In that e-mail, Mr. Nucci indicated that he conducted a quality assurance check

on Mr. Klotsche's post on January 11, 2013, but could not locate Mr. Klotsche in any of his

assigned areas.  Mr. Nucci finally located Mr. Klotsche in the subterranean area of Jonathan

Edwards College.  He was again in possession of keys to the college, despite the fact that he

had not received any calls for service which would require keys.

9.     On January 17, 2013, I conducted an investigatory interview with Mr. Klotsche

regarding his performance on January 9, 2013 and January 11, 2013.  A copy of the January

28, 2013 memorandum regarding the January 17, 2103 interview is attached hereto as Exhibit

4.

10.     During the interview, I asked Mr. Klotsche about the two incidents in which he

was observed inside of buildings during periods when he should have been visibly patrolling

outside.  Mr. Klotsche was not forthcoming with his responses, but admitted that he had been

inside the building on January 9, 2013.  Upon further questioning, Mr. Klotsche also admitted to reading and taking notes in connection with his EMT course while in the building.  This occurred at a time when he should have been patrolling his area.

11.  When asked about his conduct on January 11, 2013, the plaintiff claimed that he had been looking for a place to store his lunch.  I reminded him that he had been assigned to that area for several months and should not have needed to look for a place to store his lunch.  Mr. Klotsche then accused Mr. Nucci of spying on him.

12.  Mr. Klotsche acknowledged that he was aware that security officers were not supposed to carry college keys unless the keys were needed.  He offered that he had been disciplined by his former manager for carrying keys.

13.  When asked about his comment to Mr. Chavis, that he was not worried about being written up, the plaintiff stated that the comment was made directly in response to possibly being disciplined for being in the basement on January 9, 2013.

14.  Prior to the January, 2013 incidents, Mr. Klotsche had been counseled and given a verbal warning for substandard performance on three separate occasions.  In December, 2010, Mr. Klotsche was counseled after his supervisor twice found him in the basement of Welch Hall working on homework when he should have been patrolling his assigned area.  In August, 2011, Mr. Klotsche was counseled by his supervisors regarding congregating with other employees.  In September, 2011, Mr. Klotsche was given a verbal warning after his supervisor observed him congregating with a fellow officer when he should have been patrolling his assigned area.

3

15.     On February 21, 2013, I informed Mr. Klotsche that he was suspended for one day without pay for his continued poor work performance.  A copy of the February 21, 2013 memorandum is attached hereto as Exhibit 5.

16.     On March 14, 2013, I received a grievance filed by Mr. Klotsche.  A copy of the grievance is attached hereto as Exhibit 6.

17.     On March 18, 2013, I held a Step II Grievance Hearing in response to Mr. Klotsche's grievance.  During that hearing, the plaintiff was given an opportunity to explain the basis for his grievance as well as his actions and statements on January 9, 2013 and January 11, 2013.  A copy of the March 18, 2013 memorandum regarding the Step II Grievance Hearing is attached hereto as Exhibit 7.

18.     I denied the plaintiff's grievance on March 26, 2013 for two reasons:  (1) the grievance was untimely filed and (2) the Union did not demonstrate a violation of the collective bargaining agreement.

19.     The plaintiff had been disciplined on multiple occasions prior to receiving the one day suspension without pay on February 21, 2013.

20.     On December 11, 2010, I received an e-mail from Mr. Nucci stating that, while conducting a post check on December 8, 2011, he found Mr. Klotsche in the bike vault sitting at a desk with textbooks open and writing notes.  Mr. Nucci instructed Mr. Klotsche to leave the bike vault.  When Mr. Nucci later reentered the bike vault, Mr. Klotsche was still sitting at the desk doing homework.   Mr. Nucci informed Mr. Klotsche that his conduct was

4

inappropriate and that a large part of his job was to provide bike patrols and visibility as a crime deterrent. A copy of the December 11, 2010 e-mail is attached hereto as Exhibit 8.

21.     On April 26, 2011, I counseled Mr. Klotsche not to congregate with fellow security officers.

22.     On August 15, 2011, I received an e-mail from Mr. Chavis indicating that Mr. Klotsche had been instructed on multiple occasions not to congregate with other security officers, but was again found congregating with a fellow security officer. A copy of the August 15, 2011 e-mail is attached hereto as Exhibit 9.

23.     On August 31, 2011, I counseled Mr. Klotsche on the proper wearing of the bicycle uniform and safety gear. A copy of the August 31, 2011 counseling is attached hereto as Exhibit 10.

24.     On September 7, 2011, the plaintiff received a verbal warning for poor performance in connection with the incident that occurred on August 15, 2011. A copy of the September 7, 2011 Verbal Warning is attached hereto as Exhibit 11.

25.     On September 10, 2011, I received an e-mail from Mr. Chavis indicating that he had issued the verbal warning to Mr. Klotsche. A copy of the September 10, 2011 e-mail is attached hereto as Exhibit 12.

