UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW KLOTSCHE | : | |
| Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:13CV955 (CSH) |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
| Defendants | : | MAY 29, 2014 |

### AFFIDAVIT OF COLLEEN DAVIS

I, Colleen Davis, being duly sworn, depose and say that:

1.     I am over the age of eighteen years and believe in the obligation of an oath.  I make this affidavit of my personal knowledge and in support of Yale University's Motion for Summary Judgment.

2.     I am employed as an Associate at Donahue, Durham & Noonan, P.C. and have assisted in the defense of Yale University in the above-captioned matter.

3.     Attached hereto as Exhibit A are accurate copies of portions of the transcript of the plaintiff's April 9, 2014 deposition.

Dated at Guilford, Connecticut this 29th day of May, 2014.

_____
Colleen Davis

STATE OF CONNECTICUT          )
                             ) ss. Guilford
COUNTY OF NEW HAVEN           )


Subscribed and sworn to before me this 29th day of May, 2014.


_____
Notary Public


MAURA G. BLACK
NOTARY PUBLIC
MY COMMISSION EXPIRES : 12/31/2018

## **CERTIFICATION**

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

_/s/_

Patrick M. Noonan

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL ACTION NO.: 3:13CV955(CSH)

— — — — — — — — — — — — — — — —X
ANDREW KLOTSCHE,                    :
                    Plaintiff      :
                                   :
VS                                 :
                                   :
YALE UNIVERSITY, ET AL,            :
                    Defendants     :
— — — — — — — — — — — — — — — —X

Deposition of ANDREW KLOTSCHE taken at the
Law Offices of John R. Williams & Associates,
51 Elm Street, Suite 409, New Haven,
Connecticut, before Audra Quinn, RPR,
Licensed Shorthand Reporter #106, and Notary
Public, in and for the State of Connecticut
on April 9, 2014, at 11:40 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
 PROFESSIONAL SHORTHAND REPORTERS
 117 RANDI DRIVE, MADISON CT 06443
 (203)245-9583      (800)839-6867
        FAX (203)245-2760

HARTFORD       NEW HAVEN       STAMFORD

1      A      Yes.

2      Q      Now, have you ever been disciplined other

3  than the incident that gave rise to this lawsuit?

4      A      I received a verbal warning approximately a

5  year and a half prior.

6      Q      And so that would have been what, sometime in

7  2010 or so?

8      A      It would have been -- I'm sorry, I can't

9  recall.  I believe it was in August, maybe 2011.  I'm

10  not sure.  I'm not exactly a hundred percent.

11      Q      All right.  What was the verbal warning

12  about?

13      A      To be completely honest, I'm not a

14  hundred percent sure.  It was pretty vague.

15      Q      Do you remember anything about it at all?

16      A      I can tell you how the incident happened.

17      Q      Okay.

18      A      My partner -- I was on the bike patrol unit

19  at the time.  My partner's radio had died, and we were

20  about to cover a break at the law school.

21      Q      What do you mean a break?

22      A      A break, there's an officer stationed in the

23  law school and that post needs to be manned, so the

24  officer is entitled to a break.  So when an officer is

25  on a post like that on a central campus, the bike units

DEL VECCHIO REPORTING
(203) 245-9583

11

1   more often than not are the ones that go ahead and

2   provide the breaks for them.  So we were walking over

3   to provide a break or I was walking my partner over

4   there because his radio had died and just for emergency

5   purposes in case something happened to him and he

6   needed to get a hold of the dispatch or anything along

7   those lines.  We had just entered the building.  The

8   officer had left the post, and he had sat down in the

9   officer who was leaving their position and placed his

10  radio in the charger.  I received a text from my wife

11  and I had sat down to take a look at it, and at that

12  time the manager had -- Reginald Chavis had walked in

13  and saw the both of us together, and since I was the

14  one not covering the break, I was the one that was

15  disciplined.

16       Q     And so you were disciplined for being at the

17  law school when you should have been covering another

18  area?

19       A     Yes.

20       Q     Because your partner should have covered the

21  law school?

22       A     Yes.

23       Q     And did you agree with the discipline, that

24  it was appropriate to discipline you because you were

25  in an area that you weren't supposed to be?

12

1      A      No, I do not agree with that.

2      Q      Did you think you were supposed to be in the

3   law school with your partner together while he was

4   covering the break?

5      A      I was in the law school with him for

6   approximately one minute, so I had not gotten a chance

7   to really leave the post yet.  The incident is recorded

8   on camera, too, if anyone needs to go ahead and take a

9   look at it.

10     Q      Were you supposed to be in the law school at

11  all at that time?

12     A      No, I wasn't.

13     Q      So you agree --

14     A      I didn't -- I wasn't supposed to be in the

15  law school, but because of the nature of the post on

16  the bike, there's nothing saying that I wasn't supposed

17  to be in there as well.

18     Q      But there was no need to have two of you

19  covering for the one person who was going on break?

20     A      I was not going to cover the break.

21     Q      And therefore, you didn't need to be in the

22  law school at all.  Is that a fair statement?

23     A      Mildly fair.

24     Q      Well, you didn't need to be in the law

25  school; correct?

1     A    No, I didn't need to be in the law school,

2  but I had not been in the law school long enough to say

3  that I was covering the break with my partner.

4     Q    Understood, but from the university's point

5  of view, if they want people out on the street visible

6  for security presence, you can understand why they

7  would have preferred having you on the street?

8     A    I would have -- yes, I can understand that.

9  I was not really given the chance to get back to resume

10  a patrol.

11     Q    Okay.  If you had chosen, you could have let

12  your partner go to the law school by himself?

13     A    I could have.

14     Q    In retrospect can you see where that would

15  have been preferable so that your area would be covered

16  while he was going off to cover the break at the law

17  school?

18     A    Things happen in transit, you know,

19  unforeseen things, so I felt for the safety of my

20  partner that at least someone should be able to have

21  immediate contact with our dispatch center should an

22  incident arise where his physical safety or another

23  person's physical safety was in jeopardy.

24     Q    And then how would that be managed once he

25  was in the law school covering that post?

1       A     It would not have been managed, but like I

2    said previously, I had not really been given the chance

3    to really leave.

4       Q     So once he got to the law school, he was

5    going to be with a radio that --

6       A     Yes, he would have been able to charge his

7    radio.

8       Q     All right.  So if someone were to say that

9    you had never been disciplined prior to February of

10   2013, that would not be accurate, would it?

11      A     Yes.

12      Q     Let me re-ask it because it was a double

13   negative.

14                   MS. McLEAN:  Would it be accurate?

15                   MR. NOONAN:  Rose, if you don't mind,

16              let me ask the question.

17   BY MR. NOONAN:

18      Q     Can you tell me, would it be accurate to say

19   that you had never been disciplined prior to February

20   of 2013?

21      A     I received a verbal warning.

22      Q     And that's discipline; correct?

23      A     I mean --

24                   MS. McLEAN:  I'm going to object to the

25              form.

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1              MR. NOONAN:  You can object to the form.

2   BY MR. NOONAN:

3        Q    Don't look to your lawyer for answers.  You

4   need to answer yourself.  She can't answer the question

5   for you.

6              Would you agree that a verbal warning is

7   discipline?

