UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL ACTION NO.: 3:13CV955(CSH)

ANDREW KLOTSCHE,
Plaintiff

VS

YALE UNIVERSITY, ET AL,
Defendants

Deposition of ANDREW KLOTSCHE taken at the Law Offices of John R. Williams & Associates, 51 Elm Street, Suite 409, New Haven, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on April 9, 2014, at 11:40 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE, MADISON CT 06443
(203)245-9583 (800)839-6867
FAX (203)245-2760

HARTFORD NEW HAVEN STAMFORD

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

ROSE L. MCLEAN, ESQ.
JOHN R. WILLIAMS & ASSOCIATES
51 Elm Street, Suite 409
New Haven, Connecticut 06510

ON BEHALF OF THE DEFENDANT YALE UNIVERSITY:

PATRICK M. NOONAN, ESQ.
DONAHUE, DURHAM & NOONAN
741 Boston Post Road
Guilford, Connecticut 06437

ON BEHALF OF THE DEFENDANT UNION:

SCOTT A. BROOKS, ESQ. (VIA TELEPHONE)
GREGORY, MOORE, JEAKLE & BROOKS
65 Cadillac Square, Suite 3727
Detroit, Michigan 48226

ANDREW KLOTSCHE,

residing at 37 Quaker Road, Hamden, Connecticut, having first been duly sworn, deposed and testified as follows:

DIRECT EXAMINATION
BY MR. NOONAN:

Q Good morning, Mr. Klotsche. How are you?
A Not too bad. How are you?
Q Good, thanks. Thank you for coming today. We appreciate you making yourself available.
I'm going to assume you have not had a deposition taken before?
A No, I have not.
Q I'm sure Rose has talked with you about the do's and don'ts, but let me mention a couple of things that I think are worth repeating. First, you should be comfortable during the deposition. If at any point in time you want to take a break, just tell me. The only thing I ask is you answer the question that's pending before taking the break. Is that okay?
A Okay.
Q It is also important that you understand a question before you answer it. So if at any point in time you don't really understand what I'm getting at, just tell me. You won't insult me. I've asked poor

questions any number of times, so I'm not insulted, but I want to make sure you and I are communicating well. So if you don't understand a question, just tell me.
A Okay.
Q And if you answer a question, I'll assume that you understood it. Is that okay?
A Absolutely.
Q A couple of things for the benefit of the court reporter. It's really almost impossible for her to take both of us down at the same time. So try not to start an answer until the question is completed and adhere to that instruction even though you know where the question is going, because believe it or not, it actually ends up taking more time if you try to anticipate the question because then we have to sort of start over, and I'll try to not speak when you're speaking. Okay?
A Okay.
Q For the same reason, keep your answers verbal rather than saying uh-huh or nodding your head. If you forget, and people often do, I may say do you mean yes or do you mean no. If I do that, I'm not trying to give you a hard time. I just want to make sure the transcript accurately reflects what you intend. All right?

A Okay.
Q Let me start by asking you about your background. Can you tell us your date of birth?
A July 9, 1986.
Q And how far did you go through school?
A I completed high school, and I attended Connecticut School of Broadcasting, and two years ago I completed my EMT basic for state of Connecticut.
Q And are you certified as an EMT?
A Yes, I am.
Q And what high school did you graduate from?
A North Haven High School.
Q And what year was that?
A 2005.
Q And how were you employed prior to working at Yale?
A My last job was in Denver, Colorado with American Masonry, my cousin's small business. I apprenticed under him for one season.
Q And how about prior to that?
A World Wrestling Entertainment in Stamford. I was a freelance video editor.
Q How long did you do that?
A Almost a year.
Q And why did you end up leaving that job?

A Too far of a commute, not enough money hourly.
Q How about prior to World Wrestling or were you in high school?
A I was UPS.
Q How long did you do that?
A About nine months.
Q And why did you leave that job?
A I got the job at World Wrestling.
Q And what about prior to UPS?
A I was a delivery driver for a pizza restaurant.
Q And left that one to get the job at UPS?
A Yes.
Q How about prior to the pizza restaurant?
A I was in the United States Navy.
Q What years?
A It was from 2005 until 2006.
Q And so how long total were you in the Navy?
A About approximately seven months.
Q And when you signed up for the Navy, was that for a seven month tour of duty?
A No. I received an entry level separation.
Q Tell me what that means.
A An entry level separation is you were here,

but you really didn't do anything good or bad. So you were just here is pretty much the extent of that.
Q So when you signed up, how long did you anticipate being in the Navy?
A I had a National Call of Service contract. I think it was two years required active duty with a six year additional reserve duty.
Q And when it ended after seven months, was that at your request or the Navy's?
A It was more it was a failure to adapt sort of situation. I was 19, homesick, just didn't really work out.
Q So did they ask you to leave?
A It was pretty mutual. It was no bad conduct, nothing of the sort.
Q So you didn't get an honorable discharge?
A But I did not --
Q But you didn't get a dishonorable discharge?
A Exactly.
Q And were you terminated at any of the other jobs you had?
A No, I was not.
Q So you came to Yale when?
A In September of 2008.
Q And you came as a -- what was your title

first?
A Casual employee.
Q And was that in the security department?
A Yes, it was.
Q And you're still employed there today; right?
A Yes, I am.
Q What is your title now?
A Security officer.
Q And was that your title when you started, a casual security officer?
A Yes, although now I am a full-time security officer.
Q How long were you a casual?
A Approximately two and a half years.
Q So you became full time -- I guess it was always full time in terms of the hours; right?
A Yes.
Q But you became sort of a regular employee, if you will, somewhere in 2011?
A That sounds about right, 2010, 2011, somewhere in that neighborhood. I'm sorry, I don't remember specifically.
Q No problem. And I take it that you have not either been promoted or demoted since arriving at Yale. Is that right?

A No, I have not.
Q What is your rate of pay now?
A I believe it is approximately 19.30 an hour.
Q And how many hours a week are you working?
A Forty.
Q And what are your duties as a security officer at Yale?
A Patrol university properties, walking escorts, lockout requests, making sure that the gates and lights are all in working order around my patrol area, responding to various types of alarms, fire alarms, burglar alarms, door alarms. That pretty much sums it up.
Q And how long have those been your duties? Is that from the outset?
A From the very beginning.
Q And is it part of your responsibility to maintain a visible presence on the campus so that people are aware that someone is there in a security posture?
A Yes, it is.
Q Has that been true from the outset?
A Yes.
Q Is that something you knew from the outset that that was something you were supposed to do?

A Yes.
Q Now, have you ever been disciplined other than the incident that gave rise to this lawsuit?
A I received a verbal warning approximately a year and a half prior.
Q And so that would have been what, sometime in 2010 or so?
A It would have been -- I'm sorry, I can't recall. I believe it was in August, maybe 2011. I'm not sure. I'm not exactly a hundred percent.
Q All right. What was the verbal warning about?
A To be completely honest, I'm not a hundred percent sure. It was pretty vague.
Q Do you remember anything about it at all?
A I can tell you how the incident happened.
Q Okay.
A My partner -- I was on the bike patrol unit at the time. My partner's radio had died, and we were about to cover a break at the law school.
Q What do you mean a break?
A A break, there's an officer stationed in the law school and that post needs to be manned, so the officer is entitled to a break. So when an officer is on a post like that on a central campus, the bike units

more often than not are the ones that go ahead and provide the breaks for them. So we were walking over to provide a break or I was walking my partner over there because his radio had died and just for emergency purposes in case something happened to him and he needed to get a hold of the dispatch or anything along those lines. We had just entered the building. The officer had left the post, and he had sat down in the officer who was leaving their position and placed his radio in the charger. I received a text from my wife and I had sat down to take a look at it, and at that time the manager had -- Reginald Chavis had walked in and saw the both of us together, and since I was the one not covering the break, I was the one that was disciplined.
Q And so you were disciplined for being at the law school when you should have been covering another area?
A Yes.
Q Because your partner should have covered the law school?
A Yes.
Q And did you agree with the discipline, that it was appropriate to discipline you because you were in an area that you weren't supposed to be?

A No, I do not agree with that.
Q Did you think you were supposed to be in the law school with your partner together while he was covering the break?
A I was in the law school with him for approximately one minute, so I had not gotten a chance to really leave the post yet. The incident is recorded on camera, too, if anyone needs to go ahead and take a look at it.
Q Were you supposed to be in the law school at all at that time?
A No, I wasn't.
Q So you agree --
A I didn't -- I wasn't supposed to be in the law school, but because of the nature of the post on the bike, there's nothing saying that I wasn't supposed to be in there as well.
Q But there was no need to have two of you covering for the one person who was going on break?
A I was not going to cover the break.
Q And therefore, you didn't need to be in the law school at all. Is that a fair statement?
A Mildly fair.
Q Well, you didn't need to be in the law school; correct?

Q And tell us what that is.
A That is the residential college master set for lockouts, for fire panels, for mechanical doors.
Q And is there a rule against security officers being in possession of those keys except when they specifically need them?
A Yes.
Q And who gave you a counseling on that?
A I believe it was James Smith, former --
Q James Smith?
A Yes.
Q He's one of the supervisors?
A Former.
Q He's no longer with Yale?
A No, he's not.
Q And roughly when was that that you received that counseling?
A 2009 I believe.
Q And being in possession of keys was one of the things for which you were disciplined in February of 2013. Is that right?
A Yes.
Q Was it true, by the way, in 2009 that you were in possession of the keys, the master set keys when you were not supposed to have them under the

rules?
A Yes.
Q And were you disciplined or counseled at any other time?
A Not that I can recall.
Q Do you remember an incident where you were spoken to by your supervisors in December of 2010 for reading your textbook and writing notes while you were on duty?
A Now that I remember, yes.
Q So that was a third time when you had some type of negative interaction with regard to your performance?
A Yes.
Q And what happened then?
A Nothing. I didn't receive a counseling. I didn't receive a written, verbal or any counseling, coaching.
Q But you were told about your performance; correct?
A Yes.
Q All right. What happened that caused -- first of all, who was it that talked with you at that point?
A Richard Nucci.

