**62 LA 272**
**TEX-A-PANEL MFG. CO.**
**Decision of Arbitrator**
AAA Case No. 71 30 0129 73
December 20, 1973

**In re TEX-A-PANEL MANUFACTURING COMPANY [Jacksonville, Tex.] and UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, UBC INDUSTRIAL COUNCIL OF TEXAS, LOCAL 2885**

**Arbitrator(s)**
Arbitrator: Roy R. Ray

## Headnotes

**DISCHARGE**

**Unsatisfactory performance** ▸118.651 ▸118.6482 ▸118.301 ▸118.664

Operator of curtain coater machine used to paint wall panelling products properly was discharged for (a) failing to make periodic check of proper viscosity of paint used in production process, failing to observe dislodgment of peg used to level curtain coater head, thereby causing blistering of about 50 panels, sitting down on job contrary to instructions, and leaving his job station unattended, and for (b) frequently complaining about his job and working conditions, suggesting to other employees that they should quit employer, and suggesting to one employee that he need not follow instructions given by foreman. (1) Although discharge may not be sustained on basis of any one of charges in question, cumulative effect of employee's conduct over substantial period of time warranted employer's imposition of penalty; (2) employee's attitude toward his work and employer had adverse effect on morale of other employees; and (3) evidence does not support charge that discharge might have been motivated by union activities of grievant as shop steward.

**Unsatisfactory performance — Prior written warning — Necessity** ▸118.651 ▸118.303

Employer properly may discharge employee for unsatisfactory performance, even though it did not give prior written warning to employee, since contract does not require either prior warning or other progressive discipline to be given for charge in question.

## Attorneys

Appearances: For the company — David M. Ellis, attorney; Jack B. Farmer, general manager. For the union—A. C. Shirley, executive secretary; E. M. Churchman, business representative.

## Opinion Text

**Opinion By:**
RAY, Arbitrator:

**UNSATISFACTORY PERFORMANCE**

**History of the Proceedings**

H—, a Curtain Coater Operator, was terminated by the Company on August 16, 1973 for alleged "deliberate restrictions on production out-put in this plant, and also deliberate and willful spoilage of work" (according to the written notice). He filed a grievance the same day protesting the discharge, stating that he felt he had been doing his work, and requesting reinstatement, reimbursement for lost pay and restoration of seniority. The Grievance was denied by the Company at all steps of the Grievance Procedure and thereafter the Union appealed to Arbitration.

**Issue**

Did the Company have just cause to discharge H— on August 16?

**Contract Provisions**

ARTICLE IV—MANAGEMENT RIGHTS
* * *
*SECTION 2. The Company shall also have the exclusive right* to fully direct and assign its employees, including but not limited to, the right to hire, promote, demote, transfer, lay off for lack of work or other business reason, discharge, *suspend or discipline for just cause,* and to maintain discipline among employees, except as otherwise provided herein. (Emphasis added).
ARTICLE X—DISCIPLINE AND DISCHARGE
*SECTION 1.* The Company may discharge or otherwise discipline an employee for cause.
*SECTION 2.* In all cases of discharge the Company shall immediately notify the discharged employee in writing of his or her discharge and the reason therefor. Notice shall also be given to the Union Steward. Cause for discharge or disciplinary action shall include, but shall not be limited to, the following:

\* \* \*

J. Deliberate and willful spoilage of work, equipment or machinery.

\* \* \*

N. Deliberately restricting output of production of work in any manner.

**The Company Position**

The Company asserts that Grievant's job performance and his attitude

**Page 273**

toward his work deteriorated noticeably over a considerable period of time to the point where it reached an utterly unacceptable level. The Company presented evidence of what it calls a consistent pattern of behaviour on Grievant's part demonstrating an unacceptable job attitude and contends that this constituted just cause for termination.

**The Union Position**

The Union contends that the discharge was unjust and discriminatory. It denies that Grievant deliberately restricted production or engaged in willful spoilage of work. While the Union admits that spoilage occurred during the week prior to discharge it says that this was neither deliberate nor willful. The Union asserts that spoilage occurs every day in the department where Grievant worked and that the Company previously had not exhibited any great concern about it. The Union also says that Company rules had not been enforced prior to the strike and in only a half-hearted manner after the strike. The Union suggested that Grievant was selected by the Company as an employee to be kept under surveillance and a case built against him and it notes that other employees had been given disciplinary notices for breach of Company rules while Grievant had never received any such written notices prior to his discharge.

