**122 LA 392**

## Iten Industries
## Decision of Arbitrator

AAA Case No. 53-300-00375-05

November 4, 2005

**In re ITEN INDUSTRIES and UNITED STEELWORKERS OF AMERICA, LOCAL 5-139**

### Arbitrator(s)

Arbitrator: Gregory P. Szuter

### Headnotes

**SAFETY**

**[1] Gross negligence   ▸118.659   ▸118.643**

Employer had just cause to discharge press operator for gross negligence, where he did nothing while steel bars in press were breaking; seven of 44 bars broke.

**DISCHARGE**

**[2] Disparate treatment   ▸118.67   ▸118.643**

Discharge of 26-year press operator was with just cause, even though his partner in operating defective press also did nothing when steel bars in press were breaking, but only received three-day suspension, where discharged employee had two other suspensions within about two years, collective-bargaining contract did not limit consideration of suspensions to specified time, and serious injuries could have been caused by employee's negligence.

### Attorneys

Appearances: For the employer—Richard Petrone, operations director; Vickie Partridge, human resources manager. For the union—Eddie Blankenship, international representative.

### Opinion Text

**GROSS NEGLIGENCE**

**Opinion By:**

SZUTER, Arbitrator.

**Page 393**

### Grievance

| | | |
|---|---|---|
| Paper, Allied-Industrial, Chemical & Energy Workers Intl. Union GRIEVANCE REPORT | | |
| Date: 6-20-05 | Local No. 5-139 | Grievance #01 |
| Member: C__ | | Clock #237 |
| Company: Iten Industries | | |
| Department: Laminating | Supervisor: Mary Ann Morris | |
| When did grievance occur? | 7-17-05          Time: 3:30 | |
| Grievance reported by: | Deborah Sanders | |
| COMPLAINT | The Union charges the Company with a specific violation… Unjust Discharge | |
| REMEDY REQUESTED | | |
| | Reinstate and make whole.   /s/ Deborah Sanders | |
| FIRST STEP | Date submitted: 6-20-05 Settlement satisfaction Date: 6-20-05 | Steward: Deborah Sanders yes [ ] no [x] Co-Official /s/    Mary A Morris Date: 6-20-05 |
| SECOND STEP | Date submitted: 6-21-05 | Steward: Deborah Sanders |
| | Answer: Termination is justified - See attached documents | |
| | Date: 6-22-05 | Co-Official /s/ Vickie Partridge         /s/ Richard Petrone |

| THIRD STEP | Date: 6-29-05<br>Answer: Same as 2nd step | Steward: Deborah Sanders |
|---|---|---|
|  |  | Co-Official/s/ Richard Petrone |
|  | /s/ Deborah Sanders | /s/ Vickie Partridge |
|  |  |  |

**Contract Provisions**

The following are excerpts of the provisions of the Agreement cited by the Parties. Any emphasis herein is added for ease of reference by the reader.

*ARTICLE III*
*MANAGEMENT RIGHTS*

SECTION 1. The management of the plant and the direction of the working force and any other recognized function of management shall be vested exclusively in the Company as in the past, except as specifically limited or qualified by the provisions of this Agreement.

*ARTICLE XI*
*ARBITRATION*

* * *

SECTION 4. The arbitrator shall act in a judicial capacity. The decision of the arbitrator shall be final and binding upon both parties and shall be complied with in a reasonable time.

* * *

SECTION 6. The arbitrator shall render a decision within fifteen (15) days from the last date evidence was submitted, unless additional time is requested by him and mutually agreed to by the parties. The compensation of the arbitrator shall be shared equally between the Company and the Union. Each party shall pay the costs of their own representatives and witnesses.

SECTION 7. Any employees discharged shall fulfill his or her obligations of diligently seeking other employment and mitigate any possible back pay award and such issue shall be determined by the arbitrator.

**Page 394**

**Employee Handbook**

The following are excerpts of the provisions of the Employee Handbook published by the Company serving the function of work rules.
Safety

…. Therefore, we hold every one of our employees to high safety standards. As a result, anyone who fails to follow our safety standards is subject to discipline, up to and including termination, as management determines based upon the particular safety violation, and the facts and circumstances surrounding the particular safety violation.