26.     The imposition of a one day suspension was not arbitrary, capricious or discriminatory. Mr. Klotsche was treated just as any other security officer who engaged in the same behavior would have been treated. He was found by his supervisor violating two rules on January 9, 2013 and was informed of the violations at that time. He was then found to have

violated the very same two rules on January 11, 2013.  This behavior occurred after he had been disciplined numerous times over the previous two years.  Imposing a one day suspension without pay did not violate the progressive discipline policy, nor was it arbitrary, capricious or discriminatory.

27.    Under the circumstances detailed above, there was just cause for suspending Mr. Klotsche for one day without pay and there was no violation of the collective bargaining agreement.

Dated at New Haven, Connecticut this 28ᵗʰ day of May, 2014.

_____
Daniel Killen

STATE OF CONNECTICUT          )
                             ) ss. New Haven
COUNTY OF NEW HAVEN          )

Subscribed and sworn to before me this 28ᵗʰ day of May, 2014.

_____
Notary Public/
~~Commissioner Superior Court~~

Mary E. Evans
Notary Public
State of Connecticut
My Commission Expires
May 31, ~~2010~~ 2015

6

## CERTIFICATION

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/
Patrick M. Noonan

1

## Killen, Daniel

**From:**        Nucci, Richard
**Sent:**        Wednesday, January 09, 2013 10:28 PM
**To:**          Killen, Daniel
**Cc:**          Chavis, Reginald
**Subject:**     Andrew Klotsche (1/9/13)

**Importance:**     High
**Sensitivity:**    Confidential

Dan,

While conducting post checks of the 1800-0200 staff this evening, we post checked Officers Josephson, Walker, Vitale, Cordero and Vereen. Not present within the residential college coverage area was Branford/JE Officer Andrew Klotsche. In addition, the Central Alarm Station had requested a radio acknowledgement from the officers covering Trumbull and Saybrook Colleges (we had no regular officer on site tonight and these colleges were assigned to Officers Vitale and Klotsche). Officer Vitale acknowledged the radio communication and Officer Klotsche did not. Supervisor Chavis contacted Officer Klotsche via two-radio requesting an acknowledgement and received one.

Supervisor Chavis had contacted the Central Alarm Station at approximately 1920 and ascertained that Officer Klotsche's last card swipe was at 1908 on the Branford College Common Room. Supervisor Chavis and I entered the Common Room, could not locate Officer Klotsche, separated and proceeded to tour the interior areas of Branford College.

After approximately twenty minutes, we were still unable to locate Officer Klotsche and decided to conduct a secondary tour of the exterior of Officer Klotsche's assigned colleges. At that time, we observed Officer Klotsche, from the sidewalk on High Street, through a lower level window of the college. We observed him writing on a large pad with a textbook open on the table. His duty belt was off and his fleece coat was on the table alongside a cup of coffee and a bread loaf wrapper. He had not called out for a break nor had he requested any time to complete paperwork or handle any personal items.

At that time, we contacted CC Bike Officer Bill Hewitt and requested he pull the Branford College keys from Phelps Gate and meet us on High Street. Officer Hewitt reported the keys were missing from the Phelps Key Watcher and he would pull the secondary set from 79 Howe Street Key Trak. We later ascertained that Officer Klotsche was carrying the Phelps keys for this college on his person, which contradicts departmental policy.

Approximately fifteen minutes elapsed before Officer Hewitt arrived with the keys. During this time frame, we continued to observe Officer Klotsche inside this room, which we determined was a Custodial Break Room.

At approximately 2000 hours, I contacted Officer Klotsche via two-way radio and requested he meet me at Jonathan Edwards College on York Street. Supervisor Chavis remained inside Branford College and I waited outside. A few minutes later, Supervisor Chavis emerged accompanied by Officer Klotsche. Officer Klotsche insisted he had conducted tours of his colleges and was not inside the Custodial Break Room for any extended period of time. However, the card access activity, our personal observations and the approximate one hour of time that elapsed on this episode contradicts his statement.

At Officer Klotsche's request and later in the shift, Supervisor Chavis met individually with him and will document the results of this meeting. Supervisor Chavis has agreed to handle this issue and any investigatory details moving forward.

Regards,

1

Rich

Richard Nucci, CPP
Security Manager
Yale University Security
Office: 203-436-9145
Mobile: 203-627-0547

2

**Killen, Daniel**

| | |
|---|---|
| **From:** | Chavis, Reginald |
| **Sent:** | Sunday, January 13, 2013 10:29 PM |
| **To:** | Killen, Daniel |
| **Subject:** | Klotche's incident |

Dan,

On Wednesday January 9, 2013 while conducting post checks on the central campus officers. I heard base announce over the radio for the officer assigned to Trumbull and Saybrook to call them. Within a few minutes Officer Vitale responded and CAS dispatched a call to her for Trumbull, during roll call I assigned Officer Vitale to cover Trumbull and Officer Klotsche to cover Saybrook. After Officer Vitale responded to CAS, I called Officer Klotsche over the radio and directed him to notify CAS that he was assigned to cover Saybrook College. Myself and Rich continued to conduct post checks on central campus officesr, we had toured through Pierson and Davenport College and observed Officer Josephson on York Street.