8        A    Yes, I would agree.

9        Q    And would you agree that you had been

10  disciplined prior to February of 2013?

11       A    Yes.

12       Q    And prior to the filing of the complaint in

13  this case, did you see the complaint?

14       A    Which one?

15       Q    The one filed in the district court.

16       A    Yes, I have seen this one.

17       Q    And did you see it before your lawyers filed

18  it?

19       A    Yes.

20       Q    And did you approve it?

21       A    Yes.

22       Q    Paragraph seven of that complaint which is

23  dated August 12, 2013, states as follows, and I'm

24  quoting it:  "On February 21, 2013, the plaintiff, who

25  had not previously been disciplined by the employer in

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    any manner, was given a one-day unpaid suspension for

2    not being assigned at his post."

3            Would you agree that that sentence is not

4    accurate because you had in fact been previously

5    disciplined?

6            MS. McLEAN:  I'm going to object to the

7            form.

8    BY MR. NOONAN:

9        Q    You can answer the question.

10       A    Yes, I would say that is inaccurate.

11       Q    And did you notice the inaccuracy when you

12   reviewed it prior to being filed in the district court?

13       A    No, I did not.

14       Q    Now, had you had any other type of counseling

15   or discipline prior to February of 2013 besides the

16   verbal warning that you just mentioned?

17       A    Yes, when I was a casual employee.

18       Q    And what was that about?

19       A    That was also a counseling.

20       Q    And what were you counseled for at that time?

21       A    Being in possession of keys.

22       Q    And what kind of keys were you in possession

23   of?

24       A    I was in possession of the Pierson master

25   set.

1        Q     And tell us what that is.

2        A     That is the residential college master set

3   for lockouts, for fire panels, for mechanical doors.

4        Q     And is there a rule against security officers

5   being in possession of those keys except when they

6   specifically need them?

7        A     Yes.

8        Q     And who gave you a counseling on that?

9        A     I believe it was James Smith, former --

10       Q     James Smith?

11       A     Yes.

12       Q     He's one of the supervisors?

13       A     Former.

14       Q     He's no longer with Yale?

15       A     No, he's not.

16       Q     And roughly when was that that you received

17   that counseling?

18       A     2009 I believe.

19       Q     And being in possession of keys was one of

20   the things for which you were disciplined in February

21   of 2013.  Is that right?

22       A     Yes.

23       Q     Was it true, by the way, in 2009 that you

24   were in possession of the keys, the master set keys

25   when you were not supposed to have them under the
                          DEL VECCHIO REPORTING
                             (203) 245-9583

1    rules?

2        A    Yes.

3        Q    And were you disciplined or counseled at any

4    other time?

5        A    Not that I can recall.

6        Q    Do you remember an incident where you were

7    spoken to by your supervisors in December of 2010 for

8    reading your textbook and writing notes while you were

9    on duty?

10       A    Now that I remember, yes.

11       Q    So that was a third time when you had some

12   type of negative interaction with regard to your

13   performance?

14       A    Yes.

15       Q    And what happened then?

16       A    Nothing.  I didn't receive a counseling.  I

17   didn't receive a written, verbal or any counseling,

18   coaching.

19       Q    But you were told about your performance;

20   correct?

21       A    Yes.

22       Q    All right.  What happened that caused --

23   first of all, who was it that talked with you at that

24   point?

25       A    Richard Nucci.

19

1      Q     And what rules had you violated at that
2   point?
3      A     Taking a break without receiving permission
4   from base.
5      Q     And so basically you were studying when you
6   should have been working.  Is that right?
7      A     I had taken a break without letting everyone
8   know that I was on a break.
9      Q     And how long -- and you were studying?  Was
10  that for your EMT training?
11     A     Yes, it was.
12     Q     How long were you studying that day before
13  Mr. Nucci found you?
14     A     I can't recall with too much accuracy.
15     Q     What is your best estimate?
16     A     Approximately 15, 20 minutes.
17     Q     And do you remember what happened when
18  Mr. Nucci found you?
19     A     He told me to get up.
20     Q     And you were in the bike vault at that time;
21  right?
22     A     Yes.
23     Q     So that's an interior space?
24     A     Yes, it is.
25     Q     And you were supposed to be out on the campus

1    on your bike patrol.  Is that right?

2        A    I had not called out on break, so I had taken

3    one without calling one out.

4        Q    So you should have been out on the bike

5    patrol?

6        A    Or I should have called out on a break.

7        Q    In other words, if you're going to study, you

8    should call out and take a break?

9        A    Yes.

10       Q    So that they know, first of all, that you're

11   taking a break, and if needed, someone else covers your

12   spot; correct?

13       A    Yes.

14       Q    So at the time of this event in December of

15   2010, you were studying at a time you should have been

16   working?

17       A    I should have called out a break.

18       Q    But if you didn't call out a break, you

19   should have been working and not studying; correct?

20       A    Yes.

21       Q    And do you remember Mr. Nucci asking you why

22   you were sitting there reading and writing notes when

23   you should have been out in the field?

24       A    No, I do not recall.

25       Q    Do you remember telling him that your

23

1  Q  And what is your relationship with him?

2  A  He's now a manager on first shift.  We have

3 no relationship.

4  Q  I mean when you have seen him, do you get

5 along okay with him?

6  A  I haven't seen him in months.  The last time

7 I had seen Mr. Nucci was right after this incident in

8 question that we're talking about occurred.

9  Q  And how was your relationship with him up to

10 that point?

11  A  It was a working relationship.

12  Q  In other words, you didn't have the feeling

13 that he was out to get you or anything?

14  A  I didn't, no.  I did not necessarily feel

15 that.

16  Q  Were there any other times that you remember

17 being counseled or spoken to or disciplined prior to

18 February of 2013?

19  A  No, I do not.

20  Q  Now, would it be fair to say that the

21 discipline that you got in February of 2013 was for the

22 same type of conduct for which you had been disciplined

23 for in the past?

24  A  Can you --

25  Q  Sure.  You were disciplined in February of

1    2013 for working on your studies while you should have

2    been working for Yale and for possession of keys which

3    you should not have possessed.   Is that right?

4         A     Yes.

5         Q     And those two things were things for which

6    you had been counseled and disciplined prior to

7    February of 2013.   Is that right?

8         A     According to the union contract, discipline

9    over 18 months cannot be used in --

10        Q     I wasn't asking about the union contract.

11   I'm just asking about your conduct.   You had been

12   disciplined and counseled for both of the infractions

13   for which you were disciplined in February of 2013

14   prior to that event; correct?

15        A     Yes.   Yes, but it was much later than the

16   18-month limit as prescribed by the union contract.

17        Q     But in answer to my question, it is true that

18   the conduct for which you were disciplined in February

19   of 2013 was conduct for which you had been disciplined

20   in the past?

21              MS. McLEAN:   I'm going to object to the

22              form.

23   BY MR. NOONAN:

24        Q     Is that correct?   You can answer.

25        A     Yes.

DEL VECCHIO REPORTING
(203) 245-9583

1      Q     And you knew as of January of 2013 when those

2   infractions occurred that both of those things were

3   contrary to the university rules.   Is that correct?

4      A     Yes.

5      Q     And you agree that you in fact committed

6   those violations in January of 2013.   Is that right?