Q And what rules had you violated at that point?
A Taking a break without receiving permission from base.
Q And so basically you were studying when you should have been working. Is that right?
A I had taken a break without letting everyone know that I was on a break.
Q And how long -- and you were studying? Was that for your EMT training?
A Yes, it was.
Q How long were you studying that day before Mr. Nucci found you?
A I can't recall with too much accuracy.
Q What is your best estimate?
A Approximately 15, 20 minutes.
Q And do you remember what happened when Mr. Nucci found you?
A He told me to get up.
Q And you were in the bike vault at that time; right?
A Yes.
Q So that's an interior space?
A Yes, it is.
Q And you were supposed to be out on the campus

on your bike patrol. Is that right?
A I had not called out on break, so I had taken one without calling one out.
Q So you should have been out on the bike patrol?
A Or I should have called out on a break.
Q In other words, if you're going to study, you should call out and take a break?
A Yes.
Q So that they know, first of all, that you're taking a break, and if needed, someone else covers your spot; correct?
A Yes.
Q So at the time of this event in December of 2010, you were studying at a time you should have been working?
A I should have called out a break.
Q But if you didn't call out a break, you should have been working and not studying; correct?
A Yes.
Q And do you remember Mr. Nucci asking you why you were sitting there reading and writing notes when you should have been out in the field?
A No, I do not recall.
Q Do you remember telling him that your

homework for your EMT training was your primary job concern, not the current position you occupied at Yale?

A I do not remember that.

Q Do you remember anything about the conversation you had with Mr. Nucci that day?

A No, I do not.

Q And was it true that at that point you did feel that the most important thing to you was your EMT training, not the job you were doing at Yale?

A No, I did not.

Q Do you remember Mr. Nucci then left the bike vault for a period of time to look for your partner, and then he came back to make sure that you were out in the field and you were continuing to do your homework?

A I do not recall that.

Q Do you remember him saying to you that that conduct was inappropriate and that you should be back out working in the field because part of your job was to provide the bike patrol as a crime deterrent?

A I do not recall that.

Q And do you remember in fact you told him that you felt you could respond to lockout calls from the bike vault while you were studying?

A I do not recall that.

Q Do you remember anything about that

conversation?

A No, I do not.

Q Mr. Nucci wrote a rather detailed report about that incident at the time it occurred. Do you have any notes regarding that incident?

A No, I do not.

Q Do you remember later that day that you approached Mr. Nucci and then apologized for your conduct?

A Which date was this?

Q This was December 11 of 2010.

A No, I do not.

Q Do you think you didn't do that or you just don't remember it?

A I don't think I did it. I don't think that second incident where he came into the bike vault for the second time took place. Now that I remember first incident, I do not remember the second. I do not believe it happened.

Q Do you know why he would have written that down in this report that he did on the day that it occurred if it didn't happen?

A I do not know why.

Q And is Richard Nucci still employed at Yale?

A Yes, he is.

Q And what is your relationship with him?

A He's now a manager on first shift. We have no relationship.

Q I mean when you have seen him, do you get along okay with him?

A I haven't seen him in months. The last time I had seen Mr. Nucci was right after this incident in question that we're talking about occurred.

Q And how was your relationship with him up to that point?

A It was a working relationship.

Q In other words, you didn't have the feeling that he was out to get you or anything?

A I didn't, no. I did not necessarily feel that.

Q Were there any other times that you remember being counseled or spoken to or disciplined prior to February of 2013?

A No, I do not.

Q Now, would it be fair to say that the discipline that you got in February of 2013 was for the same type of conduct for which you had been disciplined for in the past?

A Can you --

Q Sure. You were disciplined in February of

2013 for working on your studies while you should have been working for Yale and for possession of keys which you should not have possessed. Is that right?

A Yes.

Q And those two things were things for which you had been counseled and disciplined prior to February of 2013. Is that right?

A According to the union contract, discipline over 18 months cannot be used in --

Q I wasn't asking about the union contract. I'm just asking about your conduct. You had been disciplined and counseled for both of the infractions for which you were disciplined in February of 2013 prior to that event; correct?

A Yes. Yes, but it was much later than the 18-month limit as prescribed by the union contract.

Q But in answer to my question, it is true that the conduct for which you were disciplined in February of 2013 was conduct for which you had been disciplined in the past?

MS. McLEAN: I'm going to object to the form.

BY MR. NOONAN:

Q Is that correct? You can answer.

A Yes.

Q And you knew as of January of 2013 when those infractions occurred that both of those things were contrary to the university rules. Is that correct?
A Yes.
Q And you agree that you in fact committed those violations in January of 2013. Is that right?
A Yes.
Q Now, do you recall what happened on January 9, 2013?
A This is the incident --
Q The first incident that occurred in January of 2013.
A All right. I got into my post. I'm not a hundred percent on what time I got to the post. I had conducted an exterior patrol of my area, the Branford Residential College and Jonathan Edwards Residential College. I had also conducted an interior patrol of these colleges, and again, I had taken a break without calling one out, and I had sat down in the custodial break room in Branford and I began to study.
Q And how long did that study break take?
A Approximately 20 minutes, 20, 25 minutes.
Q Your supervisors wrote a report indicating that you were there for more than an hour.
A No, that is not true.

Q And 20 to 25 minutes would be more than you should have been taking a break for. Is that right?
A No. We have a -- we are allowed to take two 15-minute breaks and a 30-minute break.
Q And how many breaks had you taken on --
A That was my first one.
Q And when you take a break without calling it in, you can then take another break later and call it in; correct?
A Well, yeah. I mean yes.
Q So in other words, when you say you took a break, you were really violating the rules if you took a break without calling it in?
A This was a -- not requesting a break has been a very common practice amongst the entirety of the security department prior --
Q Let me just cut you off. Can you just answer my question? Is it true that taking a break without calling it in is a violation of the rules?
A Yes, but this is --
Q I just wanted to get that on the table. And that was something that you had been disciplined for, for the very same conduct in the past prior to January of 2013; correct?
A Yes. This was also a practice that had

been --
Q I'm going to get to that later, but just answer my questions now. By the way, Rose will be able to ask you questions that she wants answered. So right now just answer the questions I'm asking.
In January of 2013 you were seen twice studying while you were supposed to be on duty; correct?
A January, no.
Q What happened on January 11?
A After my initial conversation with the supervisors, Reginald Chavis and Richard Nucci, I was left with the impression that I was no longer to be in that room as well. So I had gone ahead and I had taken my bag with my lunch, my radio charger, extension cord, tools for me to do my job, and I was looking for another place to secure my belongings, and he had seen me carrying my belongings.
Q Let me go back to January 9th. Just to orient you, that's the first time in January that you were disciplined or approached by your supervisors about your conduct. Who came at that time?
A Both supervisors, Reginald Chavis and Richard Nucci.
Q And do you recall what time of day it was?

A No, I do not.
Q Their report indicates that it was at 19:30 hours which I guess would be about 7:30 at night. Does that sound about right?
A About right, yes.
Q And do you remember that at the time they saw you when you were studying, you had your jacket off, your duty belt off, and the radio sitting on the desk that you were at or the table that you were at?
A Yes.
Q Do you remember telling them -- well, do you remember them telling you that you should not have been taking a break at that point in time because you were only two hours into the shift and you had not called in for a break?
A I do not remember them telling me I should not have taken a break at that time, no.
Q Well, it would be true, though, that you shouldn't have taken a break if you didn't call in for it?
A It's arguable. Taking a break without calling it in, yes, I should not have done it, but the time period, whether it's at 7:30 is arguable.
Q And do you remember you saying in response to that that it didn't matter that you were taking a break

because you had already conducted all of your tours?
A I do not recall that.
Q Well, what do you recall of that interaction with the two supervisors on January 9th?
A My supervisors had told me to get out, told me to get out of the room and to place my belongings in my vehicle. That's what I recall.
Q And do you remember any other discussion other than that?
A No, I do not.
Q Do you remember Mr. Chavis telling you that a part of your job was to be visible and that it was not sufficient to simply conduct all your tours?
A No, I do not recall that.
Q But that would be true, right, that your job was to be visible?
A Yes, it would be true.
Q So it isn't a sufficient response to say I've conducted all my tours, I don't need to be out on the street any longer?
A No, it would not, and I do not recall making such statements.
Q Do you remember Mr. Chavis reminding you that he had stated in role call shortly prior to this event that you should be putting your items in the vehicle

and you should remain visible throughout the shift? Do you remember that being discussed?
A Can you repeat the question, please?
Q Yes. Do you remember Mr. Chavis shortly before January 9th of 2013 had stated that you should be putting your personal items in the vehicle and you should remain visible throughout the shift?
A I do not recall that.
Q But that was something you were aware of in any event?
A No.
Q Well, you were aware you needed to be visible throughout the shift?
A I was aware of that, but whether my belongings had to be in my personal vehicle, no. It's still common practice to carry a backpack of personal belongings, things you're going to use during the shift. It has been and continues to be a practice.
Q And do you remember talking with Mr. Chavis later during the shift on January 9, 2013, and telling him that you were not concerned about being written up because the worst that would happen would be a counseling or written warning and you would not be getting a suspension without pay or being fired?
A I did have a conversation. That quote is

taken -- it was taken out of context. My initial reason for contacting him was not the incident that had just previously happened but an incident that happened a little while before, and it was regarding a way that he had spoken to me over the radio.
Q And in the course of that conversation, you told him that you weren't worried about being written up because the worst that would happen would be a counseling and you wouldn't get a suspension without pay?
A That was a part of the conversation, but again, it was taken out of -- that was deliberately --
Q You're referring to a different incident?
A It was deliberately taken out of context.
Q But that comment that you were not concerned about being written up because the worst that would happen would be a counseling and you wouldn't get a suspension without --
A I did say that.
Q And that was said the same evening -- let me get the question out.
Would you agree that that was said the same evening that you were found to be studying while you should have been attending to your duties?
A Yes, it was the same evening. Again, it was

taken out of context.
Q When was the next time after January 9 that you had any input from your supervisors about problems with you in the workplace?
A Explicitly was in this past October.
Q Before I get to that, I'm talking about after January 9th did you have another interaction where supervisors approached you and suggested that you were in violation of any of the rules?
A I do not remember that.
Q How about January 11th?
A Oh, that's the -- okay. If that's the -- I'm sorry. My understanding was I was lumping the two incidents together.
Q No problem. So what happened January 11th? Was it both supervisors?
A No. That was just Richard Nucci.
Q And what happened that day?
A I had done my exterior patrols again. I had initially placed my bag inside the key track which is an area where we have keys. This one in particular was residing in the Jonathan Edwards Residential College.
Q And what is a key track?
A A key track, that's our key management system, and I had left it in there. I did not feel

comfortable leaving the bag in there because it was open and it was accessible to students, to master's aides, to the master, to pretty much anybody who walked into Jonathan Edwards. Since I wasn't comfortable leaving it in there, I had picked it up and I was looking for a spot to more securely store my belongings when Richard Nucci had seen me in the basement of my assigned patrol area.