**The Finish Line Operation**

The Finish Line is a production line designed to manufacture hardboard wall panelling. It runs at a speed of from 37 to 47 feet. The following functions are performed on the line: (1) Panels or Boards are fed by hand into an edger; (2) they move unattended through a pre-heat oven where the temperature of the wood is raised. (3) Next the panels pass through a Curtain Coater Machine where a base or ground coat of paint is applied. (4) The panels continue through a high heating area with a blower to dry the base coat. (5) Then the panels go into a turn-around area where the direction is reversed and an operator counts the boards, removes spoiled boards and keeps the area clean. (6) Next the panels go into a print machine where a design is placed on them. (7) Then they pass under a second coater machine where a sealer or "top coat" of paint is applied. (The man who does this is called the Top Curtain Coater Operator and this was the job held by Grievant). (8) After this the panels pass through three ovens set at various temperatures which bake the finish. (9) Next the panels are removed by hand and placed on the cooling line (another conveyor). (10) At the end of this line the panels are removed by hand and placed in stacks for shipment to customers.

**Duties of Top Coat Curtain Operator**

The duties of the Operator of the "Top Coat" Curtain machine (the job held by Grievant) as related by the Supervisor of the Finish Line (whose testimony was uncontradicted) are: (1) He prepares the paint and maintains the proper viscosity. The viscosity is tested by using a cup with a hole about the size of a pencil. He scoops up a cup of paint and counts the seconds it takes for the paint to drip through the hole. Correct viscosity in summer months is 37 to 43 seconds; and in winter months from 43 to 47 seconds. If viscosity is not within these tolerances it can be corrected by using an agitator or the addition of a thinner. If the paint is allowed to become too heavy air bubbles may form resulting in a "curtain break", i.e. a circle without paint on the board surrounded by excess paint. Where a curtain break occurs on the "Top Coat Machine" the board must be rejected. The Operator should be sure the viscosity is correct before starting the machine and should check it every fifteen minutes. Sometimes he has to stop the line to check the viscosity. (2) The Operator must ensure that the curtain head from which the paint flows is level. A wedge on one end of the head is adjusted by the Operator to create and maintain an absolute level. If the head is not level too much paint will be applied on one side of the board causing a blister when the board goes through the drying oven. Blistered boards cannot be salvaged. (3) The Operator has to check the mill thickness to determine the amount of paint going on the boards. This is done by a glass which is run through the paint curtain on a test board every fifteen minutes. The proper thickness is between $3^{1}/_{2}$ and four mills.

While the machine is operating properly the Operator's essential function is one of constant observation to catch any malfunction. He is not free to leave the machine even to go to the rest room without advising his supervisor or some other employee to ensure that the machine will be watched during his absence. Other duties include (4) Keeping five metal rods in the area when the curtain of

**Page 274**

paint flows clean. If excess paint builds up on the rods the boards coming through will scrape and be spoiled. (5) Keeping his entire area around his machine clean, including the cleaning of paint buckets.

**Testimony Concerning Grievants Job Performance**

*E. E. Smith,* Supervisor of the Finish Line at all times involved here, testified to the following: Grievant failed to check for proper viscosity by using the cup and for proper mill thickness by using the glass although Smith had reminded him to do this. Grievant told Smith that he was smart enough to run the curtain without checking every fifteen minutes. About a week before his termination Grievant allowed approximately fifty boards to go through blistered and were therefore spoiled. This was caused by the curtain head on Grievant's machine being unlevel thus permitting an excess of paint to be applied to one side of the boards. This loss was clearly Grievant's fault. Shortly before this some twenty boards were spoiled because they scraped paint off the rods on Grievant's machine which had too much build-up. This was due to Grievant's failure to clean the rods, which he had admonished Grievant several times to do. Grievant consistently had more spoilage than other curtain coaters. Grievant failed to promptly scrape excess paint from the curtain breaks on those spoiled boards pulled at the turnaround, resulting in twice as much time being required to salvage the boards. Grievant left his work station on numerous occasions without permission or notice. Smith would frequently find him absent and other employees did not know where he was. Some times Grievant would be some distance away visiting with other employees. Several times a day Smith caught Grievant sitting down some eight to 10 feet from his station, contrary to instructions. (After the strike employees had been specifically told not to sit down). On such occasions Grievant would quickly get up and return to his station if he saw Smith. The Supervisor related two incidents reported to him by bargaining unit employees. Lula Mae Montgomery reported that Grievant told her she did not have to lift tile boards to a rack after stripping them. This was part of her job and Grievant had no authority to give her such instructions. Ronald Sanders reported that Grievant had told him he did not have to start up the line after a break and to take his time. Sanders is the first man on the line and starts feeding boards into the line. Smith expressed the positive opinion that Grievant's performance was unsatisfactory and that he kept getting worse.