Proper Care of Company Equipment and Property

…. Carelessness or damage to Company equipment or property that is willful or wanton will subject an employee to immediate discharge. We must do this not only for the protection of our equipment and our Company but for the protection of each other. Our equipment and property is essential to all of our current and future job securities. We feel confident that you will help us in this regard….

Guidelines on Disciplinary Action

…. Conduct inconsistent with the guidelines, or with generally accepted plant practices, is considered just cause for disciplinary action including an oral reprimand, a written warning, a three (3) day suspension or termination. Management has the right to use the above disciplinary actions at their own discretion depending on the severity of the circumstances involved.

The following guidelines are listed to help you know when and where disciplinary action will be taken:
* * *

4. Abusing, damaging or destroying Company equipment or property either because of careless or willful acts.
* * *

7. Poor work performance, including loafing or sleeping on the job, inefficient performance of duties, incompetence, failure or refusal to perform work as directed, or any other neglect of duty.

8. Failure to, or negligence in, observing fire prevention and safety rules.

**Position of the Company**
Iten Industries strives for a safe work environment. It trains its employees and instructs them in safety procedures. Each employee is trained in safety at meetings where reduced tolerance of safety infractions is stressed. Iten's machinery is properly guarded and safety checks are performed. To ensure safety of its employees and minimize costly and unsafe errors, a company-wide Safety Committee was established which is comprised of both management and hourly workers. The Safety Committee meets monthly to review the facility noting any possible safety concerns. It then determines if corrective action is necessary and implements it by work orders. In addition, the Company works with OSHA and BWC to identify and correct safety concerns.

Grievant, an employee of over 25 years, has been cited numerous times for safety infractions. He received verbal warnings, written warnings, unpaid time off and "one-more-chance" opportunities. Grievant has not changed his unsafe work habits. On June 5, 2005, Grievant was one of the two operators of a press that was not completely loaded and not operated properly for the load that was on it. The incident resulted in steel parts of the press breaking with the potential of other parts becoming projectiles. Grievant has violated several of the guidelines listed in the Employee Handbook related to company equipment safety and observance of safety rules.

Grievant's level of carelessness, by its repetition, rises to a level of willful or wanton action warranting immediate discharge. The employee handbook also includes other relevant sections to this termination such as abusing, damaging or destroying company equipment, poor work performance, failure or refusal to perform work as directed or any other neglect of duty, or failure to and negligence of observing safety rules. Grievant was guilty of these. The Handbook repeats the safety commitment and states failure to follow safety standards are subject to discipline up to and including termination. The Handbook was published and signed off by employees including Grievant. In addition, as a Union representative he was fully aware of the rules and policies.

Management researched the facts surrounding the most recent incident. Incidents similar in nature were also reviewed. Grievant was fully aware of the Company's rules and policies. Three prior incidents, resulting in termination of other employees, were reviewed. The standard the Company uses is to review the incident based on the severity of the similar

Page 395

incidents and the disciplinary history of the individual. Grievant had a history of performance failures that implicated safety. This was another one. The Company concluded that his disregard of safety protocols justified the termination.

**Position of the Union**
The general facts of the occurrence and the means by which the press became damaged are not in dispute. However, the Company failed to prove just cause. The press was damaged during the operation where there were two individuals tending it. Grievant's partner was in control of the operation. After the damage occurred, the person in control of the operation received a three day suspension while Grievant was terminated. The person in control put the press in motion and while it was in motion he attempted to do something else on the press as it was moving and failed to shut it off before the damage occurred.

Second, the Company charges Grievant with failure to follow work procedures but never identified the specific procedure that he failed to follow. Next the Company charges him with working in an unsafe condition but did not demonstrate what it was that Grievant did that was unsafe. The Company failed in these two respects simply because the other operator was in control of the press function. Rather the Company seems to focus on what Grievant did not do. In particular, he did not yell at his partner when the damage started to occur. However, the testimony was that Grievant did not know where the noise was coming from. Neither did his partner, who also did not attempt to stop the machine. Ultimately the penalty was discriminatory. The partner who was in control received a much lesser penalty. The rules apply to both equally. The Company emphasizes the team nature of the operation through its testimony that both were equally responsible. Yet Grievant was the only one terminated. He was terminated despite the fact that he was a long standing employee, far longer than his partner was. Grievant should be reinstated and made whole and making him whole, the Union also noted that Grievant had fulfilled his duty to mitigate damages and found interim factory employment.