Then proceeded to Branford College and Jonathan Edwards College, Officer Klotsche was not visible so I requested from CAS Officer Klotsche's last swipe record. CAS informed me that his last swipe was Branford College common room at 1908hrs, myself and Rich entered the common area and proceeded touring in different directions attempting to locate Officer Klotsche. After approximately twenty minutes of touring the lower level of Branford College, I suggested that we walk the exterior grounds of the College in an attempt to locate Officer Klotsche. We then proceeded to walk the grounds from York Street to Elm Street into Saybrook College courtyard the out to Elm Street and High Street, where we observed two more Residential College Officers on patrol and Officer Corso riding the T-3. We then began to walk down High Street, there was no visible sign of Officer Klotsche, as we approached library walk I observed a light in a basement window. When I looked down into the window I observed what appeared to be a Yale Security reflective jacket laying on a table. I stopped and pointed it out to Rich and we observed that it was one of our uniform items, a duty belt with a radio was resting next to the reflective garment. On the table was also a cup of coffee and a open book with a note pad, within a few moments of observing these items in this basement room Officer Klotsche leaned forward.

Myself and Rich Observed Officer Klotsche read the book then write something on the note pad, we observed him doing this for approximately twenty minutes. Then Rich contacted Officer Hewitt and dispatched him to retrieve the Branford College keys form 79 Howe St. key track. Upon Officer Hewitt's arrival we had decided to split off, I would remain in the lower level of Branford College while he called Officer Klotsche to report for a post check at Jonathan Edwards College. Once I was in the lower level of Branford, Rich called Officer Klotsche for a post check. I could hear through the door what sound like Officer Klotsche putting away his personal items, then putting on his duty belt and outer garment. When Officer Klotsche opened the door I was standing directly in front of the door, Officer Klotsche's appearance displayed shock and confusion. I then informed him that myself and Rich had observed him form the basement window, he immediately stated that he was not in the room for more than twenty minutes. I reminded him that we are only a little more than two hour into the shift at this point and that he didn't call for a break, he said that he had conducted all his tours.

1

I informed Officer Klotsche that his job was to be visible and I had stated that in roll call not long ago, then I direct him to place his personal items in this vehicle and to remain visible throughout the shift. A short time later while I was speaking with Rich at his office, Officer Klotsche knocked on Rich's office door and asked to speak with me in private. We when to my office, Officer Klotsche started telling me how I embarrassed him over the radio. When I contacted him about call CAS and notifying them that he was assigned to Saybrook College. He stated that Officers were calling him and Cordero and others stopped him and asked him what's up between you and Reggie. Officer Klotsche went on to say that they wanted him to file a grievance, I informed Officer Klotsche that he has that right, but this will not detract from being observed not doing his job. Then he said that his feeling was hurt and my tone was too harsh, I stated to Klotsche that it was not my intention to offend him or hurt his feeling. So I apologized to him, then he stated that he was not very concerned about being written up. Because what is the worst that can happen, a counseling or written warning it's not like I'll get a suspension without pay or fired. I stated to Officer Klotsche that I was disappointed in him and he should have known better and he needs to improve his performance. After the conversation concluded he left my office smiling and appeared not to be worry.

Reggie

---

**Reginald Fredrick Chavis Jr.**
Yale Security Manager Officer Operations
344 College Street, New Haven CT 06511
T (203)436-4266  C (203)823-8613
*reginald.chavis@yale.edu*

3

**Killen, Daniel**

| | |
|---|---|
| **From:** | Nucci, Richard |
| **Sent:** | Sunday, January 13, 2013 11:29 PM |
| **To:** | Killen, Daniel |
| **Cc:** | Chavis, Reginald |
| **Subject:** | Andrew Klotsche (1/11/13) |
| | |
| **Importance:** | High |

Dan,

In lieu of Wednesday's (1/9) episode where Supervisor Chavis and I discovered Officer Andrew Klotsche remiss in his asset protection responsibilities at Branford and Jonathan Edwards Colleges. I decided to conduct a quality assurance check on his post on Friday (1/11) evening.

I walked the perimeter and courtyard areas of his assigned colleges and could not locate Officer Klotsche. At approximately 1930 hours, I contacted the Central Alarm Station and ascertained that Officer Klotsche's last card swipe was at the Jonathan Edwards College, York Street Gate. I proceeded to that location and could not locate Officer Klotsche. At that point, I entered the subterranean area of the college and walked through the corridors for some ten minutes.

I was finally able to locate Officer Klotsche. He was wearing a large backpack and opening various storage and mechanical room doors. I approached him and inquired as to his actions. He stated "what brings you to these parts?" I responded I was conducting a post check and again asked for an explanation. He stated he was looking for a place to leave his lunch. He then left the backpack inside an elevator pit room. As with Wednesday's episode, he was in possession of the keys to the college, despite not having received any calls for service that would require keys.