7      A     Yes.

8      Q     Now, do you recall what happened on

9   January 9, 2013?

10      A     This is the incident --

11      Q     The first incident that occurred in January

12   of 2013.

13      A     All right.   I got into my post.   I'm not a

14   hundred percent on what time I got to the post.   I had

15   conducted an exterior patrol of my area, the Branford

16   Residential College and Jonathan Edwards Residential

17   College.   I had also conducted an interior patrol of

18   these colleges, and again, I had taken a break without

19   calling one out, and I had sat down in the custodial

20   break room in Branford and I began to study.

21      Q     And how long did that study break take?

22      A     Approximately 20 minutes, 20, 25 minutes.

23      Q     Your supervisors wrote a report indicating

24   that you were there for more than an hour.

25      A     No, that is not true.

1      Q     And 20 to 25 minutes would be more than you

2   should have been taking a break for.  Is that right?

3      A     No.  We have a -- we are allowed to take two

4   15-minute breaks and a 30-minute break.

5      Q     And how many breaks had you taken on --

6      A     That was my first one.

7      Q     And when you take a break without calling it

8   in, you can then take another break later and call it

9   in; correct?

10      A     Well, yeah.  I mean yes.

11      Q     So in other words, when you say you took a

12   break, you were really violating the rules if you took

13   a break without calling it in?

14      A     This was a -- not requesting a break has been

15   a very common practice amongst the entirety of the

16   security department prior --

17      Q     Let me just cut you off.  Can you just answer

18   my question?  Is it true that taking a break without

19   calling it in is a violation of the rules?

20      A     Yes, but this is --

21      Q     I just wanted to get that on the table.  And

22   that was something that you had been disciplined for,

23   for the very same conduct in the past prior to January

24   of 2013; correct?

25      A     Yes.  This was also a practice that had

                    DEL VECCHIO REPORTING
                       (203) 245-9583

27

1   been --

2       Q    I'm going to get to that later, but just

3   answer my questions now.  By the way, Rose will be able

4   to ask you questions that she wants answered.  So right

5   now just answer the questions I'm asking.

6           In January of 2013 you were seen twice

7   studying while you were supposed to be on duty;

8   correct?

9       A    January, no.

10      Q    What happened on January 11?

11      A    After my initial conversation with the

12  supervisors, Reginald Chavis and Richard Nucci, I was

13  left with the impression that I was no longer to be in

14  that room as well.  So I had gone ahead and I had taken

15  my bag with my lunch, my radio charger, extension cord,

16  tools for me to do my job, and I was looking for

17  another place to secure my belongings, and he had seen

18  me carrying my belongings.

19      Q    Let me go back to January 9th.  Just to

20  orient you, that's the first time in January that you

21  were disciplined or approached by your supervisors

22  about your conduct.  Who came at that time?

23      A    Both supervisors, Reginald Chavis and Richard

24  Nucci.

25      Q    And do you recall what time of day it was?
                DEL VECCHIO REPORTING
                    (203) 245-9583

28

1        A      No, I do not.

2        Q      Their report indicates that it was at 19:30

3   hours which I guess would be about 7:30 at night.   Does

4   that sound about right?

5        A      About right, yes.

6        Q      And do you remember that at the time they saw

7   you when you were studying, you had your jacket off,

8   your duty belt off, and the radio sitting on the desk

9   that you were at or the table that you were at?

10       A      Yes.

11       Q      Do you remember telling them -- well, do you

12  remember them telling you that you should not have been

13  taking a break at that point in time because you were

14  only two hours into the shift and you had not called in

15  for a break?

16       A      I do not remember them telling me I should

17  not have taken a break at that time, no.

18       Q      Well, it would be true, though, that you

19  shouldn't have taken a break if you didn't call in for

20  it?

21       A      It's arguable.   Taking a break without

22  calling it in, yes, I should not have done it, but the

23  time period, whether it's at 7:30 is arguable.

24       Q      And do you remember you saying in response to

25  that that it didn't matter that you were taking a break

DEL VECCHIO REPORTING
(203) 245-9583

1   because you had already conducted all of your tours?

2       A    I do not recall that.

3       Q    Well, what do you recall of that interaction

4   with the two supervisors on January 9th?

5       A    My supervisors had told me to get out, told

6   me to get out of the room and to place my belongings in

7   my vehicle.  That's what I recall.

8       Q    And do you remember any other discussion

9   other than that?

10      A    No, I do not.

11      Q    Do you remember Mr. Chavis telling you that a

12  part of your job was to be visible and that it was not

13  sufficient to simply conduct all your tours?

14      A    No, I do not recall that.

15      Q    But that would be true, right, that your job

16  was to be visible?

17      A    Yes, it would be true.

18      Q    So it isn't a sufficient response to say I've

19  conducted all my tours, I don't need to be out on the

20  street any longer?

21      A    No, it would not, and I do not recall making

22  such statements.

23      Q    Do you remember Mr. Chavis reminding you that

24  he had stated in role call shortly prior to this event

25  that you should be putting your items in the vehicle

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1   and you should remain visible throughout the shift?  Do

2   you remember that being discussed?

3        A    Can you repeat the question, please?

4        Q    Yes.  Do you remember Mr. Chavis shortly

5   before January 9th of 2013 had stated that you should

6   be putting your personal items in the vehicle and you

7   should remain visible throughout the shift?

8        A    I do not recall that.

9        Q    But that was something you were aware of in

10  any event?

11       A    No.

12       Q    Well, you were aware you needed to be visible

13  throughout the shift?

14       A    I was aware of that, but whether my

15  belongings had to be in my personal vehicle, no.  It's

16  still common practice to carry a backpack of personal

17  belongings, things you're going to use during the

18  shift.  It has been and continues to be a practice.

19       Q    And do you remember talking with Mr. Chavis

20  later during the shift on January 9, 2013, and telling

21  him that you were not concerned about being written up

22  because the worst that would happen would be a

23  counseling or written warning and you would not be

24  getting a suspension without pay or being fired?

25       A    I did have a conversation.  That quote is
                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    taken -- it was taken out of context.  My initial

2    reason for contacting him was not the incident that had

3    just previously happened but an incident that happened

4    a little while before, and it was regarding a way that

5    he had spoken to me over the radio.

6         Q    And in the course of that conversation, you

7    told him that you weren't worried about being written

8    up because the worst that would happen would be a

9    counseling and you wouldn't get a suspension without

10   pay?

11        A    That was a part of the conversation, but

12   again, it was taken out of -- that was deliberately --

13        Q    You're referring to a different incident?

14        A    It was deliberately taken out of context.

15        Q    But that comment that you were not concerned

16   about being written up because the worst that would

17   happen would be a counseling and you wouldn't get a

18   suspension without --

19        A    I did say that.

20        Q    And that was said the same evening -- let me

21   get the question out.

22             Would you agree that that was said the same

23   evening that you were found to be studying while you

24   should have been attending to your duties?

25        A    Yes, it was the same evening.  Again, it was

1    taken out of context.

2         Q    When was the next time after January 9 that

3    you had any input from your supervisors about problems

4    with you in the workplace?

5         A    Explicitly was in this past October.

6         Q    Before I get to that, I'm talking about after

7    January 9th did you have another interaction where

8    supervisors approached you and suggested that you were

9    in violation of any of the rules?