Q I thought Richard Nucci, I thought he was the one that you hadn't seen since 2010 when he counseled you?

A No. This was -- I haven't seen him since the 2013 incidents, I'm sorry for the clarification.

Q So when was the last time you saw Mr. Nucci on the job? Was that January of 2013?

A Approximately a year ago.

Q All right. I interrupted you. I'm sorry. So you put your bag in the key track at J.E., and then you went back to retrieve it and Mr. Nucci noticed you were there, and then what happened?

A He had suggested one room to put my bag, my belongings in which was an admin storage area. This was protected by -- the door was secured with a card reader. I did not feel comfortable leaving it in that room because I had no idea who has access to that room.

I had looked for other areas that would not have been as easily accessible or as frequently used, a couple different mechanical rooms, electrical closets, things like that.

Q Okay. So what were you doing on January 11th?

A I'm not a hundred percent sure what violations they're trying to cite.

Q Well, what was it that you were doing when you were approached by Mr. Nucci?

A I was looking for a secure area to store my belongings.

Q Do you remember telling him that you were looking for a place to leave your lunch?

A Yes.

Q And this was how far into your shift?

A Approximately an hour and a half, two hours into the shift I believe.

Q And you had left it somewhere else, your lunch, meaning your entire backpack or just the lunch?

A My entire backpack.

Q And you had initially left it somewhere else?

A Yes.

Q You initially left it in the key track, but then decided to change the location?

A Yes.

Q And so you were in an area that you weren't supposed to be patrolling?

A No. I was supposed to be there. My assigned patrol area was Jonathan Edwards and Branford College. I was in the interior of the building which is part of my duties.

Q And at that time you were found to have possession of the keys again?

A Yes.

Q And that was something that under the rules you were not supposed to have; correct?

A Yes. That was not specifically mentioned the previous incident on January 9th.

Q But it had been mentioned to you in the past?

A Yes.

Q And you knew from the rules anyway that you weren't supposed to have the keys; correct?

A Yes.

Q Do you remember that Mr. Nucci said that you should go out to the street and provide a visible uniform security presence within the colleges?

A No, I do not recall that.

Q And do you remember him telling you that you needed to remain visible and conduct exterior tours of

the area for the balance of your shift?

A No.

Q Do you remember anything else about your discussion with Mr. Nucci on January 11, 2013, other than what you've said?

A No, I do not.

Q And you in fact were disciplined for the incidents of January 9 and January 11, 2013. Is that correct?

A Yes.

Q Was there an investigation that was done into that?

A I don't know how in depth it was. I know I was interviewed, but I don't know what the management investigation would include.

Q But in any event, there was an investigatory interview with you?

A Yes.

Q And who was present during that?

A It was Dan Killen, the director of security operations; our HR generalist, Allison, I'm sorry, I don't remember her last name.

Q Is that Leibenhaut?

A Yes. I believe at the time her last name was Maloney.

And myself and the shift representative, Joe Ryan.

Q So he was the union representative?

A Yes.

Q And what happened during that interview?

A We had gone over the events of that day. It was pretty much it. I'm not sure how specific.

Q Well, what do you remember telling Mr. Killen about the reasons why you were inside the building on January 9, 2013?

A I was taking a break. I was trying to get warm.

Q And do you remember when you initially told him why you were inside the building, you told him you were going in the building to warm up?

A Yes, I do.

Q And do you remember, did you then volunteer to him that you actually were studying at that time?

A Yes, while I was -- while in the process of warming up, you know, I did study.

Q Right, you did. What I'm asking is did you tell Mr. Killen that when he asked you what you were doing in the building or did you simply tell him you were there to warm up?

A Yes, I told him.

Q His report indicates that you said you were in the building to warm up, and it was only after he mentioned that you were observed with an open book that you mentioned that you were also reading.

A Yes.

Q So is it true that the way the conversation went is he asked you why you were in the building, and you said it was to warm up?

A Yes.

Q And then he said, well, what about the reports I have indicating that you were in there reading?

A Yes.

Q And then you answered yes?

A Yes.

Q All right. So when he first asked you what you were doing in the building, you didn't tell him you were there to study? Fair statement?

A It's still initially to warm up. While I was --

Q I'm just trying to make sure I understand how the conversation went. I just want to know what happened. I'm not saying it's a good thing or bad thing, but is it true that when Mr. Killen asked you what you were doing in the building, you simply told

him you were there to warm up. Is that right so far?

A Yes.

Q Then he said to you, well, gee, I hear that you were there having a book open, was that true, and you admitted then you were there to study as well; correct?

A Yes.

Q And then he asked you whether you had a note pad open in front of him, and you finally agreed to that as well; correct?

A Yes.

Q And what explanation did you give for having your coat off if you were in the building to warm up?

A The reason being --

Q No. What did you tell Mr. Killen that night, do you recall?

A I don't recall what I told him.

Q What reason would you give now?

A The reason being is it's January. You're outside. It may take a minute to slightly longer to warm up after taking your coat off, but the risk of perspiring and sweating would be decreased than you would normally have if you kept a coat on while you were inside the building. I took it off because -- basically I took it off because I didn't want to sweat.

I didn't want to sweat. I didn't want to make myself more susceptible to the cold and even going ahead to prevent a further loss of time incident with me taking a sick day for any possible complications from being --

Q How about taking your radio belt off? Was that also to reduce the prospects of sweating?

A No. My radio holster, which is the container that the radio was in, it didn't fit my radio. It would -- there was a lot of give in there. So if I sat in the wrong way, I would inadvertently push the talk button which would key up the mic and cause an open mic and open up the airwaves.

Q So you were --

A I took it off to avoid that.

Q So the break to warm up wasn't going to be so brief that you would stand up during the entire time?

A No. I'm on my feet most of the night, so I would take -- you know, typically when I call a break, sit down as well.

Q And it's your recollection that the break was only about 25 minutes?

A Yes.

Q Did you time it?

A No, I did not time it.

Q Do you know whether your supervisors timed

their events that night?

A I do not know if they timed it as well.

Q So if you didn't time it, it could have been more than 25 minutes. Would you agree with that?

A It could have also been less.

Q But would you agree that it also could have been more than 25 minutes?

A Okay, I will agree with that.

Q During the investigatory interview that you had with Mr. Killen, did he talk with you about your possession of the sub master keys?

A Yes, we did discuss that.

Q And did you agree with him that you had those keys at a time when you should not have had them?

A Yes.

Q And do you remember during this investigatory interview Mr. Killen asking you about the January 11th incident?

A Yes.

Q And what do you remember telling him about that?

A That was also what I just stated. I was looking for a place to place my belongings.

Q And that was an hour and a half or two into your shift?

A Yes. To reiterate, my belongings had moved from one area to another. I initially put them in one area, didn't feel comfortable, picked them up to find another spot to place my belongings.

Q Do you remember telling that to Mr. Killen during the investigatory interview?

A Yes.

Q And do you remember telling Mr. Killen that you thought that Supervisor Nucci was spying on you on January 11th?

A Yes.

Q And would you agree that since you had violated the rules on January 9th, it would be important for the supervisors to check up on you thereafter and make sure you understood your rules and were complying with them?

A Yes, I would agree to that.

Q So in retrospect you wouldn't really think that the supervisors were spying on you when they were checking up on you in the workplace, would you?

A I had mentioned that I had in a way sort of retracted that statement, you know, I'm sorry for saying that during the grievance process.

Q So at least as of the present time, you would agree that Mr. Nucci was actually doing what he should

have done which was to make sure you were following the rules?

A Yes.

Q And turns out you weren't; correct?

A I was following the rules.

Q Well, except that you had the keys that you weren't supposed to have?

A Okay, yes.

Q So on two nights, on January 9th you weren't following the rules and on January 11th you weren't following the rules; correct?

A Yes.

Q And both of those, the rule violations were things that you had already been counseled about in the past; correct?

A Yes.

Q And as a result of those prior incidents, you were then disciplined?

A Yes.

Q And the discipline was a one day suspension?

A Yes.

Q And what amount of money did you lose because of the one day suspension?

A Approximately $150.

Q And you pursued a grievance over that?

A Yes.

Q And what happened in the grievance?

A I filled out the grievance form. I had turned it in to the steward within the time frame, and the union did not turn it in until after the time frame had expired for the grievance.

Q And when you filed the grievance, am I correct that you were not looking for return of the $150 lost pay?

A I don't recall. I think this was my first grievance. I'm not sure if -- I'm not sure about how it would all work out, if the suspension had been reversed if I had gotten the $150 lost pay back or whether I would have had to file something else. I wasn't exactly sure on the process with that.

Q Well, do you remember telling Mr. Killen at the grievance hearing that you were seeking a replacement of the suspension with a verbal warning and you were not looking to recoupe the one day in lost wages?

A I'm under the impression that if it had been reduced that I would have received the lost wages.

Q I'm just looking at Mr. Killen's March 18, 2013, report of the step two grievance hearing. I'm going to quote from it. "Lastly, the grievant wished

to point out that he is only seeking a replacement of the suspension with a verbal warning and is not looking to recoupe his lost one day wages."

Do you recall that at the grievance hearing?

A I don't. I recall saying that I would want the discipline reduced, and as a result, I assumed that the $150 for the day's wages would be refunded to me.

Q All right. I don't know why Mr. Killen wrote what he did, but when you -- let me ask you this. The grievance form, was that filled out by you?

A Yes, it was.

Q So that's the grievance and you signed that on February 27th of 2013. Is that right?

A Yes, this was completed on the 27th. Yes, it was.

Q And is the section which says "Relief Requested," is that your handwriting?

A Yes, it is.

Q And the relief you requested in that grievance was to reduce the discipline from a suspension to a verbal warning. Is that right?

A Yes.

Q And there's no mention of returning lost pay?