*Ovester Summers,* Finish Line Foreman, who was print press operator on the machine adjacent to that of Grievant in June, July and August, testified as follows: He worked about eight feet from Grievant, his station being just ahead. He observed Grievant every day and saw him take mistakes. He was there when the 50 boards were blistered—it took some 20 minutes for them to pass through the machine. Grievant was away from his station at the time. Grievant talked to him a lot while he was working—complaining about his job—this increased after the strike. This bothered Sanders. Grievant suggested to Sanders that he could get a better job and ought to quit the Company. Sanders said this annoyed him. Later he found a better paying job and told the Company about it—he was then promoted to foreman.

*Lester Patterson,* Plant Superintendent, and Foreman Smith's immediate supervisor, gave the following testimony. He moves around over the entire plant observing production problems. He is familiar with Grievant's job performance and his attitude through direct observation, conferences with Smith and conversations with other employees. After the strike the morale of employees deteriorated rapidly especially among new employees. After new employees would be there awhile he would see Grievant drift around and talk with them. When Grievant saw Patterson he would stop and go somewhere else, e.g. the rest room or water fountain. Often the employees to whom Grievant had been talking would come to Patterson or some other supervisor and complain about job conditions or too heavy a work load. This happened numerous times, as often as six times a day. He would find that Grievant had told new employees that they did not have to do certain things. These acts of Grievant seriously affected morale and made it increasingly difficult to retain new employees. On many occasions he saw Grievant sitting down on the job. He reprimanded him for it, telling him to stay on his feet and watch the machine. Grievant would them jump up and go to the machine. Patterson said that Grievant knew how to perform his job but simply would not do it. He failed to clean the rods under the

**Page 275**

curtain though repeatedly told to do so; never cleaned the side rails unless specifically directed to do it. There was most always trash around his area, and Grievant had to constantly be told to remove empty paint cans. Several employees reported specific incidents to Patterson. Gaylon Benedict stated that Grievant told him not to bid on a Company job so that Company would have to increase the wage rate if there were no bidders. William Lenville said Grievant asked him to complain to Patterson about Foreman Smith. Lula Mae Montgomery advised Patterson that Grievant told her she did not have to perform part of her assigned duties. Patterson concluded from his observation of Grievant and reports to him from other employees that Grievant was responsible at least in part for the deterioration of

morale. He advised General Manager Farmer of this and that he felt Grievant's job performance was getting worse.

*Ronald Sanders,* Edgar Machine Operator, who feeds the wood panels into the first machine, testified thusly: One day in the break room, when the buzzer rang to summon the employees back to their work stations, Grievant told him that he should not do what Smith (Line Foreman) wanted him to do, but tell Smith what he was going to do. On another occasion Grievant asked him to file a grievance against Smith for allegedly yelling at him. Sanders refused. Two or three times a day Grievant would criticize the Company and ask Sanders why he was working at Tex-A-Panel when there were better jobs at other Companies.

*Jack White,* Shipping Clerk, testified that during break periods Grievant made constant complaints about his job and the Company. He suggested to other employees almost every day (in White's presence) that they should quit their jobs: and that this sort of thing seemed to upset the employees, some of whom said they would not work with Grievant.