**Statement of the Issues**
The parties have stipulated on the statement of the issue as follows:
Did the Company have just cause to terminate the employment of C__ and if not, what shall the remedy be?

**Finding of Facts from the Record as a Whole**
*Background: The Process*

The Company is in the business of fabricating plastic panels. The panels are created by layering various ply of plastic material interladen with other material. It is a process similar to the creation of pressed plywood except that, because of the high heat and pressures exerted in compressing the panels, the ply is not visible on cross section as it would be in wooden ply material.

The press is square with an upward moving ram that compresses the material above it which is laid out on several (11) platens, or shelves. The shelves arranged above the ram are suspended over it by linkage to the frame at the top of the press. At the front and back sides of the press, each platen has bolted to it on its edge, at the corner, a brace or hanger bar, four per platen or 44 on the press. The braces are joined to the side edge of each platen by hardened steel bolts. The other end of the brace is linked to the platens above and below it by a flat oval link, or O-ring. One link connects to the platen above and another to the platen below. That end of the brace is connected to the links by means of a bolt running through each link from the inside and fastened by a nut about a 1 $\frac{1}{2}$" to 2". The nut is hand tightened (or loosened) from the outside of the press by the operator.

By the connection of the links to the braces of each platen, the platens are able to move as the ram pushes them upward. They are released in its downward stroke. Depending on the number and type of product to be pressed, some of the platens are not filled with product material, but with "dummies," blanks used as space holders. In addition, there is a sequence to loading the press that is not obvious. For example, every job is not loaded with the first platen to the second to the third, etc., because of the variables in materials and the way the pressure is delivered. The sequence of loading can appear quite idiosyncratic, almost random. In addition, the materials themselves change from job to job depending upon the type of panel being produced. Consequently the work instructions for each job are posted

**Page 396**

both at the foreman's desk and on the press itself for the operators to consult to determine the proper layers of material and the proper loading sequence.

Each press is tended by two operators, one at the front where the instructions are posted and one at the back where the power plant and hydraulic controls are located. The operating switch is near a wall about six feet from the back of the press. It is a toggle that moves in three positions indicating upstroke, neutral and downstroke. The operators generally handle the material, loading it in layers within the platen. Then they operate the press to move the whole set of platens either up or down to the next position to load another platen with material or a dummy in the sequence as indicated by the work order. The press is put in neutral while that platen is loaded. This continues until the entire loading sequence is followed. Once all the platens are filled with either the blank or product material, then the full press operation can proceed to create the finished panels.

### *The June 5, 2005 Incident*

On June 5, 2005, Grievant and his team partner were working on processing five sheets of 48" x 48" material. The shift before them had already placed a blank in one of the platens. They in turn loaded one of the other platens with the proper material and the press was set in motion by Grievant's partner. Before the press cycles, all of the O-rings are tightened down by hand. Grievant had done this and was standing at the front side of the press as his partner moved the press control to the upward stroke. The ram started upward.

Steve Schreiber, process technician, was across the press room with the supervisor, Mary Ann Morris when he heard something break at Grievant's press from 40' to 50' away. When he heard the noise, he immediately knew that it was steel bars breaking. He looked over to the press where Grievant and his partner were and saw the press was moving. Neither of them were moving away from the press, nor were they attempting to stop it. Mr. Schreiber yelled as soon as he heard the first hanger bar break. The two men stared back blankly, facing him "dead on." Mr. Schreiber ran through the press room towards the machine. The press continued to move with the ram forcing the platens upward. As he said, "steel was hitting steel and stuff was breaking." Neither of the men moved. The technician said, "What's going on?" and "What happened?" Grievant said he did not know and shrugged his shoulders. The technician went 20 feet further to the controller and put the press in neutral. By that time seven of the 44 steel hanger bars had broken.

Supervisor, Mary Ann Morris, testified similarly. She was near the technician when the noise of the first hanger bar breaking could be heard. As the technician hollered and proceeded over to the press, she followed also, but not as quickly. She testified also that the work instructions were posted by her at the machine and were also at the foreman's desk which was about 20 feet in front of the press. The instructions set out the step by step loading sequence. She said that she knows both men and that they should know how to load and follow the sequence as posted. However, the press was not fully loaded. It only had one blank, put in place by the former shift, plus one set of materials on one platen. They were to make five panels. The other nine platens were empty.