He also tried to ignore my presence on site, appeared "perturbed" with my presence and at one point proceeded to walk in the opposite direction of me. I instructed him to accompany me to the street level and emphasized the need to provide a visible, uniformed security presence at the colleges. He appeared hesitant to accompany me and then stated "I need to have a cigarette anyway" and we proceeded to the street level, courtyard area of the college. At that point, I departed the college and informed Officer Klotsche to remain visible and conduct exterior tours of the area.

I remain concerned that Officer Klotsche is not providing visible, uniformed security tours of the college and could be potentially exposing personnel and assets in his assigned area to unnecessary risk. In particular, his uncooperative demeanor when I encountered him in the subterranean area of the college and the fact that we had clearly addressed a similar, serious issue with Officer Klotsche only two days prior.

Regards,

Rich

Richard Nucci, CPP
Security Manager
Yale University Security
Office: 203-436-9145
Mobile: 203-627-0547

1

4

# Yale University

*University Security Programs*
*79 Howe St.*
*New Haven, Ct. 06520-8235*
*Telephone: 203-436-4393*

TO:         File

FROM:     Daniel F. Killen, Director of Security Operations

DATE:     January 28, 2013

RE:         January 17, 2013 Investigatory Interview with Andrew Klotsche

On Thursday, January 17, 2013 at approximately 6:20pm Human Resources Generalist Ali Leibenhaut and I conducted an investigatory interview with Security Officer Andrew Klotsche regarding his performance on Wednesday, January 9, 2013 and Friday, January 11, 2013. At Klotsche's request, Union steward Joe Ryan was present during the interview.

During the interview I asked Klotsche about the two incidents in which he was observed inside of buildings during periods he should have been visibly patrolling outside. Klotsche was not completely forthright in his responses, only admitting to things when directly questioned. Regarding January 9, 2013 I asked him if he was inside the building. He indicated that he was inside of the building to warm up. Only after I mentioned that he was observed with an open book, did he mention that he also had been reading. Again, only after I brought it up, did he admit to also taken notes and having a notepad open next to him and his book. He also denied being in the building for an extended period of time. He also never offered an explanation as to why if he was inside the building to simply warm up, would he be observed with his coat off and his radio belt removed.

During the conversation it appeared that Officer Klotsche was not understanding the seriousness of his actions. He showed little to no remorse. I pointed out to him that his responsibilities include being a highly visible deterrence and that his reflective uniform is one aspect used to increase his visibility. I noted that being in the basement of a building, not being seen by anyone, provides little value to the University.

Officer Klotsche described his routine of signing out the college (submaster) keys at the start of shift. He then proceeds directly to the college to 'find' a place to store his lunch. I asked him about the January 11th incident, which appeared to be a repeat of his substandard perform two nights earlier. Officer Klotsche first attempted to deflect the issue by stating that on this night he was 'looking' for a place to store his bag and lunch. I reminded him that he has been assigned to the same two areas for several months and it would not make sense that at this point he would still need to be 'looking' for a place to store his belongings. I also reminded him that he earlier indicated that his daily routine was to immediately go to the college and look for a place, yet when Supervisor Nucci found him in the basement area, one and one half hours of his eight hour shift had already lapsed.

Officer Klotsche attempted to cast aspersions on Supervisor Nucci by claiming that he was 'spying' on him. He felt as though Supervisor Nucci was picking on him by confronting him again on January 11th. I explained that Supervisor Nucci was following his responsibilities in ensuring that he checked on the

officers, especially an officer who had performance issues a few days earlier. I explained that part of supervising is to correct behavior and then follow up to make sure that the behavior has been corrected. By checking on him on January 11th, Supervisor Nucci was doing just that.

I questioned Officer Klotsche regarding his carrying college (submaster) keys on his person. I asked him if he knew what the department's practice/procedure was regarding carrying keys. He said yes, he knew that officers weren't supposed to carry them unless needed, but then indicated that 'everyone' does it. Officer Klotsche offered that he has been 'disciplined' in the past by former manager James Smith for carrying keys and he was by Smith that it was not allowed.

When I followed up on his statement that 'everyone' carries keys in violation of the department policy, Klotsche refused to identify anyone else who was carrying keys, saying he didn't want to get fellow union members in trouble. He indicated that supervisors were aware of this, but again would not identify who.

I reminded Officer Klotsche that these two latest incidents, January 9th and January 11th, are a continuation of a pattern of substandard performance on his part. I reminded him that his disciplinary history included:
- December 11, 2010
  - Counseled by Supervisor Nucci after twice finding Klotsche in the basement of Welch Hall working on 'homework' when he should have been patrolling his assigned area.

- August 15, 2011
  - Counseled by Supervisors Nucci and Chavis regarding congregating with other employees. They discussed expectations moving forward, to include he needs to stay separate from the other officers , 'check various outlying buildings, etc...' . He was told that he needed to "optimize (their) exposure within their coverage area, interacting with clients and improving upon providing traditional, security related services to the university".

- September 7, 2011
  - Verbal Warning by Supervisor Chavis after being observed in the Law congregating with a fellow officer when he should have been actively patrolling his assigned area.