10        A    I do not remember that.

11        Q    How about January 11th?

12        A    Oh, that's the -- okay.  If that's the -- I'm

13    sorry.  My understanding was I was lumping the two

14    incidents together.

15        Q    No problem.  So what happened January 11th?

16   Was it both supervisors?

17        A    No.  That was just Richard Nucci.

18        Q    And what happened that day?

19        A    I had done my exterior patrols again.  I had

20   initially placed my bag inside the key track which is

21   an area where we have keys.  This one in particular was

22   residing in the Jonathan Edwards Residential College.

23        Q    And what is a key track?

24        A    A key track, that's our key management

25   system, and I had left it in there.  I did not feel
                     DEL VECCHIO REPORTING
                        (203) 245-9583

1    comfortable leaving the bag in there because it was

2    open and it was accessible to students, to master's

3    aides, to the master, to pretty much anybody who walked

4    into Jonathan Edwards.  Since I wasn't comfortable

5    leaving it in there, I had picked it up and I was

6    looking for a spot to more securely store my belongings

7    when Richard Nucci had seen me in the basement of my

8    assigned patrol area.

9        Q    I thought Richard Nucci, I thought he was the

10   one that you hadn't seen since 2010 when he counseled

11   you?

12       A    No.  This was -- I haven't seen him since the

13   2013 incidents, I'm sorry for the clarification.

14       Q    So when was the last time you saw Mr. Nucci

15   on the job?  Was that January of 2013?

16       A    Approximately a year ago.

17       Q    All right.  I interrupted you.  I'm sorry.

18   So you put your bag in the key track at J.E., and then

19   you went back to retrieve it and Mr. Nucci noticed you

20   were there, and then what happened?

21       A    He had suggested one room to put my bag, my

22   belongings in which was an admin storage area.  This

23   was protected by -- the door was secured with a card

24   reader.  I did not feel comfortable leaving it in that

25   room because I had no idea who has access to that room.
                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    I had looked for other areas that would not have been

2    as easily accessible or as frequently used, a couple

3    different mechanical rooms, electrical closets, things

4    like that.

5         Q    Okay.  So what were you doing on

6    January 11th?

7         A    I'm not a hundred percent sure what

8    violations they're trying to cite.

9         Q    Well, what was it that you were doing when

10   you were approached by Mr. Nucci?

11        A    I was looking for a secure area to store my

12   belongings.

13        Q    Do you remember telling him that you were

14   looking for a place to leave your lunch?

15        A    Yes.

16        Q    And this was how far into your shift?

17        A    Approximately an hour and a half, two hours

18   into the shift I believe.

19        Q    And you had left it somewhere else, your

20   lunch, meaning your entire backpack or just the lunch?

21        A    My entire backpack.

22        Q    And you had initially left it somewhere else?

23        A    Yes.

24        Q    You initially left it in the key track, but

25   then decided to change the location?

1     A    Yes.

2     Q    And so you were in an area that you weren't

3  supposed to be patrolling?

4     A    No.  I was supposed to be there.  My assigned

5  patrol area was Jonathan Edwards and Branford College.

6  I was in the interior of the building which is part of

7  my duties.

8     Q    And at that time you were found to have

9  possession of the keys again?

10    A    Yes.

11    Q    And that was something that under the rules

12  you were not supposed to have; correct?

13    A    Yes.  That was not specifically mentioned the

14  previous incident on January 9th.

15    Q    But it had been mentioned to you in the past?

16    A    Yes.

17    Q    And you knew from the rules anyway that you

18  weren't supposed to have the keys; correct?

19    A    Yes.

20    Q    Do you remember that Mr. Nucci said that you

21  should go out to the street and provide a visible

22  uniform security presence within the colleges?

23    A    No, I do not recall that.

24    Q    And do you remember him telling you that you

25  needed to remain visible and conduct exterior tours of

1   the area for the balance of your shift?

2       A    No.

3       Q    Do you remember anything else about your

4   discussion with Mr. Nucci on January 11, 2013, other

5   than what you've said?

6       A    No, I do not.

7       Q    And you in fact were disciplined for the

8   incidents of January 9 and January 11, 2013.  Is that

9   correct?

10      A    Yes.

11      Q    Was there an investigation that was done into

12  that?

13      A    I don't know how in depth it was.  I know I

14  was interviewed, but I don't know what the management

15  investigation would include.

16      Q    But in any event, there was an investigatory

17  interview with you?

18      A    Yes.

19      Q    And who was present during that?

20      A    It was Dan Killen, the director of security

21  operations; our HR generalist, Allison, I'm sorry, I

22  don't remember her last name.

23      Q    Is that Leibenhaut?

24      A    Yes.  I believe at the time her last name was

25  Maloney.

37

```
 1              And myself and the shift representative, Joe
 2   Ryan.
 3        Q    So he was the union representative?
 4        A    Yes.
 5        Q    And what happened during that interview?
 6        A    We had gone over the events of that day.  It
 7   was pretty much it.  I'm not sure how specific.
 8        Q    Well, what do you remember telling Mr. Killen
 9   about the reasons why you were inside the building on
10   January 9, 2013?
11        A    I was taking a break.  I was trying to get
12   warm.
13        Q    And do you remember when you initially told
14   him why you were inside the building, you told him you
15   were going in the building to warm up?
16        A    Yes, I do.
17        Q    And do you remember, did you then volunteer
18   to him that you actually were studying at that time?
19        A    Yes, while I was -- while in the process of
20   warming up, you know, I did study.
21        Q    Right, you did.  What I'm asking is did you
22   tell Mr. Killen that when he asked you what you were
23   doing in the building or did you simply tell him you
24   were there to warm up?
25        A    Yes, I told him.
```

1    Q    His report indicates that you said you were

2    in the building to warm up, and it was only after he

3    mentioned that you were observed with an open book that

4    you mentioned that you were also reading.

5    A    Yes.

6    Q    So is it true that the way the conversation

7    went is he asked you why you were in the building, and

8    you said it was to warm up?

9    A    Yes.

10   Q    And then he said, well, what about the

11   reports I have indicating that you were in there

12   reading?

13   A    Yes.

14   Q    And then you answered yes?

15   A    Yes.

16   Q    All right.  So when he first asked you what

17   you were doing in the building, you didn't tell him you

18   were there to study?  Fair statement?

19   A    It's still initially to warm up.  While I

20   was --

21   Q    I'm just trying to make sure I understand how

22   the conversation went.  I just want to know what

23   happened.  I'm not saying it's a good thing or bad

24   thing, but is it true that when Mr. Killen asked you

25   what you were doing in the building, you simply told

DEL VECCHIO REPORTING
(203) 245-9583

1  him you were there to warm up.  Is that right so far?

2       A     Yes.

3       Q     Then he said to you, well, gee, I hear that

4  you were there having a book open, was that true, and

5  you admitted then you were there to study as well;

6  correct?

7       A     Yes.

8       Q     And then he asked you whether you had a note

9  pad open in front of him, and you finally agreed to

10  that as well; correct?

11       A     Yes.

12       Q     And what explanation did you give for having

13  your coat off if you were in the building to warm up?

14       A     The reason being --

15       Q     No.  What did you tell Mr. Killen that night,

16  do you recall?