A No, it was not, but again, I was under the impression that if they had reduced the suspension to a

warning, I would be entitled to my $150 lost wages. So I didn't feel that it was necessary to write it down. Again, this is my first grievance ever, so I really wasn't explained on the process and what to do.

Q And have you had any other grievances that you filed since this one?

A No.

Q So it was your view that it was appropriate to discipline you for your conduct in January of 2013; correct?

A I felt it was a middle ground, a middle, you know, a middle ground that we can both agree to.

Q At least in terms of what you were seeking in the grievance, you were agreeing that you should be disciplined. You just didn't agree with the severity?

A I was looking for a reasonable agreement and that's what I felt would be reasonable, something that I would actually pan out that the university would agree to and I would agree to.

Q So in other words, you thought it was appropriate to discipline you with a verbal warning, but not with a suspension. Is that a fair statement?

A I wouldn't say it's exactly fair. Again, I'm just trying to, you know, did I -- I'm looking for a reasonable place to meet with management. That's what

I was looking for. If that meant, you know, accepting a verbal warning in place of, I would have been willing to accept that.

Q So you would have accepted a verbal warning?

A Yes, I would have accepted a verbal warning.

Q And the reason you would have accepted a verbal warning is because you had on two different occasions been found to be in violation of the rules; correct?

A Yes.

Q You simply thought the unpaid suspension for a day was too harsh?

A Yes.

Q So despite the fact -- strike that.

The complaint that was filed in district court says that the union filed the grievance too late.

A Yes.

Q But despite that fact, Yale allowed you to proceed with the grievance; correct?

A Yes.

Q Because they held a hearing and heard your grievance; right?

A Yes. I mean they heard the grievance. I'm not exactly sure if they seriously entertained it because in response it was saying that the grievance

was not turned in in a timely manner.

Q Right. They gave you two reasons for declining the grievance. One was that after hearing the merits of the grievance, they decided that it was not well founded; correct?

A Yes.

Q And number two, they decided the grievance was late?

A Yes, that's what they decided.

Q And you agreed that the grievance was late?

A Not by me.

Q But I mean you agree it was filed late?

A I agree that it was filed late, but not by me.

Q So the university could have simply refused to hear the grievance at all under the rules; correct?

A They could have.

MS. McLEAN: Could we take a short break?

MR. NOONAN: Sure.

(THEREUPON, A RECESS WAS TAKEN FROM 12:45 TO 1:00.)

BY MR. NOONAN:

Q So aside from the roughly $150 in lost pay, are you claiming any other damages in this case?

A The attorney fees and filing costs for emotional distress.

Q Well, actually, your lawyer eliminated the emotional distress claim from your complaint when we moved to dismiss it because they're not allowable under the cause of action you've brought.

A Okay.

Q But as long as you're mentioning it, so what emotional distress have you had? Have you had treatment with a mental health care professional?

A No, I have not.

Q So the most mental stress is what, you felt bad that they disciplined you?

A No, it's not that I felt bad. I'm married. I have two children. I have a mortgage payment that I have to pay. I'm the primary provider of the household.

Q Has the loss of $150 prevented you from providing food for your children or prevented you from paying your mortgage?

A Yes, it has.

Q How much money have you spent in attorney's fees?

A 5,000.

Q You already spent that?

A Yes.

Q So you spent $5,000 on attorney's fees because of your concern that you might not be able to provide for your family because you lost a day's pay of $150?

MS. McLEAN: I'm going to object to the form.

BY MR. NOONAN:

Q Is that a fair statement?

A No, it's not a fair statement. I would say that I paid the $5,000 in money that I did not have because I'm in fear of my job. That's why.

Q So you were really filing this lawsuit to preempt the university from terminating you?

A Yes.

Q Okay. Then I understand it. You really weren't suing about the $150?

A No.

Q And as far as the emotional distress goes, you don't have emotional distress from losing $150?

A No. The potential of losing my home.

Q The potential of losing your job?

A Yes, and subsequently my home.

Q And if you were to adhere to the rules that the university has in the security department, you

would be able to feel comfortable keeping your job; correct?

A No, because they change the rules. Rules apply differently amongst different officers.

Q All right. And are you subject to any additional attorney's fees besides the $5,000? In other words, do you have to pay anything more?

A I don't believe so. I would have to go ahead and take a look at my retainer agreement.

Q Well, just for your benefit, if you were unaware of it, the complaint has now been amended to eliminate the request for attorney's fees and emotional distress damages so that the only thing left is $150 in this case.

Now, you told me about a number of times when you were disciplined or counseled. You didn't mention a counseling on August 31, 2011, for failure to wear your helmet properly on the bike. Do you recall getting a counseling for that?

A No, I don't recall that.

Q You don't remember anyone counseling you in the summer of 2011 with regard to proper bike attire?

A Bike attire as in how?

Q The helmet.

A The helmet? I was told to buckle up my

helmet, but I wasn't assuming that that was a counseling or a coaching or anything of the sort.

Q So you were told you needed to keep your helmet buckled, that that was part of the rules; correct?

A No. I mean I was told to buckle my helmet, but I wasn't --

Q Who told you that?

A I believe it was Dan Killen.

Q He was the director of safety?

A He's the -- no, he's the director of operations. I didn't even know that that was a hearing or anything like that. I wasn't offered union representation.

Q I didn't suggest that there was a hearing, but you were instructed that you needed to buckle your helmet; correct?

A Yes, I was.

Q And were you aware prior to that that it was a rule that you keep the helmet buckled for safety reasons?

A That was kind of muddled.

Q Let me just see if you can answer this yes or no. Were you aware prior to the time when you were counseled by Mr. Killen about buckling your helmet

that there was a rule that you should keep them buckled?

A The rule was very muddled because with the -- when we were taught to ride the bike, we did not buckle up the helmet because in the event that somebody did want to start an altercation with us that someone would be able to grab the bottom end of the helmet and lead you wherever you wanted to go and in which case it would be better that the helmet would just fly off should a situation like that arise. So it wasn't -- it's not written down. It's not either way. It's not written down that we have to keep it buckled and not written down to keep it.

Q Now that you've been told by Mr. Killen that you should keep it buckled, did you keep it buckled?

A I did for the remainder of my time on the bike unit.

Q And I know you were counseled in August of 2011 by Mr. Chavis for the incident at the law school where you were seen congregating with another officer instead of being on your patrol. Is that right?

A Yes.

Q Were you counseled at any other times for congregating with other officers instead of being out on patrol?

A There was another time. I don't remember the specific date, but it was the Spring Fling which is a spring concert that the university puts on for the students. The incident, how it happened was --

Q Which year was that?

A I'm not sure. I'm not a hundred percent. I know I was on the bike at the time.

Q And that would be sometime in what, the May period?

A April, end of April.

Q And was that Mr. Killen that counseled you then?

A I believe so.

Q And it was for congregating with other officers instead of being on your patrol?

A It's not exactly the case.

Q What did he counsel you for?

A That's what he counseled me for, but --

Q That's what I was asking. Just he counseled you for congregating with fellow officers -- let me get the question out. Is it true that Mr. Killen counseled you for congregating with fellow officers as opposed to attending to your duties?

A Yes.

Q And that's something that has happened --

that counseling for congregating with officers is something that's happened three times in your career?

A I haven't kept count.

Q And have you had any counseling since February of 2013 or discipline?

A In October of this past year there was mention by Reginald Chavis that I needed to start approving my time sheet, and under --

Q That you need to what?

A Start approving my time sheet.

Q What does that mean?

A The way that we get paid is we are automatically scheduled for certain days, and if we have any overtime, we go ahead and add that in, and then we approve that, yes, you know, yes, I worked these hours.

I had a bad habit of not approving the time, and he had said that I needed to start approving my time. The conversation initially didn't start off like that, and at the end he said consider this a coaching.

Q So he was trying to make sure that you abided by the rules and approved your time sheet; right?

A That's not a rule. It hasn't been -- there is no rule saying that we have to approve the time sheets.

Q But you were told to approve the time sheets?

A Yes, but there's no rule for that.

Q I see. So unless someone puts it in writing, you think you can ignore what your supervisor tells you?

A I don't think that at all and that's when I started --

Q So is it true that you should be approving your time sheets now?

A And I have been since then, but there is nothing in writing saying that I have to approve my time sheet, and I received a coaching on the policy that is nonexistent even as of today.

Q And in connection with this lawsuit which is limited to the one day suspension, do you think Yale did anything wrong other than to give you a suspension as opposed to a verbal warning?

A Yes. I believe they enforce the rules unfairly. Other officers have gone ahead and have done the same things that I've done multiple times.

Q Let's stick to this incident, February 2013. Which other officers are you aware of who have within the same week violated the rules about studying while they should be patrolling and possession of keys they should not have?

A All the officers --

Q You have to give me names.

A You can -- I'm pretty sure you can get a duty roster.

Q You have to give me names.

A There are too many to list.

Q Specific question. Okay. Which officers within a week's time were noticed twice by their supervisors having been studying or reading while they were supposed to be on the job and in possession of keys they should not have? That's a very specific set of people. Who was it?

A With keys, it was the entire --

Q No. I'm not asking you keys alone. Which officers over a three-day period were caught twice violating rules relating to both studying or reading while they should have been on the post and possession of keys?

A For carrying keys --

Q Please listen to the question. I'm asking you a specific question.

A And I'm trying to answer your specific question.

Q I'm not asking you keys alone. Which officers had violations for both keys and reading while

on the job when they should have been on a post?

A And I'm trying to answer that.

Q Go ahead.

A For keys, the entire college unit which I'm currently a part of. That would be --

Q Don't list them. Let me cut you off. Did all of those people also have violations for reading on the job --

A For taking breaks without calling it out, yes.

Q Did they have those within a two-day period?

A Yes.

Q Tell me who they were.

A Names would be starting off with Timothy Dwight and Silliman College officer would be Michael Robinson, the Berkeley Calhoun officer which is Eileen Vitale, the Old Campus officer which is Michael Rivera, the Trumbull Saybrook officer, Gregory Teel.

Q Gregory?

A Gregory Teel.

Q How do you spell that?

A T-e-e-l.

What day of the week was it? It would either be -- I'll just mention both of them. It would be Victor Josephson, Wanda Alicea, George Fusco, William

Hewitt, Pete Leonardo, Charlie Hebron. These would have been --

Q The last one was who?