*H—.* Grievant, testified as follows concerning his work performance. He had operated the Curtain Coater for three years. On the day the fifty boards were spoiled he arrived at his work station about 7 A.M. He set up his machine, pumped in 30 gallons of paint, checked the viscosity and started the machine. After waiting about 10 minutes to see that it was running properly he left the machine to go outside for more paint, telling Ovester Summers where he was going. He got a 55 gallon drum and went to storage for a five gallon can of flattening paint. He returned to his station and began mixing the flattening paint with a high glow to create a semi-gloss required for his curtain. About this time Summers came over and said "you have 'side breaks' on the curtain." He looked around and saw that the peg used to level the curtain coater head was out, apparently having slipped, resulting in the paint being too heavy on one side. About that time Patterson came up and helped him level the curtain. Grievant said he did not perform his work any different after the strike than before. But he felt that the Company looked at him more closely because he was Shop Steward. He said the spoilage was about the same before the strike as after it except for the 50 boards. He denied deliberately spoiling any material or deliberately interrupting production. He denied stopping and talking with other employees on the way to the rest room. He admitted that he did sit down on the job occasionally despite instructions to the contrary. He admitted that he was instructed by his Supervisor to check viscosity and mill thickness every fifteen minutes; that this was a Company rule which was restated to the employees immediately after the strike, and that he did not comply. But he claimed that this rule was never really followed. He also admitted that he did allow paint to accumulate on the rods to the point where some boards were spoiled. He said he liked his job but it was dirty and there were fumes. He complained about his job in June, July and August when talking with other employees, mainly during breaks. He was disgusted with the Contract and told other employees that it was no good. He suggested to Mae Ella Reader that she should quit her job but he claimed it was because of her qualifications (she could get a better job) and not to disparage the Company. He said he did not suggest to others that they quit.

## Opinion

The uncontradicted testimony of Company witnesses establishes the following facts concerning Grievant's job performance and his attitude toward his job and the Company. He sat down on the job contrary to instructions and often left his job station unattended. He did not perform checks for viscosity and mill thickness every fifteen minutes as he was admittedly instructed to do so. His spoilage rate was above average.

**Page 276**

On one occasion shortly before termination some 50 panels were blistered due to his failure to observe that the peg used to level the curtain coater head had slipped or been knocked out. His failure to clean the rods on his machine resulted in frequent spoilage. Often he failed to keep his work area clean and another employee had to do it. He frequently complained about his job and working conditions and suggested to other employees that they should quit the Company (three of the witnesses who gave this evidence are or were formerly members of the bargaining unit). He sought complaints from employees against Foreman Smith and attempted to get one employee to file a grievance against Smith for allegedly yelling at him. He suggested to one employee (Sanders) that he need not follow instructions given by Smith. It is extremely significant that in his own testimony Grievant either admitted or did not deny most of the above described acts.

The remaining issue, therefore, before the Arbitrator is whether the poor job performance and attitude set forth above constituted sufficient cause for discharge. After a careful review of all the evidence and a reading of many Arbitral Awards involving somewhat similar situations I have concluded that just cause existed for termination. While no single incident would in my view have been sufficient the cumulative effect of Grievant's actions over a substantial period of time did warrant the Company in

discontinuing his employment. Caterpillar Tractor Company. 64-2 ARB § 8859 (Erbs) (where the employee was discharged for consistently failing to follow instructions).

The Grievant's Supervisor concluded that his job performance had deteriorated to the point where continued employment was no longer justified; and that his attitude toward his work and the Company was having an adverse effect on the morale of other employees. The overwhelming preponderance of evidence sustains this conclusion. Evaluation of an employee's job performance and attitude necessarily rests initially with Management subject to challenge by the employee and Union on the ground that the Company's action is unreasonable, arbitrary or discriminatory. Here there is nothing to show that the Company acted in other than good faith and upon reasonable grounds. While Union Counsel indicated in his opening statement that the Company might have been motivated by Grievant's Union activities there is no evidence in the record to support such charge. Under all the circumstances the Arbitrator would not be justified in interfering with the Company judgment.

Other arbitrators have upheld discharge for poor job performance which deteriorated to the point of unacceptability, Carnation Company, 72-2 ARB § 8463 (Oppenheim), or for a continuing poor attitude on the part of an employee which had an adverse effect on the morale of other employees. Steel Supply Company, 62-2 ARB § 8156 (Hon); or a combination of unsatisfactory job performance and poor attitude which made continuation on the job unacceptable. Carey Salt Company, 69-1 ARB § 8019 (Bothwell).

With reference to the Union's point that the Company had not given Grievant any prior written warning, it is sufficient to say that the Contract does not require either a prior warning or other progressive discipline prior to discharge for the kind of conduct involved here.

**AWARD**

For the reasons expressed I find that the Company had just cause to discharge Grievant and the Grievance must be denied.

- End of Case -