The operators did not follow the procedure. After loading the material, they should have started the press to adjust the opening so the next platen could be filled and then stop the operation and load that platen. What they had done instead was to begin the operation of the press allowing it to continue to cycle without stopping before it was damaged. The point at which it should be stopped, according to the supervisor, is determined by the operators watching to see when the pressure is relieved on the hanger bars and O-rings of the next platen to be filled. Both men should be watching for this because the operation is a team effort. Rather they allowed it to continue to crunch upward breaking the steel bars.

Grievant described finding the press with a dummy and loading the next level with his partner. He hand tightened the nuts on the O-ring bolts on his side and stepped back. His partner turned the control to "up" and the press started to move. Grievant expected his partner to stop the press but it just kept on going. He said that his partner was not at the switch but was tightening the bolts on the platens at the back of the press as the press was moving. As he heard the first bar break, Grievant said he was surprised and that he did not know what it was. He knew it was not normal, but did not think the noise was coming from his press. At the time of the breaking

**Page 397**

noise, he did not see his partner. He did not look for him, nor did he call out to him.

Another operator, Mr. Fleissner, who used the same press testified that the bars had appeared to be bent before the incident in question. Mr. Petrone explained that the hanger bars are not made of hardened steel because they are intended to absorb the force of the press as a fail safe element if something had to break before the hardened steel bolts would break. The bars would be bent over time until they do not meet the required standard. Eventually, they became replaced or repaired. He stated this was a case of the bars actually breaking under the force which, had it continued, could cause the failure of other parts. If the hardened metal bolts attaching the bars to the edge of the platens themselves broke off, they would shoot out at indeterminate directions like shrapnel.

### *The Post-Incident Developments*

Vickie Partridge, Human Resource Manger, testified that on June 8th there was a group meeting to investigate. In the investigation, Mr. Petrone asked Grievant if he had told his partner to stop the press and he said that he did not. They considered that Grievant was a 26 year employee and not inexperienced in press operations. They confirmed he was aware of policy and procedures.

The Company safety policy exhorts employees to recognize safety as a first responsibility to keep accidents to an absolute minimum and minimize hazards. Grievant signed that one page policy on November 19, 2004. At the same he signed an acknowledgment indicating he had been presented with a review of Iten's safety manual.

His acknowledged receipt of the employee handbook was signed in 1990. The Handbook also had a safety provision holding employees to high safety standards, stating "anyone who fails to follow our safety standards is subject to discipline up to and including termination, as management determines based upon the particular safety violation, and the facts and circumstances surrounding a certain safety violation." The Handbook addressed the proper care of company equipment, specifically carelessness or damage to company equipment, which would make an employee subject to immediate discharge. There are listed examples that include damaging or destroying company equipment carelessly, poor work performance including failure or refusal to perform work as directed or "any other neglect of duty", and failure to or negligence in observing safety rules.

In addition, the two employees' histories were considered. Grievant had prior discipline for similar situations, one in November, 2004. The other employee was shorter term but had no history of prior incidents or discipline of this nature.

Grievant's two most recent suspensions were considered, November, 2004 and February, 2003. [1] In November, Grievant participated in loading the incorrect material as one of the ply within each of the platens. He used a white material instead of a blue one which could have been obvious from the first. The chemical properties of the two materials were such that with the blue one, the fusion of the plastic would occur; with the white one the material would slip because it would fail at high temperatures under pressure. The supervisor pointed out that the sheets were beginning to slide and asked why. Grievant did not know but continued to operate causing the entire production to slide apart instead of fusing into plastic panels. This was the result of not following the work orders posted at the press, similar to the situation that led to his termination. It also presented safety issues with material coming out of the machine. He was given a three day suspension and a written warning that, "future incidents of this nature will result in further disciplinary action up to and including termination." His prior suspension in February, 2003, occurred when he was attempting to unload a press. He activated the unloader while part of the bottom carriage was still on the lift. In this situation he did not stop the loader by pushing the emergency button. He was given three days off suspension for unsafe actions and damage to the press and a similar warning.