Lastly, I questioned Officer Klotsche regarding his comments to Supervisor Reggie Chavis on January 9, 2013. I read Klotsche a portion of Supervisor Chavis' account of the conversation which included Klotsche saying the he "was not overly concerned about being written up because what is the worst that can happen, a counseling or written warning, it's not like I'll get a suspension without pay or fired." I explained that I found these comments and attitude troubling because it indicated that he did not grasp the seriousness of the two incidents, nor was he taking responsibility for his behavior. At this point union representative Ryan interceded and attempted to help Officer Klotsche explain his comments. Ryan explained that Klotche had two simultaneous conversations with Chavis, with Klotche saying that the second part of the conversation was between he and Chavis and he would not speak about it. Ryan repeated asked Klotchse if the comments, which showed a lack of remorse, were made or could have been made to Chavis during this second, unspecified conversation. Ryan pointed out that if that were the case, the comments would have a whole different meaning. It was apparent to me that Ryan was attempting to provide an alternative to Klosche so as to minimize the impact of the comments. Although he repeatedly offered Klotsche the chance to explain his comments and attribute them to something else, Klotshe ultimately indicated that he made them directly in response to his possibly being disciplined for being in the basement.

At the conclusion of the interview I explained that we would have a follow-up conversation in the coming weeks.

During the week of January 21, 2013 I spoke to both second shift supervisors, Rich Nucci and Reggie Chavis. Neither were aware that officers were routinely carrying college keys during their tours of duty in violation of the Department procedures.

5

# Yale University

*University Security Programs*
*79 Howe St.*
*New Haven, Ct. 06520-8235*
*Telephone: 203-436-4393*

TO:        Andrew Klotsche

FROM:      Daniel F. Killen, Director of Security Operations

DATE:      February 21, 2013

RE:        One (1) Day Unpaid Suspension

This memo is to inform you that you are suspended from employment with Yale University without pay on Thursday, February 28, 2013 as a result of your continued poor work performance. On September 7, 2011 you were issued a verbal warning for poor performance by failing to remain visible and for failing to actively patrol your assigned area. Since the issuance of the verbal warning, you have not shown significant and sustained improvement in your job performance.

On January 9, 2013 management was unable to locate you while checking your assigned post. Upon further investigation, you were observed inside an interior basement room, with your coat and duty belt off, reading a book and taking notes for an extended period of time when you should have been actively patrolling your assigned area. Contrary to the observations of two supervisors, you denied being in the room for a lengthy period of time. You were found to be in possession of the master keys to the residential college, which is contrary to department procedure. During an initial conversation with management, you were reminded that you were to be visible on your post. You stated that you were not very concerned about being 'written up, it's not like I'll get a suspension without pay or fired'. You left this initial meeting with the manager smiling and appeared not to be worried.

On January 11, 2013, management again found you inside of a building, this time wearing a non-department backpack, and you were unlocking various mechanical room doors. Your explanation was that you were looking for a place to leave your lunch, however this occurred ninety minutes into your shift when you should have been very visible and actively patrolling your assigned area.

On January 17, 2013, during an investigatory interview with me and Human Resources Generalist Alexandra Leibenhaut you were not forthcoming in your responses regarding the January 9th incident. You initially indicated that you went into the basement room to 'get warm', with no mention of removing your coat. You failed to mention that you had been seen reading a book, only acknowledging it when specifically questioned by me. You also failed to mention that you were also taking notes, until specifically questioned by me. You again denied being in the room for a lengthy period of time, despite the observations of two managers.

You admitted that you knew the department's procedure on carrying University keys when not actively responding to a call for service. In fact, you identified that you had been 'disciplined' in the past by former Security manager James Smith for carrying University keys.



When questioned regarding your actions on January 11th, you initially accused the manager of 'spying' on you. Your explanation of looking for a place to store your lunch did not match your earlier accounting of your regular routine.

By your actions, statements, and demeanor you failed to demonstrate that you understand the seriousness of your actions. You continue to fail to perform your duties as explained to you. After being spoken to on January 9th about your performance, you minimized its importance by virtue of your comments that you would not be disciplined harshly. Then two days later you again failed to perform your essential duties as explained to you, and again attempted to redirect blame instead of taking responsibility for your actions.

You continue to exhibit conduct of being inattentive on duty, failing to carry out the essential functions of your job, and accept the seriousness of your actions. Management has made numerous attempts to correct your behavior, but you continue to perform poorly and this will not be tolerated. Failure to demonstrate immediate, significant and sustained improvement in your performance will result in further discipline, up to and including termination of your employment with Yale University.

CC  HR Personnel File

6



# SPFPA | Grievance

**International Union, Security, Police and Fire Professionals of America (SPFPA)
and Local Union No. ___562___ , SPFPA**

# GRIEVANCE

Grievance No.: 13-006

Date: 2/27/13

Shift: 2nd

Company: Yale university Security

Unit: _____

This Grievance is filed pursuant to Article ___VI___ of the Agreement

between _____ and the

International Union, SPFPA and Local Union No. 562 as follows:

Basis for Grievance: Failure to follow progressive discipline on behalf of
University and selective disciple on behalf of the University.