17       A     I don't recall what I told him.

18       Q     What reason would you give now?

19       A     The reason being is it's January.  You're

20  outside.  It may take a minute to slightly longer to

21  warm up after taking your coat off, but the risk of

22  perspiring and sweating would be decreased than you

23  would normally have if you kept a coat on while you

24  were inside the building.  I took it off because --

25  basically I took it off because I didn't want to sweat.

1   I didn't want to sweat.  I didn't want to make myself

2   more susceptible to the cold and even going ahead to

3   prevent a further loss of time incident with me taking

4   a sick day for any possible complications from being --

5        Q    How about taking your radio belt off?  Was

6   that also to reduce the prospects of sweating?

7        A    No.  My radio holster, which is the container

8   that the radio was in, it didn't fit my radio.  It

9   would -- there was a lot of give in there.  So if I sat

10  in the wrong way, I would inadvertently push the talk

11  button which would key up the mic and cause an open mic

12  and open up the airwaves.

13       Q    So you were --

14       A    I took it off to avoid that.

15       Q    So the break to warm up wasn't going to be so

16  brief that you would stand up during the entire time?

17       A    No.  I'm on my feet most of the night, so I

18  would take -- you know, typically when I call a break,

19  sit down as well.

20       Q    And it's your recollection that the break was

21  only about 25 minutes?

22       A    Yes.

23       Q    Did you time it?

24       A    No, I did not time it.

25       Q    Do you know whether your supervisors timed

1    their events that night?

2         A    I do not know if they timed it as well.

3         Q    So if you didn't time it, it could have been

4    more than 25 minutes.  Would you agree with that?

5         A    It could have also been less.

6         Q    But would you agree that it also could have

7    been more than 25 minutes?

8         A    Okay, I will agree with that.

9         Q    During the investigatory interview that you

10   had with Mr. Killen, did he talk with you about your

11   possession of the sub master keys?

12        A    Yes, we did discuss that.

13        Q    And did you agree with him that you had those

14   keys at a time when you should not have had them?

15        A    Yes.

16        Q    And do you remember during this investigatory

17   interview Mr. Killen asking you about the

18   January 11th incident?

19        A    Yes.

20        Q    And what do you remember telling him about

21   that?

22        A    That was also what I just stated.  I was

23   looking for a place to place my belongings.

24        Q    And that was an hour and a half or two into

25   your shift?

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1     A    Yes.  To reiterate, my belongings had moved

2    from one area to another.  I initially put them in one

3    area, didn't feel comfortable, picked them up to find

4    another spot to place my belongings.

5     Q    Do you remember telling that to Mr. Killen

6    during the investigatory interview?

7     A    Yes.

8     Q    And do you remember telling Mr. Killen that

9    you thought that Supervisor Nucci was spying on you on

10   January 11th?

11    A    Yes.

12    Q    And would you agree that since you had

13   violated the rules on January 9th, it would be

14   important for the supervisors to check up on you

15   thereafter and make sure you understood your rules and

16   were complying with them?

17    A    Yes, I would agree to that.

18    Q    So in retrospect you wouldn't really think

19   that the supervisors were spying on you when they were

20   checking up on you in the workplace, would you?

21    A    I had mentioned that I had in a way sort of

22   retracted that statement, you know, I'm sorry for

23   saying that during the grievance process.

24    Q    So at least as of the present time, you would

25   agree that Mr. Nucci was actually doing what he should

43

```
 1    have done which was to make sure you were following the

 2    rules?

 3         A    Yes.

 4         Q    And turns out you weren't; correct?

 5         A    I was following the rules.

 6         Q    Well, except that you had the keys that you

 7    weren't supposed to have?

 8         A    Okay, yes.

 9         Q    So on two nights, on January 9th you

10    weren't following the rules and on January 11th you

11    weren't following the rules; correct?

12         A    Yes.

13         Q    And both of those, the rule violations were

14    things that you had already been counseled about in the

15    past; correct?

16         A    Yes.

17         Q    And as a result of those prior incidents, you

18    were then disciplined?

19         A    Yes.

20         Q    And the discipline was a one day suspension?

21         A    Yes.

22         Q    And what amount of money did you lose because

23    of the one day suspension?

24         A    Approximately $150.

25         Q    And you pursued a grievance over that?
```

1    I was looking for.  If that meant, you know, accepting

2    a verbal warning in place of, I would have been willing

3    to accept that.

4         Q    So you would have accepted a verbal warning?

5         A    Yes, I would have accepted a verbal warning.

6         Q    And the reason you would have accepted a

7    verbal warning is because you had on two different

8    occasions been found to be in violation of the rules;

9    correct?

10        A    Yes.

11        Q    You simply thought the unpaid suspension for

12   a day was too harsh?

13        A    Yes.

14        Q    So despite the fact -- strike that.

15             The complaint that was filed in district

16   court says that the union filed the grievance too late.

17        A    Yes.

18        Q    But despite that fact, Yale allowed you to

19   proceed with the grievance; correct?

20        A    Yes.

21        Q    Because they held a hearing and heard your

22   grievance; right?

23        A    Yes.  I mean they heard the grievance.  I'm

24   not exactly sure if they seriously entertained it

25   because in response it was saying that the grievance

1    was not turned in in a timely manner.

2         Q      Right.  They gave you two reasons for

3    declining the grievance.  One was that after hearing

4    the merits of the grievance, they decided that it was

5    not well founded; correct?

6         A      Yes.

7         Q      And number two, they decided the grievance

8    was late?

9         A      Yes, that's what they decided.

10        Q      And you agreed that the grievance was late?

11        A      Not by me.

12        Q      But I mean you agree it was filed late?

13        A      I agree that it was filed late, but not by

14   me.

15        Q      So the university could have simply refused

16   to hear the grievance at all under the rules; correct?

17        A      They could have.

18               MS. McLEAN:   Could we take a short

19               break?

20               MR. NOONAN:   Sure.

21               (THEREUPON, A RECESS WAS TAKEN

22                  FROM 12:45 TO 1:00.)

23   BY MR. NOONAN:

24        Q      So aside from the roughly $150 in lost pay,

25   are you claiming any other damages in this case?

1   would be able to feel comfortable keeping your job;

2   correct?

3        A    No, because they change the rules.  Rules

4   apply differently amongst different officers.

5        Q    All right.  And are you subject to any

6   additional attorney's fees besides the $5,000?  In

7   other words, do you have to pay anything more?

8        A    I don't believe so.  I would have to go ahead

9   and take a look at my retainer agreement.

10       Q    Well, just for your benefit, if you were

11  unaware of it, the complaint has now been amended to

12  eliminate the request for attorney's fees and emotional

13  distress damages so that the only thing left is $150 in

14  this case.

15            Now, you told me about a number of times when

16  you were disciplined or counseled.  You didn't mention

17  a counseling on August 31, 2011, for failure to wear

18  your helmet properly on the bike.  Do you recall

19  getting a counseling for that?

20       A    No, I don't recall that.

21       Q    You don't remember anyone counseling you in

22  the summer of 2011 with regard to proper bike attire?

23       A    Bike attire as in how?

24       Q    The helmet.

25       A.   The helmet?  I was told to buckle up my

52

1   helmet, but I wasn't assuming that that was a

2   counseling or a coaching or anything of the sort.

3         Q     So you were told you needed to keep your

4   helmet buckled, that that was part of the rules;

5   correct?