A Charlie Hebron.

They would have both -- all those people would have had keys on them longer than the allotted time and all would have taken breaks without calling them out.

Q And would all of them have been apprehended in both violations within a three-day period?

A They would have been if they had checked, yes.

Q That wasn't what I asked you. Were all of them apprehended?

A No, I don't know actually. I don't know whether or not they were caught.

Q So with regard to all of those people, do you know whether any of them were caught in a three-day period both possessing keys they should not have possessed and taking breaks without calling it in?

A No, I do not know whether they have been caught.

Q And do you know whether any of those people were ever disciplined?

A I do not know.

Q So when you say that Yale enforced the rules selectively, you actually don't know what Yale did with regard to those officers?

A I have no idea what they did with those officers.

Q And you have no idea whether the violations those officers engaged in were known by management; correct?

A Oh, they were known by management.

Q And who knew? Let's take them one at a time. Michael Robinson?

A It would have been known by management.

Q Tell me the dates that he violated the rules regarding keys and undeclared breaks in a three-day period?

A It would have --

Q And tell me the supervisor who apprehended him.

A I don't know if the supervisor apprehended him, but this was a common --

Q Sir, that's all I'm asking you.

A I understand.

Q Let me just explain something to you. In order to make a claim that Yale has selectively enforced the rules, Yale has to know about the

violations. Are you aware of any of the security officers that you've mentioned who you claim violated the rules, are you aware of Yale's management knowing about any of those violations?

A I am not aware if they -- I'm not aware of actions that were taken against them.

Q And you're also unaware of whether or not Yale management was aware of violations of rules by those officers. Is that a fair statement?

A These were commonplace practices amongst all the officers.

Q Right. The officers might know a lot of things that management doesn't know. I'm asking you to list for me which of the officers violated the rules and in which cases where management was aware of them and which managers were aware of the violations of the rules.

A Nucci got hired in 2010. It would have been since 2010 since he finished his training up until the date that these incidents in January would have occurred. These were everyday common practices amongst every security officer across the board.

Q I understand that, but did you ever see Mr. Nucci apprehending one of the security officers who was engaged in a rule violation?

A No, I have not seen that.

Q Have you seen any supervisor encountering an officer who was engaged in a rule violation?

A Can you repeat? I'm going to ask for a little clarification.

Q Sure. Have you ever seen a Yale manager who apprehended one of the security officers who engaged in one of these rule violations?

A No, I have not seen that.

Q So in point of fact, you don't know whether the Yale management was aware of these rule violations that you're claiming occurred by your fellow officers, correct?

A I have not seen it, but there are --

Q That's all I was asking.

A There would be records of the key tracks and radio recordings and whether or not these officers did in fact call out breaks and whether or not they took keys and for how long they carried said keys for.

Q Have you seen those records?

A No, I have not seen those records.

Q So would it be a fair statement that you actually don't have any evidence of Yale treating you selectively?

A I have no idea, but there is evidence out

there.

MR. NOONAN: I don't have any other questions.

CROSS-EXAMINATION

BY MR. BROOKS:

Q Good afternoon, Mr. Klotsche. Is that correct how I pronounced it?

A Klotsche.

Q I'd like to start where you just left off with respect to the allegations of other officers and the rule violations.

Is one of your jobs as a security officer to enforce the rules against other employees?

A No, it's not.

Q So if you find an employee at Yale University who is breaking the rules, you're not obligated to report that?

A I was never specifically told that I was supposed to.

Q Are there written rules and regulations that are given to the security officers?

A There are.

Q And have you reviewed those recently?

A Not recently.

Q Do those rules and regulations include

reporting misconduct of other employees?

A It's possible. I haven't, like I said, I haven't reviewed anything recently.

Q Let me ask you a general question. Why are you suing the union?

A Because they held onto my grievance past the allotted time period. I was locked out of my step three process. I was up for a stewardship position. I was told I could not be a steward.

I had also brought up on multiple occasions about forming our own local within the context of the international. It was voted on. I had mentioned it. It was seconded. It was voted on, passed on two different occasions that I can recall. Nothing had been done about it. No explanation had been given. No paperwork has been filed, nothing of the sort.

The chief steward at the time when I had received my discipline had gone ahead and I had heard through another officer who was the recording secretary that if I had even come downtown on a date that I was suspended that he would make sure that I was fired. Again, you know, that's what the recording secretary had told me about that.

I did not feel I was being represented at all, not fairly, not at all. So I felt that this was

my only recourse.

Q Okay. So let's talk about the chief steward at the time and the comments you heard about him. Who was the chief steward?

A That would be Michael Rubino.

Q Did Mr. Rubino make any statements to you?

A Not to me directly.

Q Who reported to you that Mr. Rubino made statements?

A That would be Judith Rivera and she is the recording secretary.

Q And when did Judith Rivera report this to you?

A This was about the time that the discipline -- I was notified of the discipline. So it would have been like the third week in February of 2013.

Q Before or after you filed a grievance?

A This was after I filed the grievance.

Q Before or after the second step meeting?

A Before.

Q And were you in a face to face conversation with Ms. Rivera?

A I was on the phone with her.

Q Who called who?

A I had called her.

Q And do you remember the time of the day?

A No, I do not.

Q Were you at work?

A No, I was not.

Q Did you use your home phone or your cell phone?

A Cell phone.

Q I guess I shouldn't have even assumed you had a home phone. I'm not sure everyone does now.

And did you call her on -- what phone number did you have for her?

A Her cell phone.

Q Was she at work?

A I believe she was at work.

Q How long did the conversation last?

A Ten minutes maybe.

Q Was anything discussed other than the subject matter of the grievance and the discipline?

A I do not recall.

Q Was anyone present who heard your side of the conversation?

A No.

Q Do you know if anyone was present who heard Ms. Rivera's side of the conversation?

A I do not know.

Q Tell me what was said during this conversation.

A I had heard through another officer, Noel Cordero, that Mike Rubino was trying to mess with me, get me in trouble, and that I should call Judith as soon as I was able to. I had called her and I had told her that I had talked to Mr. Cordero and asked her what was going on, and she had then said -- I can't, you know, I can't quote word for word the entire conversation, but that Mike had basically said that if I was even seen in the downtown New Haven area that he was going to make sure that I was terminated.

Q And what, to your knowledge, was the reference to the downtown New Haven area about?

A I don't even -- I don't know, you know, anything.

Q So you have no idea why she would have said or why he allegedly said downtown New Haven area?

A Because that's where the university resides.

Q So was it your understanding it was a reference to if you were seen in the area of the university?

A Yes.

Q And did you respond to the statement?

A I did not -- I do not recall if I responded. I think I was more in shock than anything.

Q And did she say anything else?

A Not that I remember because, again, I was still in shock that this would even take place.

Q And I'm sorry, but did you originally say that you thought this conversation took ten minutes?

A Again, I'm not exactly a hundred percent sure on it.

Q Okay. Well, let me go over a couple rules here in this deposition. When I ask a question, if you aren't sure of the answer, please let me know that. If you give me an answer, I'm going to assume that you have knowledge of that. Okay?

A Okay. So the length of the conversation, then I'm not exactly sure how long that conversation was. It was more than 30 seconds but less than 10 minutes. Somewhere in that area. I wasn't looking at the clock during the course of the conversation.

Q Okay. So let's talk about your conversation then with Noel Cordero. When did that conversation take place?

A Right before I had called up Judith Rivera.

Q Was that by phone?

A I had spoke to her. I had been contacted by

Mr. Cordero through a text message.

Q He texted you?

A Yes.

Q And do you recall the content of the text?

A Saying to call -- well, specifically -- and I'm sorry, I mean I don't exactly know what the rules are with language, but he did, you know, he did say you need to call Judith ASAP because Mike is trying to fuck with you.

Q And are you reading that or is this what your memory recalls?

A That's what my memory recalls. I have -- I can look on my phone and get the exact wording, but I do remember that if it's not exactly that, it's pretty close.

Q You still have that text?

A Yes.

Q And do you have your phone with you?

A Yes.

Q Will you retrieve the text message?

A Okay.

I'm sorry. It's taking me a little long to find it.

Q That's okay.

A Okay. It's dated February 25, 2013. It was

at 9:24 p.m. Noel Cordero, "Call Judith." Next message is "ASAP, Mike is trying to fuck with you."

Q Hold on. You said the next message, so this came in a series of messages?

A Yes.

Q The first one was at 9:24 that said, "Call Judith"?

A Yes.

Q And then there was a separate one that says "ASAP, Mike is trying to fuck with you."

A Yes.

Q And what time was that?

A That was also at 9:24.

Q And then there was another message?

A My response was "Thanks bro." And then I had -- my response after that was I had just got off the phone with her.

Q So you responded "Thanks bro." What time did you respond?

A That was still within the -- the 9:24 was when I responded, "Thanks bro." Because I have an iPhone, it's still showing that I just got off the phone with her. Comment is being recorded at the same time, but it was -- there was definitely at least a couple minutes separation between the two.

Q Okay. And your statement was "just got off the phone with her"?

A Yes.

Q And then was there any more in that sequence of texts?

A No.

Q Did you have any conversation with Noel after those texts in which you discussed your conversation with Judith?

A When I discussed the thing about Judith, no.

Q Did you have any conversation with Noel after those texts in which you discussed Mike and his trying to fuck with you?

A Yes.

Q That conversation?

A I mean this is pretty -- this is pretty vulgar.

Q But we want you to do your best to remember the exact words.

A I'm looking at it right now. It's fairly vulgar. I'm not -- should I drop the swear words?

Q No.

A February 25th at 9:57 p.m., Cordero said, "Fuck him that fat fuck. We run this shit."

My response being --

Q Hold on. Let me write that down.

Okay. Go ahead.

A My response was, "He should have listened to all of us all along and shown some sort of loyalty to us. It's about to stop."

Q Okay. Was there any further conversation in that series of texts?

A Yes.

Q Go ahead.

A "Fuck him. No more side deals, no more secret shit, not anymore." It continues on, "He does not care about anyone but himself. Eight months it took me to deal with my issue. I did it, not Mike, me."

My response to that was, "He's lucky we're only looking to vote him out and not contact the NLRB about him."

His response was, "We need solid proof. Just the trendy uniform thing is enough." Then he went on to say, "I can't wait to say something to his ass."

Q Okay. Was that the end of that series?