[1] Grievant's file, as provided to the Union, has many other diverse incidents but it was not considered.

Ms. Partridge considered that the two employees were not equally situated, although they were both part of the same team and both in equal responsibility for operation of the press. She met with Mr. Petrone, to reach a decision that they recommended to the company president. Mr. Petrone agreed also that both are guilty of the same infractions. The conclusion reached was that, while both men

**Page 398**

were at fault, two different penalties were justified because of the past occurrences. One man had several "one-more-chance" opportunities and the other man did not.

Three other employees whose employment was terminated for safety derelictions were considered. One was terminated after a series of incidents where he did not complete his work causing other employees to cut their hands from unfinished product edges. Another was terminated after performing the same unsafe practice that had caused him to suffer a finger amputation months earlier. The third was discharged for a single incident of hand holding stock that was being cut by a saw while in a precarious seated position. There were no prior disciplines in any of theses cases.

A decision to terminate Grievant's employment was reached on June 17th. A grievance was filed on June 20th.

## Discussion

The Company has the burden of proving just cause for its action and to support it with a relatively high degree of proof, clear and convincing evidence. *Coastal Resin Co.*, 61 LA 686, 687 (Jenkins, 1973).

### *Cause for Discharge*

While the press that Grievant was tending was in motion, one of the steel braces on the corner of a platen cracked and snapped. It was so loud that a supervisor and a process technician from 50 feet across the plant heard it. The technician yelled, and ran over to turn off the machine ultimately covering 70 feet. Meanwhile seven braces in total had snapped.

The reason this had happened is that the press motion continued beyond the point where it should have been stopped. It should have been stopped when the operators observed it was positioned for the next load. Because it was not fully loaded, the ram kept pushing against the nine empty platens that were not spaced by a dummy or product material in turn putting pressure on all of the hangar bars in the upward motion until, seven of the braces cracked.

The braces are not made of hardened steel. The first one that broke was presented at hearing. It appeared to be about 18" in length, possibly more, and $2\ 1/2$ "3" wide and at least 1" thick. The bolts holding the brace to the platen are hardened steel. Had the pressure continued to the point where the hardened steel bolts would fail, the testimony was that the bolts on any given brace, could pop off in indeterminate directions and become a projectile. While that point was not reached, there was no indication that either of the operators were taking steps to avoid such a catastrophe. Grievant just stood there. The other man was busy trying to catch up with part of his job that he had left undone by tightening bolts after he turned the press on.

The June, 2005, decision was based on failure to follow instructions and safety violations. The safety issue arose out of Grievant's failure to follow the procedure on how to load the press and adjust the platens. In a team operation, he was to communicate with his partner about when to turn the machine on and when to O-rings were relaxed enough to remove the bolts and open the press to load the next level. He did nothing but stand by and allow the press to close without telling his partner to stop or attempting to stop the press himself.

The Union disputes Grievant was doing anything unsafe or violating work procedures because Grievant's partner was in control of the operation. The written instructions themselves do not state when the press is to be stopped. The Company never cited any specific safety standard. However, this is not convincing.

In his cross examination, Grievant was asked whether he was working in an unsafe condition. He admitted that he was. In redirect, which began with the next question, his representative asked, "Did you understand the question because what you said was damaging to your case?" Then he asked him to repeat the question. Grievant repeated it exactly. Then he was asked to repeat the answer, and he repeated the answer. The next question was whether Grievant wanted to stay with that answer. Grievant said that he did not and added he was not in control of the switch. His vacillation is not persuasive but there is more to consider than this exchange.

The operators are trained to observe and know when to stop the press when the O-rings are loose enough to get access to the platens and to communicate with each other. Indeed, the person at the front of the press, had been described as the "leader" in the testimony by Mr. Fleissner another operator who testified about running jobs himself from the font end.

**Page 399**

Indeed, the work orders with the materials and loading sequence are at the front end. This is also evident in the November, 2004, incident when Grievant was working with a temporary agency employee. As the full time employee was in charge of the operation but he was also in the same position at the front of the press with the temporary employee at the Control side.