Contract Provision Violated: Article 6 section 1 (a) "no non-probationary
security officer may be disciplined or discharged except for just cause."
Article 6 Section 4 "Neither the University nor the Union shall apply
the provisions of this agreement in an arbitrary, capricious or discriminatory manner."

Relief Requested: Reduction and removal of "unpaid suspension" from
Employment file and replaced with a verbal warning for
failure to request break.

---

Discussed in
1st Step by: _____  With: _____  Date: _____

Andrew Klotsche ___ Joe Ryan  (Union Representative/Title)  (Company Representative/Title)

Grievant (Print)  Union Representative (Print)  Daniel F. Killeen  Management (Print)

Grievant (Signature)  Union Representative (Signature)  Management (Signature)

2/27/17  2/27/13  3/14/3
Date  Date  Date

SUBMIT ORIGINAL TO COMPANY, AND RETAIN A COPY FOR THE UNION    Rev. 06/2004

POSTED

**PROTECT TIME LIMITS**

**Disposition by Management: (1st Step)**

_"X" One choice only._

☐ Grievance Satisfactorily Settled

☐ Appealed

Date: _____

Union Representative Signature _____ Date _____

Company Representative Signature _____ Date _____

**Disposition by Management: (2nd Step)** THIS GRIEVANCE IS DENIED. THE UNION HAS NOT DEMONSTRATED A VIOLATION OF ARTICLE VI AS CLAIMED IN THE WRITTEN GRIEVANCE, NOR ARTICLE XI AS CLAIMED DURING THE STEP II GRIEVANCE MEETING. FURTHER, THE GRIEVANCE WAS ~~FILED~~ RECEIVED BY MANAGEMENT ON 3/14/13 WHEN EMPLOYEE WAS NOTIFIED ON 2/21/13 THAT HE WAS BEING SUSPENDED ON 2/28/13. THE GRIEVANCE WAS FILED OUTSIDE / PAST THE PERIOD STATED IN THE CONTRACT.

_"X" One choice only._

☐ Grievance Satisfactorily Settled

☐ Appealed

Date: _____

Union Representative Signature _____ Date 3/26/13

Company Representative Signature _____ Date _____

**Disposition by Management: (3rd Step)**

_"X" One choice only._

☐ Grievance Satisfactorily Settled

☐ Appealed

Date: _____

Union Representative Signature _____ Date _____

Company Representative Signature _____ Date _____

7

# Yale University

University Security Programs
79 Howe St.
New Haven, Ct. 06520-8235
Telephone: 203-436-4393

TO:        File

FROM:     Daniel F. Killen, Director of Security Operations

DATE:      March 18, 2013

RE:        Step II Grievance Hearing – Andrew Klotsche – SPFPA Grievance 13-006

On Monday, March 18, 2013 I held a Step II grievance hearing in response to SPFPA Grievance #13-006, as outlined in Article XI, Section 1(b) of the collective bargaining agreement.  In attendance was Human Resources Generalist Ali Leibenhaut, Michael Rubino (SPFPA), Judith Rivera (SPFPA) and the grievant, Andrew Klotsche.

I began the meeting by asking both Michael Rubino and Judith Rivera to explain how the written grievance came to be slipped under my door, to be found by my on the morning of March 14, 2013.  Judith acknowledged putting it under my door.  It should be noted that it was not there when I left my office on the afternoon of March 13, 2013.

I asked the grievant to explain the basis of his grievance.  He indicated that he felt that management violated Article XI Section 1(a) No non-probationary Security Officer may be disciplined or discharged except for just cause.  He also cited Article XI Section 4  Neither the University nor the Union shall apply the provisions of this Agreement in an arbitrary, capricious or discriminatory manner.

He indicated that 'past practice' was for an employee to experience progressive discipline in the following manner- counseling, verbal warning, written warning, suspension, termination.  He felt that management did not follow those steps in his situation.

He further stated:

- when found by Manager's Nucci and Chavis, he was in a 'common room' that are part of his patrols.
- He was carrying a non-department issued backpack because the department never issued him a backpack.
- He wanted to give some context to his quote of "it's not like I'm going to be suspended or fired".  He indicated that this was said as part of a 'friend to friend' conversation he was having with Manager Chavis and was not meant as a challenge, nor was it in response to his being found in the basement.  He indicated that the private conversation with Manager Chavis concerned Chavis' frustration with management and the way things were being handled.  He went on to say that during the night of the original incident, Manager Chavis called him on the radio and 'said in a very demeaning way that Base is looking for you'.  The grievant did not like the way Chavis said this on the radio so he went to speak to him privately.  The grievant told Chavis something to the effect of- he (grievant) knew what Manager Nucci was going to do what because he (grievant) knows how Nucci operates, but Chavis shouldn't be concerned about the grievant

wasn't going to file a grievance about it, nor was he going to be fired or suspended. He indicated that this was said in private to Chavis and only as a way of consoling a 'friend' who was upset that the grievant was in trouble.

- The only thing he did wrong was failing to call out on a break.
- He was not spoken to or disciplined since 2011 so he didn't understand the language that he failed to sustain improvement in his performance.
- When Manager Nucci found him in the basement with his backpack on, Manager Nucci helped him find a place to store it.
- Management was aware that everyone carried keys around with them.