6         A     No.  I mean I was told to buckle my helmet,

7   but I wasn't --

8         Q     Who told you that?

9         A     I believe it was Dan Killen.

10        Q     He was the director of safety?

11        A     He's the -- no, he's the director of

12   operations.  I didn't even know that that was a hearing

13   or anything like that.  I wasn't offered union

14   representation.

15        Q     I didn't suggest that there was a hearing,

16   but you were instructed that you needed to buckle your

17   helmet; correct?

18        A     Yes, I was.

19        Q     And were you aware prior to that that it was

20   a rule that you keep the helmet buckled for safety

21   reasons?

22        A     That was kind of muddled.

23        Q     Let me just see if you can answer this yes or

24   no.  Were you aware prior to the time when you were

25   counseled by Mr. Killen about buckling your helmet

1   that there was a rule that you should keep them

2   buckled?

3        A     The rule was very muddled because with the --

4   when we were taught to ride the bike, we did not buckle

5   up the helmet because in the event that somebody did

6   want to start an altercation with us that someone would

7   be able to grab the bottom end of the helmet and lead

8   you wherever you wanted to go and in which case it

9   would be better that the helmet would just fly off

10  should a situation like that arise.  So it wasn't --

11  it's not written down.  It's not either way.  It's not

12  written down that we have to keep it buckled and not

13  written down to keep it.

14       Q     Now that you've been told by Mr. Killen that

15  you should keep it buckled, did you keep it buckled?

16       A     I did for the remainder of my time on the

17  bike unit.

18       Q     And I know you were counseled in August of

19  2011 by Mr. Chavis for the incident at the law school

20  where you were seen congregating with another officer

21  instead of being on your patrol.  Is that right?

22       A     Yes.

23       Q     Were you counseled at any other times for

24  congregating with other officers instead of being out

25  on patrol?

```
 1      A     There was another time.  I don't remember the
 2   specific date, but it was the Spring Fling which is a
 3   spring concert that the university puts on for the
 4   students.  The incident, how it happened was --
 5      Q     Which year was that?
 6      A     I'm not sure.  I'm not a hundred percent.  I
 7   know I was on the bike at the time.
 8      Q     And that would be sometime in what, the May
 9   period?
10      A     April, end of April.
11      Q     And was that Mr. Killen that counseled you
12   then?
13      A     I believe so.
14      Q     And it was for congregating with other
15   officers instead of being on your patrol?
16      A     It's not exactly the case.
17      Q     What did he counsel you for?
18      A     That's what he counseled me for, but --
19      Q     That's what I was asking.  Just he counseled
20   you for congregating with fellow officers -- let me get
21   the question out.  Is it true that Mr. Killen counseled
22   you for congregating with fellow officers as opposed to
23   attending to your duties?
24      A     Yes.
25      Q     And that's something that has happened --
```

56

1    Q    But you were told to approve the time sheets?

2    A    Yes, but there's no rule for that.

3    Q    I see.  So unless someone puts it in writing,

4    you think you can ignore what your supervisor tells

5    you?

6    A    I don't think that at all and that's when I

7    started --

8    Q    So is it true that you should be approving

9    your time sheets now?

10    A    And I have been since then, but there is

11    nothing in writing saying that I have to approve my

12    time sheet, and I received a coaching on the policy

13    that is nonexistent even as of today.

14    Q    And in connection with this lawsuit which is

15    limited to the one day suspension, do you think Yale

16    did anything wrong other than to give you a suspension

17    as opposed to a verbal warning?

18    A    Yes.  I believe they enforce the rules

19    unfairly.  Other officers have gone ahead and have done

20    the same things that I've done multiple times.

21    Q    Let's stick to this incident, February 2013.

22    Which other officers are you aware of who have within

23    the same week violated the rules about studying while

24    they should be patrolling and possession of keys they

25    should not have?

```
 1      A      All the officers --

 2      Q      You have to give me names.

 3      A      You can -- I'm pretty sure you can get a duty

 4   roster.

 5      Q      You have to give me names.

 6      A      There are too many to list.

 7      Q      Specific question.  Okay.  Which officers

 8   within a week's time were noticed twice by their

 9   supervisors having been studying or reading while they

10   were supposed to be on the job and in possession of

11   keys they should not have?  That's a very specific set

12   of people.  Who was it?

13      A      With keys, it was the entire --

14      Q      No.  I'm not asking you keys alone.  Which

15   officers over a three-day period were caught twice

16   violating rules relating to both studying or reading

17   while they should have been on the post and possession

18   of keys?

19      A      For carrying keys --

20      Q      Please listen to the question.  I'm asking

21   you a specific question.

22      A      And I'm trying to answer your specific

23   question.

24      Q      I'm not asking you keys alone.  Which

25   officers had violations for both keys and reading while
```

1   on the job when they should have been on a post?

2        A    And I'm trying to answer that.

3        Q    Go ahead.

4        A    For keys, the entire college unit which I'm

5   currently a part of.  That would be --

6        Q    Don't list them.  Let me cut you off.  Did

7   all of those people also have violations for reading on

8   the job --

9        A    For taking breaks without calling it out,

10  yes.

11       Q    Did they have those within a two-day period?

12       A    Yes.

13       Q    Tell me who they were.

14       A    Names would be starting off with Timothy

15  Dwight and Silliman College officer would be Michael

16  Robinson, the Berkeley Calhoun officer which is Eileen

17  Vitale, the Old Campus officer which is Michael Rivera,

18  the Trumbull Saybrook officer, Gregory Teel.

19       Q    Gregory?

20       A    Gregory Teel.

21       Q    How do you spell that?

22       A    T-e-e-l.

23            What day of the week was it?  It would either

24  be -- I'll just mention both of them.  It would be

25  Victor Josephson, Wanda Alicea, George Fusco, William

1   Hewitt, Pete Leonardo, Charlie Hebron.   These would

2   have been --

3        Q     The last one was who?

4        A     Charlie Hebron.

5              They would have both -- all those people

6   would have had keys on them longer than the allotted

7   time and all would have taken breaks without calling

8   them out.

9        Q     And would all of them have been apprehended

10  in both violations within a three-day period?

11       A     They would have been if they had checked,

12  yes.

13       Q     That wasn't what I asked you.   Were all of

14  them apprehended?

15       A     No, I don't know actually.   I don't know

16  whether or not they were caught.

17       Q     So with regard to all of those people, do you

18  know whether any of them were caught in a three-day

19  period both possessing keys they should not have

20  possessed and taking breaks without calling it in?

21       A     No, I do not know whether they have been

22  caught.

23       Q     And do you know whether any of those people

24  were ever disciplined?

25       A     I do not know.

60

1      Q     So when you say that Yale enforced the rules

2  selectively, you actually don't know what Yale did with

3  regard to those officers?

4      A     I have no idea what they did with those

5  officers.

6      Q     And you have no idea whether the violations

7  those officers engaged in were known by management;

8  correct?

9      A     Oh, they were known by management.

10     Q     And who knew?  Let's take them one at a time.

11 Michael Robinson?

12     A     It would have been known by management.

13     Q     Tell me the dates that he violated the rules

14 regarding keys and undeclared breaks in a three-day

15 period?

16     A     It would have --

17     Q     And tell me the supervisor who apprehended

18 him.