A Yes.

Q Now, who is Nick Cordero?

A Noel Cordero, he's another officer that I work with.

Q Does he hold a position in the union?
A No, he does not.
Q At that time did he hold a position in the union?
A No, he did not.
Q Did he ever run for union office?
A No, he did not.
Q And during this conversation what was meant by you when you said, "He's lucky we're only looking to vote him out"?
A We had gone -- at the time we had been -- he had -- him, Noel Cordero, and Judith Rivera were looking to get another vote taken place for chief steward position. Mike Rubino was given the position as a temporary emergency action because the previous steward had resigned, and we were told another vote was going to take place and it never did. So we were looking to pass on a petition to have a new vote.
Q Who was the previous steward?
A It would be Albert Krebel.
Q And when did he resign?
A Shortly after being voted into the position.
Q Do you know when that was?
A Not off the top of my head.
Q Do you know which year that was?

A It was the first year that I became affiliated with the Security, Police and Fire Professionals of America.
Q Do you remember when that was?
A 2010, 2011, something like that. I think that's when the contract negotiations have ended.
Q So Mr. Krebel was elected chief steward?
A Yes.
Q And then he resigned his position?
A Yes.
Q And then the local appointed a replacement?
A Yes.
Q And the replacement was Mr. Rubino?
A Yes.
Q And this was sometime in 2010 or 2011?
A Yes.
Q So Mr. Rubino remained in place for two to three years as chief steward?
A Until this past election cycle. I think it took place in January.
Q Of 2014?
A Yes, January, early February, somewhere in that neighborhood.
Q So when he was first appointed as chief steward, did you have an objection to that?

A No, I did not have an objection to that.
Q So it wasn't the manner in which he was appointed. It was the manner in which he was representing the employees that you objected to?
A Yes.
Q And are you aware of any bylaws of the local union that would have required an election to replace Mr. Krebel's position as opposed to an appointment by the union?
A No, I'm not aware of any bylaws.
Q And Mr. Rubino had to stand for election in past January?
A Yes.
Q Did he run for re-election?
A Yes.
Q Did someone run against him?
A Yes.
Q Do you know who?
A Dirk Morra.
Q Do you know who won?
A Dirk Morra.
Q So Mr. Rubino is no longer the chief steward?
A No, he's not.
Q Now, prior to this, had you had any run-ins with Mr. Rubino, prior to the February 25, 2013?

A He represented me in the incident that took place at the law school.
Q The one at the law school was when?
A Can you refresh my --
Q Is that the first verbal warning that you received in 2011?
A Yes, 17 months prior to the suspension.
Q Okay. So he represented you in 2011?
A Yes.
Q Other than that was there any -- did he represent you at all?
A No.
Q And when he represented you in 2011, what was your relationship with him?
A It was a working relationship. We weren't friends nor did we have any issues with one another.
Q Do you have any idea why it would have been reported then that he was so upset with you in February of 2013?
A I had spoken to Judith Rivera about my grievance process. She had asked me, because we were in the middle of a petition, she had asked me since she was at a post where she couldn't move -- she was running the circulation desk at the health plan -- since she couldn't move from her post and since I was

off duty at the time whether or not I would mind going to the medical school portion of the campus to see if there was anybody else that wanted to sign the petition. I think -- I'm only speculating at this point, but I believe that that was the cause for him to make his comments of if he even comes downtown, I'm going to make sure he gets fired.

Q And was that comment then with respect to your circulating the petition?

A I'm not a hundred percent. I believe it would be.

Q And are you allowed to go on campus and engage the other security officers if you're off duty?

A Yes. We have an open campus, and a majority of the buildings that we have on campus are open to the public.

Q So when you're off duty, you can go and start talking to the security officers and ask them to sign a petition and that would be approved?

A I believe so.

Q You're not sure?

A Well, I don't think there's anything -- I don't believe that there's anything in the rules or anything saying that I can't if I decided to.

Q Okay. You'd be taking that security

officer's attention away from their duties; correct?

A I guess so.

Q And would that be a rule violation?

A I mean I'm still not -- I still wouldn't -- no, because I'm not on duty at the time. If I were on duty, I could see how that would be, but since I was off duty, I'm not a hundred percent on whether that would be a violation or not.

Q Did you circulate a petition at all with respect to removing Mr. Rubino while you were off duty?

A I had been asked if anybody -- if I would go to the med school to see if there was anybody that wanted to sign. So I'm not sure if that would be circulating or not because I didn't spearhead or initiate anything like that.

Q So when you went to the med school, that was while you were off duty?

A That's while I was off duty, yes.

Q So when you spoke to Judith Rivera when she was sitting at the desk, you were off duty at the time?

A Yes, I was.

Q Now, you also said that you believe -- you're suing the union because you believe they acted -- let me make sure I got this right -- because you wanted to have your own local?

A Yes.

Q Why have you reached that conclusion?

A We are underneath a local in Pittsburgh. I believe it's 502. We haven't received help from them at all for anything, day-to-day operations to training stewards to even coming to meetings to help us, you know, conduct the meetings, show us how a meeting is conducted. We had asked for financial reports. They were denied us. We were told that if we wanted to see the financial records that we would have to go down to the office in Pittsburgh and they would show us then.

The fact that none -- our grievances were being held by Michael Rubino, and he had said that in meetings as well that he was looking to hold onto the grievances until he got a lot and then turn them into HR to show that, you know, these are -- that these aren't isolated incidents. I think that's what he was trying to get at.

And just in general, us and Yale feel very abandoned by the union in Pittsburgh. We wanted a little bit more control over our day-to-day operations, our financial situation. I understand that a portion of dues would have to go to the International, but we would still be able to be in control of the other portion.

Q And what did you do in terms of trying to seek a separate local union?

A I had mentioned it at one of the meetings. I had taken the book of the bylaws because this is something that I did look up in the bylaws and I quoted from the bylaws the article and section that said that we could.

Q And when you say during a meeting, what type of meeting?

A During a union meeting.

Q When was that meeting?

A I don't remember when exactly it was, but it was a formal meeting.

Q When was it in relation to your discipline?

A It was well before.

Q When you say well before, what do you mean?

A At least a year probably.

Q Do you recall who was at this meeting?

A Michael Rubino; Judith Rivera, she was recording secretary; Noel Cordero I believe was there; myself; Charlie Hebron was there; Adele Rubio, another security officer was there. Those are the ones that I can remember specifically off the top of my head. I know there are approximately 18 people on the sign-in sheet though.

Q Do you have a copy of the sign-in sheet?
A No, I do not.
Q You remember that from a meeting that took place two years ago?
A That was typically what we had always gotten. It was between 12 to 20 people. So it was probably, you know, probably in the neighborhood -- it was somewhere in the neighborhood of that. I haven't been to a meeting, though, since this lawsuit was filed.
Q And when you suggested that there be a separate local at this meeting, how did Mr. Rubino react, if he did at all?
A It was nonverbal. He didn't say anything about it, but he, you know, he looked like, you know, what am I going to -- you know, he looked puzzled I guess. That's probably the best way to put it, you know.
Q Describe what you mean by him looking puzzled.
A He looked taken aback because it was a surprise because I had in fact quoted from the bylaws at that time, and you know, surprise I mean eyebrows raised, eyes opened. I mean just in general surprise.
Q And that's when you were quoting from the bylaws?

A Yes, it was.
Q But he didn't say anything during this meeting about your proposal?
A No, he did not.
Q Did you have conversations with him after this meeting through the date of February 25, 2013?
A In regards to this, no, I don't believe so.
Q How about in regards to anything?
A I don't believe so.
Q And then the February 25th meeting that you -- I mean conversations that you had, the texting you had with Judith Rivera, was that the same day that Judith Rivera asked you to distribute the petition to the -- was it the medical school?
A I believe it was. I'm not a hundred percent. It might have been the day before. I'm not -- you know, it was either that day or the day before.
Q Okay. And I want to make sure I understand. So for a year you have no conversation with Mr. Rubino. You then start actively passing a petition to have him removed from his office?
A Yes.
Q And you heard that he's pissed off. Excuse my language.
A Yes.

Q To your knowledge, that didn't have anything to do with your discipline?
A I do not know if it had anything to do with my discipline.
Q And to your knowledge -- well, this occurred prior to you filing the grievance?
A No. I had spoken to -- this was -- my grievance was already turned in I believe.
Q You dated your grievance February 27th, two days afterwards.
A Okay. Then I'm mistaken. It was about that time, though.
Q So it was two days before you filed your grievance or turned in your grievance?
A Yes.
Q And are you suggesting that somehow the union failed to act properly with your grievance because of your activities regarding Mr. Rubino's position?
A I believe that was the case, yes.
Q And what is your evidence?
A I don't have any text messages or emails or anything of the sort.
Q Did you have conversations with someone in which they said that the union was going to retaliate against you with respect to your grievance because you

were passing the petition against Mr. Rubino?
A No, I was not specifically told that.
Q So you're just surmising that the two are somehow related?
A I believe so, yes.
Q But other than believing so, you have no evidence that they are?
A No.
Q And you said that the grievance was filed untimely?
A Yes.
Q That you were locked out of the step three process as a result?
A Yes.
Q What do you mean you were locked out of the step three process?
A I was not told the meeting place or the time, nor was I invited by anybody within the union.
Q And what does that have to do with the fact that the grievance was filed untimely?
A It's just in addition to.
Q Now, when step three meetings are held with Local 502 and Yale University, does the grievant usually attend?
A I don't know. I would assume that I would

have the right to attend just like I would the step two meeting.

Q So this is an assumption?

A Yeah. I wasn't explicitly told otherwise that I wasn't allowed to attend.

Q Did you review the collective bargaining agreement?

A I have.

Q Does it say that you're entitled to attend the step three meeting?

A I don't believe it says I'm not entitled to attend.

Q And did you communicate to anyone that you wanted to attend the step three meeting?

A Yes.

Q To whom did you communicate that?

A Judith Rivera.

Q When did you communicate that?

A It was shortly after I received notice I was going to be denied. That was denied at the step two process, at the step two.

Q How did you communicate that to Judith?

A That I wanted to pursue this grievance as far as it would go.

Q I'm sorry, in what manner? Did you talk to

her, send her something?

A I talked to her over the phone.

Q What day was it?

A I don't know.

Q And did you call from your cell phone?