An element of tremendous significance is that Grievant had worked in this plant, in this business, operating these peculiar presses for 26 years. In his testimony, Grievant stated that he did hear the snapping of the first brace and that it "surprised him" because he did not know what was causing it. Not knowing what had happened with that much experience while he permitted the machine to process with nine empty platens is inconceivable. In kindness, there may be some explanation of distraction or dependence on the other man in operating the toggle switch. That might be acceptable in a situation where failure would not be so terribly dangerous. Had anyone been injured or killed by flying metal, even if it were his partner unbeknownst to him, the excuse that he did nothing because he was not the nearest to the switch would be inadequate. He should have been able to move 20 feet around the machine to the toggle or call out to his partner or do something before the technician got there from 70 feet away and six more steel bars broke.

The Company determined that this was just cause for termination based on the guidelines on discipline in the Handbook where it defines just cause as "conduct inconsistent with the guidelines or with generally accepted plant practices." Penalties could include oral or written reprimands, suspensions and termination. "Management has the right to use the above disciplinary actions at their own discretion depending on the severity of the circumstances involved." As Ms. Partridge explained, the situation was one of carelessness, but because of the repeated offenses of a similar nature, in particular the November, 2004, incident, it appeared to be willful or wanton on the part of Grievant. The Company charged Grievant with willful and wanton conduct also with carelessness and neglect of duty. From this the Arbitrator understands the charges are gross negligence. "Ordinary" negligence entails an obligation to act (or refrain) that proximately causes damage. The actor must have been unreasonable in the undertaking and the result somewhat foreseeable. Gross negligence standards are set out in Discipline and Discharge in Arbitration, (BNA, 1998), Brand, Editor, at p. 146 which summarizes:

"Where gross negligence is alleged, arbitrators rely on the same factors required to sustained allegations of negligence or carelessness as well as on a variety of factors to determine whether the severity of the alleged act or omission rises to wilful or wanton misconduct warranting suspension or discharge for a first or second offense."

The factors include (in precis):

• whether the conduct is habitual or otherwise likely to be repeated

• the attitude of the employee

• the damage or injury sustained

• potential for injury or damage

• the effect of the conduct on others

[ 1 ]   The case has been made that Grievant had a duty to perform in the operation of the press and did not, with the foreseeable consequence of damage which was in fact caused. In addition, the severity was established in accord with the above mentioned gross negligence standards. His history shows a likelihood of recurrence and his attitude was one of non-involvement. (He shrugged his shoulders and did not know what was going on with his own press that he knew as virtually not loaded.) The damage was large enough but the potential damage and injury is catastrophic. The Company proved Grievant was grossly negligent (i.e. negligent to the extent of wilfulness or wantonness).

However, the circumstance that leads to the decision is only one of the elements that determine just cause in arbitration. Just cause has become defined by the Daugherty Seven Tests first propounded in 1966 in *Enterprise Wire Co.*, 46 LA 359 (1966) by Arbitrator Carroll R. Daugherty. These have been subject to multiple renditions and commentaries. *cf Zellerbach Paper Co.*, 73 LA 1140 (Sabo, 1979). Using the *Zellerbach* rendition, the seven tests are, for the most part, procedural due process issues. The substantive just cause inquiry is the second test of the listing: whether the act done at Grievant's initiative is so detrimental to the employer's interest as to preclude the continuation of the relationship. This involves matters of fault and antagonistic

**Page 400**

posture against the nature of the employment which the Company has proven.

Once the employee's fault is present [2] , the other factors must be examined. The other standards have to do with due process rights of notice and fair hearing, the advance warning through

progressive discipline, full and complete investigation, non-discrimination, and proportionality of the penalty. The other six standards are tests of how just is the cause. The second is the cause itself.
[2] Fault can be supplied by the Company's definition of its legitimate standards in its work rules.

Here the Union points to several of the other standards. One is the claimed discriminatory enforcement since Grievant's partner was not discharged but suspended. Another is the failure to follow progressivity in discipline to allow individuals to correct themselves rather than to precipitously punish them.

### Discriminatory Enforcement

The focus for discriminatory enforcement is on similarities of the actions of the employees being compared and the circumstances, their relative histories in terms of seniority, discipline and training, and their respective responsibilities. If the employer had a valid reason for treating an employee differently based on factors such as these, the enforcement is not discriminatory.