The grievant failed to provide any information that would indicate that Article 6 was violated, as was claimed in the written grievance, nor was any information provided that would indicate that Article XI was violated, as was claimed at the Step II meeting.

During the meeting the grievant was asked to clarify his statements made to Manager Chavis regarding not being fired or suspended. I reminded him that approximately six (6) times during his January 17, 2013 investigatory meeting with me he was asked by his own union representative, Joseph Ryan, if the comments were made regarding his private conversation with Manager Chavis or were they made in response to his being found in the basement not performing his required duties. During that interview, as witnessed by HR Generalist Leibenhaut, the grievant was adamant that it was in direct response to being found in the basement. This is in direct conflict with what the grievant is now claiming.

I asked what the basis of his assertion was regarding discipline being issued to other employees. I asked him if he would still be claiming 'past practice' if he was aware that management disciplined other employees without going from counseling, verbal warning, written warning, suspension, termination. He responded no. I pointed out that management does not share disciplinary matters with officers so he had no way of knowing how discipline is handled.

I asked him to provide the names of officers that routinely carried keys with them. He cited Teel, Robinson, Vitale, and Fusco, and all the residential college officers. I asked him to cite a date and time that a supervisor was aware that the officers were carrying these keys. He could not. I reminded him that he told us that he had been disciplined in the past for carrying keys and knew that it wasn't allowed. I asked him to provide me that name or time since then that a supervisor gave him permission to carry the keys with him, and he could not cite one. He said that he began to carry them when he started as a residential college officer because everyone else was. He did not indicate that he received management's permission to do this.

Regarding not calling out for a break, I asked him how long his breaks were – they are two fifteen minute breaks and one half hour break. I asked if he every bundled them together to take an hour break and he said no. He said he stayed too long in the basement and should have, at some point, called out for a break. It should be noted that he was observed in the basement by Managers Chavis and Nucci for over one hour, far exceeding any break he would have been allowed to take had he even requested one. It was also pointed out to him that during our January 17th meeting he indicated that he went into the room to warm up, not to take a break. It should be noted that if this were true, he would not have taken off his coat and duty belt.

Lastly, the grievant wished to point out that he is only seeking a replacement of the Suspension with a Verbal Warning and is not looking to recoup his lost one-day wages.

8

**Killen, Daniel**

| | |
|---|---|
| **From:** | Nucci, Richard |
| **Sent:** | Saturday, December 11, 2010 12:02 PM |
| **To:** | Killen, Daniel |
| **Cc:** | Ortiz, Francisco; Chavis, Reginald |
| **Subject:** | Bike Officers (12/8) |

Dan,

At approximately 4:15pm on Wednesday (12/8), I received a telephone call from Supervisor Reggie Chavis stating he driving to 221 Whitney and had sighted the bike officers near the Old Campus. I was conducting a post check at Art & Architecture and proceeded, on foot, to the Old Campus. When I arrived, I noted two bikes secured to the fence in front of Welch Hall. I entered the hall and Bike Vault on the lower level.

Inside the Bike Vault, I discovered Officer Andrew Klotsche sitting at the desk with textbooks open and writing notes. I asked him what he was doing in the bike vault and why he was not in the field. He responded that his homework (related to EMT training) was "his primary job concern, not his current position." I informed him that I had listened to him complain regarding obtaining employment with Yale, his Casual status, lack of benefits, etc. for the prior seven months and it would be a shame to see him lose what he had recently achieved by underperforming within the first ninety days (probationary period) of full-time status. I asked him to leave and proceeded upstairs to the Old Campus to seek out the other bike officer.

When I arrived outside, Officer Peter Leonardo approached me and stated he was taking a rest room break. He departed the area. A few minutes later, Officer Bill Hewitt arrived - he had just begun his shift at 4:00pm. He also departed the area. Both officers were informed that I was concerned that despite repeated requests, they continued to congregate and were not visible during the shift.

I reentered the Bike Vault to determine whether Officer Klotsche has followed my instructions and encountered him continuing to work on homework. I informed him his conduct was inappropriate. He stated, in a negative tone, "I can still respond to lock out calls from here." I informed him that his position included more than just lock out calls and that a large part of his job was to provide bike patrols and visibility as a crime deterrent around Yale facilities and personnel.

He left the area and later, at the 6:00pm Roll Call, apologized for his misconduct. I departed the Old Campus at approximately 4:45pm and proceeded down Elm Street. A short time later, Officer Bill Hewitt rode up alongside me and stated "I was speechless since you are 100% correct. We've developed some bad habits and we need to break from them." I informed him that all involved were heading down a "dead end road" towards under performance and needed to "step it up." He stated that he agreed and would work towards improvement.