19     A     I don't know if the supervisor apprehended

20 him, but this was a common --

21     Q     Sir, that's all I'm asking you.

22     A     I understand.

23     Q     Let me just explain something to you.  In

24 order to make a claim that Yale has selectively

25 enforced the rules, Yale has to know about the

1  violations.  Are you aware of any of the security

2  officers that you've mentioned who you claim violated

3  the rules, are you aware of Yale's management knowing

4  about any of those violations?

5      A    I am not aware if they -- I'm not aware of

6  actions that were taken against them.

7      Q    And you're also unaware of whether or not

8  Yale management was aware of violations of rules by

9  those officers.  Is that a fair statement?

10      A    These were commonplace practices amongst all

11  the officers.

12      Q    Right.  The officers might know a lot of

13  things that management doesn't know.  I'm asking you to

14  list for me which of the officers violated the rules

15  and in which cases where management was aware of them

16  and which managers were aware of the violations of the

17  rules.

18      A    Nucci got hired in 2010.  It would have been

19  since 2010 since he finished his training up until the

20  date that these incidents in January would have

21  occurred.  These were everyday common practices amongst

22  every security officer across the board.

23      Q    I understand that, but did you ever see

24  Mr. Nucci apprehending one of the security officers who

25  was engaged in a rule violation?

1      A     No, I have not seen that.

2      Q     Have you seen any supervisor encountering an

3   officer who was engaged in a rule violation?

4      A     Can you repeat?  I'm going to ask for a

5   little clarification.

6      Q     Sure.  Have you ever seen a Yale manager who

7   apprehended one of the security officers who engaged in

8   one of these rule violations?

9      A     No, I have not seen that.

10      Q     So in point of fact, you don't know whether

11   the Yale management was aware of these rule violations

12   that you're claiming occurred by your fellow officers;

13   correct?

14      A     I have not seen it, but there are --

15      Q     That's all I was asking.

16      A     There would be records of the key tracks and

17   radio recordings and whether or not these officers did

18   in fact call out breaks and whether or not they took

19   keys and for how long they carried said keys for.

20      Q     Have you seen those records?

21      A     No, I have not seen those records.

22      Q     So would it be a fair statement that you

23   actually don't have any evidence of Yale treating you

24   selectively?

25      A     I have no idea, but there is evidence out
                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    there.

2              MR. NOONAN:   I don't have any other

3         questions.

4    CROSS-EXAMINATION

5    BY MR. BROOKS:

6         Q    Good afternoon, Mr. Klotsche.   Is that

7    correct how I pronounced it?

8         A    Klotsche.

9         Q    I'd like to start where you just left off

10   with respect to the allegations of other officers and

11   the rule violations.

12             Is one of your jobs as a security officer to

13   enforce the rules against other employees?

14        A    No, it's not.

15        Q    So if you find an employee at Yale University

16   who is breaking the rules, you're not obligated to

17   report that?

18        A    I was never specifically told that I was

19   supposed to.

20        Q    Are there written rules and regulations that

21   are given to the security officers?

22        A    There are.

23        Q    And have you reviewed those recently?

24        A    Not recently.

25        Q    Do those rules and regulations include

DEL VECCHIO REPORTING
(203) 245-9583

1     Q     To your knowledge, that didn't have anything

2 to do with your discipline?

3     A     I do not know if it had anything to do with

4 my discipline.

5     Q     And to your knowledge -- well, this occurred

6 prior to you filing the grievance?

7     A     No.  I had spoken to -- this was -- my

8 grievance was already turned in I believe.

9     Q     You dated your grievance February 27th, two

10 days afterwards.

11     A     Okay.  Then I'm mistaken.  It was about that

12 time, though.

13     Q     So it was two days before you filed your

14 grievance or turned in your grievance?

15     A     Yes.

16     Q     And are you suggesting that somehow the union

17 failed to act properly with your grievance because of

18 your activities regarding Mr. Rubino's position?

19     A     I believe that was the case, yes.

20     Q     And what is your evidence?

21     A     I don't have any text messages or emails or

22 anything of the sort.

23     Q     Did you have conversations with someone in

24 which they said that the union was going to retaliate

25 against you with respect to your grievance because you

84

1      were passing the petition against Mr. Rubino?

2          A     No, I was not specifically told that.

3          Q     So you're just surmising that the two are

4      somehow related?

5          A     I believe so, yes.

6          Q     But other than believing so, you have no

7      evidence that they are?

8          A     No.

9          Q     And you said that the grievance was filed

10     untimely?

11         A     Yes.

12         Q     That you were locked out of the step three

13     process as a result?

14         A     Yes.

15         Q     What do you mean you were locked out of the

16     step three process?

17         A     I was not told the meeting place or the time,

18     nor was I invited by anybody within the union.

19         Q     And what does that have to do with the fact

20     that the grievance was filed untimely?

21         A     It's just in addition to.

22         Q     Now, when step three meetings are held with

23     Local 502 and Yale University, does the grievant

24     usually attend?

25         A     I don't know.  I would assume that I would

1    Q    Let me take a step back.  Are you allowed to

2   carry your personal cell phone while you're on duty?

3    A    Yes.

4    Q    Do you know where Judith was when you called

5   her?

6    A    Not that I recall.

7    Q    Was she working?

8    A    I believe she was working that day.  I'm not

9   sure whether she was on duty.  I think she was working.

10   Q    You work the same shift as Judith?

11   A    She comes in -- she works 2 p.m. to 10 p.m.

12   I work from 6 p.m. to 2 a.m.

13   Q    And what did you tell Judith exactly with

14   respect to -- tell me about the conversation.

15   A    The conversation was that she told me that my

16   grievance was denied, that she didn't believe it was

17   going to go anywhere, and basically trying to persuade

18   me to abandon the grievance.

19        I had told her the opposite, that I wanted to

20   pursue the grievance as far as it would go and I just

21   wanted to be heard with everything.  She agreed.  Yeah,

22   she agreed.

23   Q    Did you call her or did she call you?

24   A    I don't recall.

25   Q    So you asked that it be appealed further?

1      A     Yes.

2      Q     And to your knowledge, was it appealed to the

3  step three?

4      A     I believe that this is the -- that it was

5  appealed to the step three.  I was told it was.

6      Q     And was a step three meeting held to your

7  knowledge?

8      A     I was informed afterwards that it was

9  discussed at the labor management meeting.

10     Q     And do you know who represented the union at

11 that meeting?

12     A     No, I do not.

13     Q     And do you know whether a response was given

14 to the union following that meeting with respect to

15 your grievance?

16     A     I do not.

17     Q     And do you know what the union did at that

18 point?

19     A     I know that they said that they weren't going

20 to pursue it any further towards arbitration.

21     Q     Okay.  Now, did you want your case to be

22 arbitrated?

23     A     Yes, I did.

24     Q     Are you entitled to have your case

25 arbitrated?

DEL VECCHIO REPORTING
(203) 245-9583

1      A      I believe so, yes.

2      Q      Under what theory?

3      A      I believe that -- I just think it was the

4  right thing to do, you know.

5      Q      Does the union have to arbitrate every

6  grievance?

7      A      No, it does not.

8      Q      Does it have to arbitrate every grievance

9  that the grievant wants arbitrated?