A Yes.

Q Where was she, do you know?

A I do not know where she was.

Q Did anyone hear your side of the conversation?

A No, not that I -- people might have heard it in passing as they were walking by, but these were people walking on the street.

Q You were on the street at the time?

A Yes.

Q Were you on or off duty?

A I was on duty.

Q Are you allowed to use your cell phone while you're on duty?

A I'm not sure because this was a union activity. I'm not sure if I was -- I know that I'm allowed to speak to -- I believe I'm allowed to speak to stewards when I'm on duty. So I'm not a hundred percent sure whether this falls in a realm where I can't do it or where I can do it.

Q Let me take a step back. Are you allowed to carry your personal cell phone while you're on duty?

A Yes.

Q Do you know where Judith was when you called her?

A Not that I recall.

Q Was she working?

A I believe she was working that day. I'm not sure whether she was on duty. I think she was working.

Q You work the same shift as Judith?

A She comes in -- she works 2 p.m. to 10 p.m. I work from 6 p.m. to 2 a.m.

Q And what did you tell Judith exactly with respect to -- tell me about the conversation.

A The conversation was that she told me that my grievance was denied, that she didn't believe it was going to go anywhere, and basically trying to persuade me to abandon the grievance.

I had told her the opposite, that I wanted to pursue the grievance as far as it would go and I just wanted to be heard with everything. She agreed. Yeah, she agreed.

Q Did you call her or did she call you?

A I don't recall.

Q So you asked that it be appealed further?

A Yes.

Q And to your knowledge, was it appealed to the step three?

A I believe that this is the -- that it was appealed to the step three. I was told it was.

Q And was a step three meeting held to your knowledge?

A I was informed afterwards that it was discussed at the labor management meeting.

Q And do you know who represented the union at that meeting?

A No, I do not.

Q And do you know whether a response was given to the union following that meeting with respect to your grievance?

A I do not.

Q And do you know what the union did at that point?

A I know that they said that they weren't going to pursue it any further towards arbitration.

Q Okay. Now, did you want your case to be arbitrated?

A Yes, I did.

Q Are you entitled to have your case arbitrated?

A I believe so, yes.
Q Under what theory?
A I believe that -- I just think it was the right thing to do, you know.
Q Does the union have to arbitrate every grievance?
A No, it does not.
Q Does it have to arbitrate every grievance that the grievant wants arbitrated?
A No, it doesn't.
Q So the union can exercise discretion in arbitrating grievances?
A Yes.
Q And could the union exercise discretion deciding not to arbitrate your case?
A Yes.
Q And then what did they do wrong?
A They held onto a grievance past the allotted time period.
Q So it was untimely?
A It was untimely.
Q But didn't the union and the university also discuss the merits of the case --
A Yes, they discussed --
Q -- during the step two hearing?

A Yes, I was at the step two hearing.
Q And the merits of the case were discussed?
A Yes.
Q And you were allowed to say what you wanted with respect to your position?
A Yes.
Q And can a union decide not to arbitrate a case if it believes that the merits of the case are not valid?
A Yes.
Q Can a union decide not to arbitrate a case if it believes that it is not cost effective to arbitrate a case?
A Yes.
Q And could Local 502 or the International Union have concluded that the merits of your grievance were not valid?
A They could have. I don't know specifically.
Q And if they did so, would that have been a legitimate basis for not arbitrating the grievance?
A Yes.
Q Now, let's talk about your grievance for a minute. You drafted this. Is that right?
A Yes.
Q You decided the words to put in it?

A Yes.
Q And in your grievance, and this was discussed a little earlier when Mr. Noonan took your deposition, you state that the unpaid suspension was too severe and that you should have had a verbal warning?
A Yes.
Q So you were admitting from the beginning that you deserved some discipline?
A As I had stated previously, I was thinking that it was a common ground to meet and I would have accepted a verbal.
Q And why a verbal?
A The lowest -- it's the lowest form of the discipline.
Q So you believe that you should have received the lowest form of discipline?
A Yes.
Q And that by receiving the suspension, what? That progressive discipline wasn't being followed?
A Yes.
Q That's what your complaint says; right?
A Yes.
Q But you had already received a verbal warning in September of 2011. Is that correct?
A Yes. It was -- I think it was August of

2011.
Q Well, the document I've seen is dated September I believe it's the 7th, 2011.
A Okay.
Q So that's on your record.
A Okay.
Q Is that right?
A Yes.
Q And so when you get disciplined for the events of January, wouldn't you move up to the next level of discipline?
A Yes, I would move up to the next level.
Q What's the next level?
A It would have been a written warning.
Q A written warning. Okay. So would you agree with me then that under the progressive discipline policy you should have had a written warning, not a verbal warning?
A Yes.
Q That's for January 9th?
A Yes.
Q How about January 11th?
A Maybe it's my fault, but I've lumped the two incidents together.
Q But you were accused of two different

violations of the rules. Is that right?
A Yes.
Q And you could be disciplined for each one separately. Is that right?
A Yes.
Q I mean they weren't the same incident. They were two separate incidents?
A Yes.
Q So if you were disciplined for each separately and you already had a verbal on your record, you would have received a written for January 9th and a suspension for January 11th. Is that right?
A Yes, I believe so.
Q So progressive discipline was applied?
A Arguably.
Q Arguably. Okay. So the local union in analyzing the grievance could have concluded that your argument that there wasn't progressive discipline was misplaced?
A Could you clarify?
Q Sure. When the union analyzed your grievance and decided whether to arbitrate it or not, one of the factors it could have looked at is whether your claim of failure to administer progressive discipline was valid?

A Yes, okay.
Q And in doing so, based on the fact that you had a verbal warning from 2011 that was 17 months prior to this incident and two separate incidents in January of 2013 for which you could have been disciplined twice, the local could have concluded that the suspension to you was consistent with progressive discipline?
A Okay.
Q Do you agree with that?
A Yes.
Q If you just give me a minute, I want to look at my notes here.
Is there any evidence that you have that the grievance was filed untimely because of your union activities?
A No, I do not.
Q And when you drafted the grievance, do you know what step it should be filed in?
A I believe it should be filed at two.
Q Collective bargaining agreement says for suspensions and terminations, the grievance should be filed at step two. Is that right?
A I believe so.
Q And under step two, the collective bargaining

agreement provides that the employee, that would be you, may file the grievance with the director or his designee. Is that right?
A Yes.
Q So you had the right and the opportunity to file the grievance with the university?
A Yes.
Q You did not do so. You asked the local union to file it for you?
A Well, again, this was my first grievance. This is still my first grievance and my only grievance. I wasn't explicitly explained on how the whole process worked. I figured I filled out the grievance. I turned it into the shift steward.
Q You read the collective bargaining agreement?
A I have.
Q Did you read the collective bargaining agreement before you filled out the grievance?
A Yes.
Q And so you had the opportunity to review the grievance procedure?
A Yes.
Q Now, the grievance that you filed, you drafted the contents; right?
A Yes.

Q And you stated that article six, section one and section four were violated?
A Yes.
Q And when I look at the collective bargaining agreement, article six is employee categories, definition of employee.
A The copy of the contract that I have was not the final one. I was given the copy that I had used to draft the grievance from Judith Rivera. I realize that it's not that specific article, but that the article that I'm referencing was mentioned still in the collective bargaining unit agreement.
Q Okay. So you miscited the article. You were referring to a different article, but you had the right language?
A Yes.
Q The amended complaint that you filed, and you testified earlier that you reviewed this before it was filed; correct?
A Yes.
Q It says that you were a candidate for the position of second shift union steward at the time?
A Yes.
Q Tell me about that.
A After my incident, I don't know exactly how

long afterwards, the shift steward who was representing me, Joe Ryan, had stepped down from the position, and they were looking to have an election for a replacement. I was nominated and I accepted the nomination and I was denied the position.

Q What do you mean you were denied the position?

A To my knowledge, I was the only one that was running, and I was told by the union that I could not be the steward because of my discipline process. They had cited something like a member in good standing.

Q Who told you that?

A It was Judith. I believe it was Judith Rivera.

Q And when was that?

A It was shortly after the nomination.

Q When was the nomination?

A I don't recall offhand.

Q And when was it in relation to your discipline?

A It was after I filed the grievance.

Q Did the second shift have a steward then?

A Not a specific second shift steward. The only two representatives were Mike Rubino who is the chief steward and Judith Rivera who was also recording

secretary, but there was no designee for second shift steward.

Q And did that change?

A No, it did not change.

Q Wasn't Joe Ryan, didn't he come back from his leave and take the position again in 2013?

A Not that I was made aware of.

Q In fact, isn't that why the election was not held because he returned to the position?

A No, I was not aware of that. They did pass out the nomination slips. I was nominated. I accepted the nomination, and from there I was told I couldn't be because I was not a member in good standing.

Q Were you told that on the same day that you accepted the nomination?

A It was shortly after.

Q Was this during a meeting that you were told that?

A I'm not sure. I believe I was speaking with Judith still about the grievance. If I remember correctly, it was sometime between the second and third step.

Q So it was after the second step was filed?

A Yes, I think.

Q Where do you believe that you were when you

were speaking with Judith?

A I don't remember specifically.

Q Was it by telephone or in person?

A I believe it was in person.

Q Was anyone else present?

A Not that I remember.

Q Do you know Mike Guzman?

A Mike Guzman, yes.

Q He was nominated for the position also, wasn't he, the steward position?

A I don't know.

Q So when you say that you were the only one who was nominated, you actually don't know that?

A To my knowledge I said I was the only one that was -- to my own knowledge, I was the only one that was nominated. I was not made aware of who else may have been or may not have been nominated.

Q Bill Hewitt, do you know Bill Hewitt?

A Yes, I know Bill Hewitt.

Q Do you know whether he was nominated for the position?

A I do not know.

Q So as far as you know, there may have been three people nominated including yourself?

A There may have been. I'm not a hundred

percent. All right. I don't know who else was nominated. I know I was nominated, and I know why I was told I could not be a steward.

Q Okay. But when you testified earlier that you were the only one nominated, that's not accurate. Well, you don't know one way or the other?

A You know, I still, to my knowledge, I was the only one that was nominated.

Q What did you do with your grievance after you filled it out?