[ 2 ]   Grievant had been a long term employee functioning at least satisfactorily to maintain his position for 26 years and was not a frequent disciplinary problem to management outside of perhaps attendance issues. [3] However the prior record of Grievant includes more than seniority. Grievant's history that was considered by management were two other suspensions which management characterized as "one more chance" opportunities. In both, he was given a suspension *and* a warning that discharge is possible for similar conduct.

[3] The personnel folder of Grievant was presented at the hearing only at the request of the Union but was not relied upon in the Company's decision and is not considered here to any greater detail than the allusions made to a long history with only occasional problems in a disciplinary sense.

Without any earlier infractions by Grievant's partner, the Company moved to a suspension rather than any lesser penalty like warnings. There is no appearance that the Union or the employee protested the penalty. This implies that the incident was concededly severe enough to justify one of the two most severe penalties.

There is also no greater responsibility on the part of the partner. The Union's focus on the partner's proximity to the switch as "control" misses the point. Energizing the press was not the infraction. It was the failure to stop it and either one could have done it quicker than the technician. As between the two, the partner had no prior progressive discipline on safety infractions and Grievant had at least two which were suspensions including warnings of potential discharge. The difference that Grievant, having had two earlier suspensions, was terminated does not support a finding of discriminatory enforcement.

Compared to the dismissals of the three other employees on the record, the Company demonstrated it was consistent in its "reduced tolerance" for safety infractions. Compared to those three other cases, Grievant received much more opportunity for correction.

### Principles of Progressivity

The Union attacks the justice of the cause with the lack of progressivity in the Company's prior decisions. While the Company acknowledges that progressive discipline is available under its Handbook beginning with reprimands to time off and termination, they have stated that they do not interpret progressivity in that manner, nor do they apply it that way. More than one form of discipline could be assessed on any given incident, such as a written warning and a suspension, both given together. They look upon it as a catalog of choices they may use to apply to a given situation. All prior discipline remains on record for consideration indefinitely but typically the Company never had to go back beyond one year in considering prior discipline. Although the Company did not have to go back more than one year in other cases, it says the one year was not a limitation but just a matter of history.

The Union vehemently protests that this is contrary to the concept of progressivity. Management cannot move helter skelter through any of the available penalties at its whim.

The Union is generally correct that each incident ought to be evaluated in light of the least penalty for earliest infractions with more severe penalties for later ones. The Company's progressive policy does not commit to

Page **401**

that. However, its system is not as arbitrary as the Union fears.

First, proof of gross negligence is often sufficient for immediate discharge if not suspension at first or second offence.Discharge and Discipline In Arbitration, *Id.*

Additionally, a rigid system of progressive discipline is a creature of contract and, if the bargaining agreement is silent, one cannot be imposed by an arbitrator. *Tex-a-Panel Mfg. Co.*, 62 LA 272 (Ray, 1973). Absent that expression, only the Company's policy supports any type of progressive discipline. Here from a collective bargaining perspective, its policy is somewhat eccentric. Even unusual policies are honored. *Thatcher & Sons*, 76 LA 1278 (Nutt, 1981). Here it is also historically unchallenged.

The Company has actually been more progressive than the Union gives it credit. It groups like offenses together to decide discipline. Offenses of a different natures are thus allowed to have different levels of discipline. That is a more rigorous way to go about progressive discipline than is the norm in collective bargaining or even the jurisprudence of just cause in arbitration. More often all infractions, other than attendance, are compared to one another for the determination of the next progressive penalty. Similarity of the subject offense is given more weight, but it is not indispensable. Here the Company has taken the approach of considering safety and performance issues only. That circumstance makes it more, rather than less, progressive than the norm.

To the Union, the history of two suspensions and a termination over the period of 2003 to 2005 is too punitive to be progressive. The Company's lack of a sunset on the disciplinary penalties, to the consternation of the Union, was also brought out at hearing. Discipline could be on its records for all time and considered in decision making on the next penalty to be assessed. (This seems consistent with considering only similar subject matter.) The Union urges that the discipline should drop from the record after time, but the incident does not. That is, the incident remains on the record for purposes of notice for all time but the actual penalty for determining what the next level of penalty ought to be should not consider penalties beyond a certain age, such as one year. Hence the February, 2003, suspension ought not be considered to support the termination and should not even support the next suspension in November, 2004, which was over a year later. The 2003 incident might have more properly been subject of a reprimand to maintain the integrity of the traditional progressive steps. However in progressive discipline, it is not just a matter of the integrity of stepping up discipline that is important.