Regards,

Rich

9

## Killen, Daniel

| | |
|---|---|
| **From:** | Chavis, Reginald |
| **Sent:** | Monday, August 15, 2011 9:00 PM |
| **To:** | Killen, Daniel |
| **Cc:** | Albis, Kristen; Ortiz, Francisco |
| **Subject:** | A. Klotsche Failure to Follow Instructions |

Dan,

At approximately 1654hrs I was conducting a post check at the Law School, when I entered the building Officer Hebron was seated at the desk and Officer Klotsche was sitting in a chair next the desk entrance with his cell phone displayed. Officer Klotsche noted my arrival and spoke but remained seated, I then asked who was conducting the break. Neither Officer responded to the question and then I noted that Officer Hebron was behind the desk and observed in the log book that Officer Hebron signed in as the break relief officer. I then instructed Officer Klotsche to leave that post, which he did immediately.

Officer Klotsche along with all the second shift bike officers have been instructed on occasions not to cluster together and be on the same post at the same time. I myself and Rich have issued this instruction to Officer Klotsche, it is apparent that is Officer has failed to comply with me instructions and the instruction of Supervisor R. Nucci.

Sincerely,

Reggie

---

*Reginald F. Chavis*
*Yale Security Supervisor*
*344 College Street*
*New Haven, CT 06511*
*Office (203) 436-4266*
*Cell (203)823-8613*

1

10

# Yale University

University Security Programs
79 Howe St.
New Haven, Ct. 06520-8235
Telephone: 203-436-4393

TO:        Andrew Klotsche, Security Officer

FROM:      Reginald F Chavis

DATE:      August 25, 2011

RE:        Verbal Warning for Performance Issues

You are being issued a Verbal Warning for Performance Issues which occurred on August 15, 2011. On that date at approximately 4:54pm I observed you at the Law School Security desk sitting near Security Officer Charles Hebron Jr. On December 8, 2010 Supervisor Nucci counseled you not to congregate with fellow officers. On April 26, 2011 Assistant Director Daniel Killen counseled you not to congregate with fellow officers.

During an investigatory meeting with you in the presence of Supervisor R. Nucci and Union Representative Michael Rubino, you admitted to accompanying Officer Hebron to the Law School. You indicated that Officer Hebron's portable radio battery was dying so you felt it necessary, for safety reasons, to accompany him to his relief post. However, when I entered the Law School you were sitting in a chair and looking at your cell phone. While I disagree that your presence was needed to walk with Officer Hebron, you should have notified me of what was occurring and then immediately left once Officer Hebron arrived at the building. Instead you went inside, sat down, and congregated in direct violation of two previous orders from management.

By this Verbal Warning, you are given an opportunity to improve your conduct. Failure to demonstrate significant, immediate and sustained improvement in your performance will result in further disciplinary action, up to and including termination of your employment with Yale University.

11

# Yale University

*University Security Programs*
*79 Howe St.*
*New Haven, Ct. 06520-8235*
*Telephone: 203-436-4393*

TO:        File

FROM:    Daniel F. Killen, Assistant Director

DATE:    August 31, 2011

RE:        Counseling of Bike Officers [1]          , Klotsche, and

On August 31, 2011 I counseled bike officers,          , Klotsche and          on the proper wearing of the bicycle uniform and safety gear.  I have had individual conversations with these individuals previous to this date and instructed them, on separated occasions to latch their bike helmets onto their heads while riding the bike.  I had observed each of them, separately, either not wearing the helmet or having the helmet unsnapped as they rode.

On this date I instructed each of them to wear the equipment provided and to wear it properly.  They were told that future instances would result in discipline.  Each indicated that they understood.

12

# Yale University

University Security Programs
P.O. Box 208006
Quad I
100 Church St South
New Haven, Connecticut

Telephone: 203-436-4393

To:            Andrew Klotsche
From:          Reginald F. Chavis
Date:          September 7, 2011
Subject:       Verbal Warning

As a follow-up to our conversation on August 15, 2011, this memo is a Verbal Warning for poor performance in your position as a Security Officer in the Yale University Security Department.

On August 15, 2011 at approximately 4:54 PM, I observed you at the Law School Security desk sitting near Security Officer Charles Hebron. During this time, you should have been actively checking the facilities within your coverage zone. Your actions detracted from your duties, which include interaction with customers and to serve as a uniformed deterrent to unauthorized activity in and around University property. Management has had several conversations with you in the past regarding the importance of remaining visible, actively patrolling your assigned area and not congregating with fellow Officers during your shift.

By this Verbal Warning, I am giving you another opportunity to improve. Failure to show significant, immediate, and sustained improvement will lead to further disciplinary action, up to and including termination of your employment with Yale University.

cc: Personnel File
     Kristen Albis

13

**illen, Daniel**

| | |
|---|---|
| **From:** | Chavis, Reginald |
| **Sent:** | Saturday, September 10, 2011 8:58 PM |
| **To:** | Killen, Daniel |
| **Subject:** | A. Klotsche Verbal Warning |

Dan,

I issued Officer Klotsche the verbal warning at 1812hrs in the break room of 79 Howe St., I asked Officer Klotsche if he required the presents of a union representative before I issued him the verbal warning. Officer Klotsche declined union representation, Officer Klotsche was very receptive and received the warning well, a copy of the verbal warning was given to him at the conclusion of the meet.

Reggie