10      A      No, it doesn't.

11      Q      So the union can exercise discretion in

12  arbitrating grievances?

13      A      Yes.

14      Q      And could the union exercise discretion

15  deciding not to arbitrate your case?

16      A      Yes.

17      Q      And then what did they do wrong?

18      A      They held onto a grievance past the allotted

19  time period.

20      Q      So it was untimely?

21      A      It was untimely.

22      Q      But didn't the union and the university also

23  discuss the merits of the case --

24      A      Yes, they discussed --

25      Q      -- during the step two hearing?

1    A    Yes, I was at the step two hearing.

2    Q.   And the merits of the case were discussed?

3    A    Yes.

4    Q    And you were allowed to say what you wanted

5    with respect to your position?

6    A    Yes.

7    Q    And can a union decide not to arbitrate a

8    case if it believes that the merits of the case are not

9    valid?

10   A    Yes.

11   Q    Can a union decide not to arbitrate a case if

12   it believes that it is not cost effective to arbitrate

13   a case?

14   A    Yes.

15   Q    And could Local 502 or the International

16   Union have concluded that the merits of your grievance

17   were not valid?

18   A    They could have.  I don't know specifically.

19   Q    And if they did so, would that have been a

20   legitimate basis for not arbitrating the grievance?

21   A    Yes.

22   Q    Now, let's talk about your grievance for a

23   minute.  You drafted this.  Is that right?

24   A    Yes.

25   Q    You decided the words to put in it?
                    DEL VECCHIO REPORTING
                      (203) 245-9583

1      A      Yes.

2      Q      And in your grievance, and this was discussed

3   a little earlier when Mr. Noonan took your deposition,

4   you state that the unpaid suspension was too severe and

5   that you should have had a verbal warning?

6      A      Yes.

7      Q      So you were admitting from the beginning that

8   you deserved some discipline?

9      A      As I had stated previously, I was thinking

10  that it was a common ground to meet and I would have

11  accepted a verbal.

12     Q      And why a verbal?

13     A      The lowest -- it's the lowest form of the

14  discipline.

15     Q      So you believe that you should have received

16  the lowest form of discipline?

17     A      Yes.

18     Q      And that by receiving the suspension, what?

19  That progressive discipline wasn't being followed?

20     A      Yes.

21     Q      That's what your complaint says; right?

22     A      Yes.

23     Q      But you had already received a verbal warning

24  in September of 2011.  Is that correct?

25     A      Yes.   It was -- I think it was August of

                        DEL VECCHIO REPORTING
                          (203) 245-9583

92

1    2011.

2        Q    Well, the document I've seen is dated

3    September I believe it's the 7th, 2011.

4        A    Okay.

5        Q    So that's on your record.

6        A    Okay.

7        Q    Is that right?

8        A    Yes.

9        Q    And so when you get disciplined for the

10   events of January, wouldn't you move up to the next

11   level of discipline?

12       A    Yes, I would move up to the next level.

13       Q    What's the next level?

14       A    It would have been a written warning.

15       Q    A written warning.  Okay.  So would you agree

16   with me then that under the progressive discipline

17   policy you should have had a written warning, not a

18   verbal warning?

19       A    Yes.

20       Q    That's for January 9th?

21       A    Yes.

22       Q    How about January 11th?

23       A    Maybe it's my fault, but I've lumped the two

24   incidents together.

25       Q    But you were accused of two different

DEL VECCHIO REPORTING
(203) 245-9583

93

1    violations of the rules.  Is that right?

2        A    Yes.

3        Q    And you could be disciplined for each one

4    separately.  Is that right?

5        A    Yes.

6        Q    I mean they weren't the same incident.  They

7    were two separate incidents?

8        A    Yes.

9        Q    So if you were disciplined for each

10   separately and you already had a verbal on your record,

11   you would have received a written for January 9th and

12   a suspension for January 11th.  Is that right?

13       A    Yes, I believe so.

14       Q    So progressive discipline was applied?

15       A    Arguably.

16       Q    Arguably.  Okay.  So the local union in

17   analyzing the grievance could have concluded that your

18   argument that there wasn't progressive discipline was

19   misplaced?

20       A    Could you clarify?

21       Q    Sure.  When the union analyzed your grievance

22   and decided whether to arbitrate it or not, one of the

23   factors it could have looked at is whether your claim

24   of failure to administer progressive discipline was

25   valid?

94

1     A     Yes, okay.

2     Q     And in doing so, based on the fact that you

3   had a verbal warning from 2011 that was 17 months prior

4   to this incident and two separate incidents in January

5   of 2013 for which you could have been disciplined

6   twice, the local could have concluded that the

7   suspension to you was consistent with progressive

8   discipline?

9     A     Okay.

10    Q     Do you agree with that?

11    A     Yes.

12    Q     If you just give me a minute, I want to look

13   at my notes here.

14          Is there any evidence that you have that the

15   grievance was filed untimely because of your union

16   activities?

17    A     No, I do not.

18    Q     And when you drafted the grievance, do you

19   know what step it should be filed in?

20    A     I believe it should be filed at two.

21    Q     Collective bargaining agreement says for

22   suspensions and terminations, the grievance should be

23   filed at step two.  Is that right?

24    A     I believe so.

25    Q     And under step two, the collective bargaining

DEL VECCHIO REPORTING
(203) 245-9583

1      A     Not in regards to the grievance itself.

2      Q     What did he say otherwise?

3      A     He had said something about me with the

4   petition a couple, you know, or about the same time

5   period.  He had said that I could get in a lot of

6   trouble and that I could get fired for that.

7      Q     For what?

8      A     For passing around the petition.

9      Q     While you were working?

10      A     I don't know whether or not he was saying

11   whether I was working or whether I was off duty or not,

12   but the only time that I passed around the petition is

13   when I was off duty.  I'm assuming that's what it was

14   reference to.

15      Q     And did you have any discussions with

16   Mr. Ryan after you handed him the petition with respect

17   to the progress of the grievance?

18      A     No.

19      Q     I mixed up words there.

20            Did you have any discussions with Mr. Ryan

21   after you handed him the grievance with respect to the

22   process of the grievance?

23      A     Not that I recall.

24      Q     Did you have a discussion with any union

25   representative with respect to why the grievance was

1    filed when it was filed?

2         A    No, I did not.

3         Q    So did you have any evidence with respect to

4    reasons why the grievance was delayed in filing, if it

5    was?

6         A    I don't have any evidence other than the fact

7    that it was dated the date that it was and with the

8    collective bargaining agreement that the time frame

9    is -- I believe it's ten days, ten business days.

10        Q    And does your grievance state a date other

11   than the date that you filled it out?

12        A    No, other than the -- I believe it's the

13   dates that are in question, like the dates that the

14   incidents happened.  I don't believe -- I believe the

15   only dates mentioned was possibly the dates that the

16   incident occurred that led to the discipline and the

17   date that I turned it in to the steward.

18        Q    I'm asking you looking at it, and I apologize

19   because we're not in the same room, otherwise I would

20   show it to you right now.  But when I review it, I see

21   it's dated 2/27/13 both at the top and where your

22   signature is, but I don't see any other date with

23   respect to identifying the incident or the discipline.

24        A    All right.  Then I'm sorry.  I don't have

25   it -- now I have it in front of me.