A I had given it to -- I had talked to the manager on duty which was Reginald Chavis, and I asked to speak to Joe Ryan citing union business. I was able to meet up with Joe Ryan who was driving transit that night, and I passed my grievance off to him.

Q Did you have any conversation with Mr. Ryan with respect to that grievance?

A Not with respect to that grievance.

Q Did you tell him anything about what you wanted done?

A No.

Q So you just handed him the document?

A I handed him the document. You know, here's my grievance.

Q Did he say anything to you?

A Not in regards to the grievance itself.
Q What did he say otherwise?
A He had said something about me with the petition a couple, you know, or about the same time period. He had said that I could get in a lot of trouble and that I could get fired for that.
Q For what?
A For passing around the petition.
Q While you were working?
A I don't know whether or not he was saying whether I was working or whether I was off duty or not, but the only time that I passed around the petition is when I was off duty; I'm assuming that's what it was reference to.
Q And did you have any discussions with Mr. Ryan after you handed him the petition with respect to the progress of the grievance?
A No.
Q I mixed up words there.
Did you have any discussions with Mr. Ryan after you handed him the grievance with respect to the process of the grievance?
A Not that I recall.
Q Did you have a discussion with any union representative with respect to why the grievance was

filed when it was filed?
A No, I did not.
Q So did you have any evidence with respect to reasons why the grievance was delayed in filing, if it was?
A I don't have any evidence other than the fact that it was dated the date that it was and with the collective bargaining agreement that the time frame is -- I believe it's ten days, ten business days.
Q And does your grievance state a date other than the date that you filled it out?
A No, other than the -- I believe it's the dates that are in question, like the dates that the incidents happened. I don't believe -- I believe the only dates mentioned was possibly the dates that the incident occurred that led to the discipline and the date that I turned it in to the steward.
Q I'm asking you looking at it, and I apologize because we're not in the same room, otherwise I would show it to you right now. But when I review it, I see it's dated 2/27/13 both at the top and where your signature is, but I don't see any other date with respect to identifying the incident or the discipline.
A All right. Then I'm sorry. I don't have it -- now I have it in front of me.

MR. BROOKS: Thank you whoever presented it to the plaintiff.
BY MR. BROOKS:
Q So am I missing something here? Is there any other date on here other than the 27th?
A Other than the date that it was reviewed by Dan Killen and that was the -- the date that he received it, March 14th of 2013, and the date that it was decided on by Dan Killen also which is March 26th of 2013. Those are the only dates on there.
MR. BROOKS: I have no further questions of the plaintiff.
MS. McLEAN: I have a few.
MR. KLOTSCHE: Can we take a quick break?
MS. McLEAN: Sure. Short break, five minutes.
(THEREUPON, A RECESS WAS TAKEN FROM 2:12 TO 2:34.)
CROSS-EXAMINATION
BY MS. McLEAN:
Q There were a few things I wanted to clear up with you. Attorney Noonan had asked you if you had any evidence that management was aware of carrying the keys or not reporting breaks. Do you have any evidence that

management was aware?
A Yes.
Q Please address that.
A Yes. The 21st of this past month, a pre-shift roll call, Reginald Chavis had said -- I got the note written down here.
Q Who was Reginald Chavis?
A He's the manager for second shift. He is a second shift manager supervisor.
As you know, we don't carry keys, but what the manager don't know won't hurt him, as long as you don't lose the keys. He said that at approximately six o'clock on the 21st.
MR. NOONAN: And you have that in writing somewhere?
MR. KLOTSCHE: Yes, I have a note right here on my phone.
MR. NOONAN: Can you make a copy of that?
MR. KLOTSCHE: Yes.
BY MS. McLEAN:
Q Now, did you draft the note?
A Yes, I wrote this note.
Q How close to the time he actually said that did you make the note?

A Almost immediately after.

Q There was also some conversation or a question was asked about some comments you had made to Chavis, and you said they were taken out of context?

A Yes.

Q Can you explain what you meant about out of context?

A Earlier that evening there was a miscommunication over the radio on who was going to cover one of the residential colleges. Base had dispatched -- was looking for an officer covering I think it was Trumbull College. I'm not a hundred percent on which college it was, but it was because we were short one officer that night. Base had repeated, had two times called for an officer who was covering. I was not covering this college that was in question at the time, and Reginald Chavis had come over the air and said -- I'm not sure if we were on the radio or if we were on the call because we change call signs. I wasn't sure if he was still on the call sign, but he said, "Five to 78".

And I responded, you know, "78, go ahead."

And he said, "I believe base is trying to call you," just like that.

So I had responded, you know, "Okay base. Go

ahead with the call."

I have a lockout at one of the colleges. It wasn't mine because another officer and I had doubled up on -- we had split the colleges, the absent person's college in half, and it was for the college I did not -- I was not covering. And I was like, we have a lockout in this college, you know, this entryway, this room number. You know, that's not my college, like that over the air.

Later that -- I was embarrassed about the entire situation because he had -- the way Reggie had spoken to me over the air was pretty derogatory. It was like a parent scolding, you know, their child, and I had walked into his office to discuss that matter with him, that the radio etiquette wasn't called for.

He had apologized for it and he had said, "You don't know the stress that I'm under." He said, "This guy," pointing across the hall to Nucci's office, "is here for two weeks and then goes off for another three or four weeks. He writes somebody up and I'm the one that has to deal with everything. You know, I'm tired of it." You know, that's what his words were.

So I had said to him, because at that time I thought we had a friendship, "Don't worry. Do what you have to do. I'm a man and I'm going to take it on the

chin. It's not like I'm going to get suspended or fired."

The only thing I was trying to do was to reassure a friend that I was okay with what was going to happen. I did not expect my quote to be submitted into the write-up that ended up being discussed in my interview. I chose not to answer at the time because I did not -- one, I was totally taken aback that it was even mentioned, and at the time I still didn't want to go ahead and I did not want to get him in trouble for anything. So I had refused to give, you know, a context because he was bad mouthing his colleague who was also the manager at the time and also Dan Killen by allowing him to take all -- to take time off and everything like that. So I tried not to throw him under the bus with anything. I really didn't want to. That was the last thing, and still I only say this now because we're at the process we're in now.

Q Are you proud to be part of Yale security?

A Yes, I am.

Q Do you have a family history of people being involved in Yale security?

A Yes. My parents were both Yale police officers. They got hired in the mid seventies. My mother was the second or the third female officer in

the department.

Q How long did she stay there?

A She retired in 2005. So almost 30 years, about 30 years, give or take a year or two.

Q And how about your dad?

A My father initially started off as a New Haven police officer but then went over to Yale University where he stayed until I think September 2012. September or October 2012 was his official retirement date.

Q Have you felt targeted, though?

A Yes, I have.

Q And to get to the union, did any union representative ever communicate to you that the January 9, 2013, conduct could have or should have resulted in a written warning?

A No.

Q Did any union representative ever communicate to you that the January 11, 2013, conduct should have or could have resulted in a suspension?

A No.

Q You were asked by the union, Attorney Brooks, if you had any evidence that your union activity or the untimely filing of your grievance was related -- do you have any evidence to believe that it was in retaliation

against you? Do you have anything? I mean what makes you think -- where did you come up with this reasoning?

A Because the incident where I was passing out the -- where I was going around with the petition was so close to the date that my grievance was filed and turned in that I definitely felt like that this was directly targeted against me.

The chief steward also had a habit of holding on to past grievances until he had gotten what he considered enough to bring to human resources and then, you know, submit everything all at once.

Q Do you think it was just an error, though, that he held onto it?

A No, I don't believe so. I don't believe.

Q Also, do you know if a union representative reviews the grievance that you would have filled out before they submit them?

A I don't know.

MS. McLEAN: I have no other questions.

REDIRECT EXAMINATION

BY MR. NOONAN:

Q I just have a couple. The statement it's not like I'll be suspended or fired, that's something you said to Mr. Chavis?

A Yes.

Q And that related to the incidents of January 9 and January 11. Is that right?

A To the January 9 incident.

Q So the fact that the reports indicate that you made that statement relative to the January 2013 incident was accurate?

A I was -- the only --

Q Can you just answer that yes or no? Is it accurate that that statement, it's not like I'll be suspended or fired, did in fact relate to the January 2013 incident?

A It did. I was trying to --

Q I heard your explanation before.

A I'm just trying to -- I was at the time just trying to reassure a friend with everything that I was going to be okay --

Q Okay.

A -- with everything.

Q You were prepared to take the discipline you thought should be meted out for that as long as it wasn't a suspension or termination. Is that right?

A Yes.

MR. NOONAN: Okay. I don't have any other questions. Thank you.

RECROSS-EXAMINATION

BY MR. BROOKS:

Q Just a quick one I hope.

You indicated, sir, that the chief steward had a habit of holding grievances to bring them to HR, I guess, en masse?

A Yes.

Q What is your knowledge of that happening?

A He said that at a union meeting, at a formal union meeting.

Q When was that union meeting?

A It was one of the first ones that we had. I can't -- I remember it was warm out. Probably sometime in the summer.

Q Summer of when? What year?

A First year that we had the union.

Q 2010?

A I believe one of the first -- it was one of the first meetings that we had conducted. I'm not exactly sure whether it was 2010, 2011. I know it was one of the very first meetings that we had, though.

Q And other than his statement, do you have any evidence that he actually did hold grievances to bring them collectively to HR?

A Other than his statements that were recorded

by the recording secretary, no.

Q And do you know whether the chief steward had a habit of holding discipline grievances as opposed to contract violation grievances?

A I'm not sure.

Q Do you understand the difference?

A Yes.

MR. BROOKS: Okay. I don't have anything further.

MS. McLEAN: We're done.

(THEREUPON THE DEPOSITION WAS CONCLUDED AT 2:46 P.M.)

CERTIFICATE

I hereby certify that I am a Notary Public, in and for the state of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _______ day of ________________, 2014.

_____________________
Audra Quinn, RPR, LSR
Notary Public

My commission expires: 7/31/2016
LSR No. 106

INDEX OF EXAMINATION

| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. NOONAN | 3 |
| CROSS-EXAMINATION BY MR. BROOKS | 63 |
| CROSS-EXAMINATION BY MS. McLEAN | 103 |
| REDIRECT EXAMINATION BY MR. NOONAN | 109 |
| RECROSS-EXAMINATION BY MR. BROOKS | 111 |

(Reporter's Note: No exhibits were marked.)