There is no requirement in the Agreement or in Company policy that there be a sunset on penalties after any amount of time. Nonetheless, an arbitrator may consider that a remote, although similar, incident might not justify a later severe penalty after a long period of repose in the disciplinary record. "Such historic incidents should be close enough in their relation to the problem involved in the immediate case to warrant consideration." *Borg-Warner Corp.*, 22 LA 589, 596,(Larkin, 1954). Absent an agreed policy, the February, 2003, suspension is not too stale for the consideration given it by the record.

Prior warnings that conduct was unacceptable is the function of progressive discipline, not the rigid application of each traditional step. This is particularly important in issues of work performance, including safety. A discharge was upheld where the employee was warned that failure to improve poor work quality could lead to termination. *Johnson Controls*, 95 LA 182 (Dworkin, 1990), *Fairview Gen. Hosp.*, 94 LA 1080 (Hewitt, 1990). It is the notice not the discipline that is important.

The Company provided a variety of notice to Grievant. Group safety meetings provide only constructive knowledge of what Grievant should have known. Progressive discipline establishes actual knowledge of standards and consequences. The Company has proven its efforts of individual employee education through its version of progressive discipline in February, 2003 and November, 2004, suspensions with termination warnings.

The February, 2003, suspension was relied upon by the Company to show the number of "one more chances" he received and not for subject matter similarity. The most recent, the November, 2004, suspension, was considered because the time was so short and because of the similarity between it and the termination event. Grievant had sufficient "one-more-chance" opportunities to have been adequate warning of severe consequences for reoccurrence

**Page 402**

to satisfy the requirement of progressivity.

### *Mitigation of Penalty*

Having determined that just cause has been established, the grievance stands to be denied subject to any consideration of mitigating the penalty. *Common Law of the Workplace*, 2nd Ed. (BNA, 2005) St. Antoine, Editor, "Remedies in Arbitration," §10.23. Arbitrators typically mitigate penalties where long service employees are involved. However, those are most often situations where there has been a long uneventful history that ended in a dramatic moment that might be considered anomalous in the employee's work life.

That is not this situation. Grievant had two subject-specific progressive penalties with terminal warnings shortly before the final event. Part of the basis for the just cause here is his depth of training and experience that should have manifested itself in some sort of action to safeguard life, limb and property. It is difficult for the Arbitrator to take into consideration that same length of experience and service to consider that the penalty might have been excessive. That would render the decision contradictory.

The Arbitrator is not undiscerning of Grievant's predicament of long service ending with a termination for cause. However, the event that precipitated it was dramatic enough that could have caused serious injury, potentially even death, to his co-workers and possibly even Grievant himself, who was nearest

to the breaking press. Had it not been for the record of the recent lapses of a similar nature with termination warnings, mitigation could have been seriously considered. But the similarities of the histories of events that were not too distant and the warning was clear. This does not allow the Arbitrator to agree to reinstatement under any conditions of mitigation.

Ultimately seven of the 44 steel bars failed and broke. That is a 16% failure rate in a few seconds. Each of those failed bars were joined to the platens by two hardened steel bolts. That means that the 37 remaining bars were absorbing the pressure from the ram and those bars each had two bolts, making 74 hardened steel bolts under exorbitant pressure, even beyond what the first seven suffered. In addition, the 14 bolts on the first seven bars, since the bars had broken, were under completely different sets of forces than the machine was designed for. Had the press continued to crunch all that steel together without Grievant or his partner stopping it, the 74 bolts under higher stress could have begun to fail. Had they failed at 16% rate, 12 of those bolts would have shot out into the plant like bullets. That may not be a likely scenario, but the potential for one or two, rather than 12, strikes the Arbitrator as very real. The grievance will be denied.

**AWARD OF ARBITRATOR**

The Arbitrator finds for Iten, Industries, Inc. and against United Steelworkers, Local Union #5-139, on the grievance on behalf of C__. The Grievance is denied. The administrative fees of the American Arbitration Association and the compensation and expenses of the Arbitrator shall be borne by the parties equally.

This Award is in full settlement of all disputes presented in the hearing of this matter.

- End of Case -