47 LA 1065
## ARO, INC.
### Decision of Arbitrators
FMCS Case No. 66A/5570
November 14, 1966

**In re ARO, INC. [Arnold Air Force Station, Tenn.] and AIR ENGINEERING METAL TRADES COUNCIL AND AFFILIATED UNIONS, AFL-CIO**

### Arbitrator(s)
Board of Arbitration: James P. Whyte (impartial arbitrator, selected by parties); R. C. Tate (union-appointed arbitrator); C. E. Plunk (company-appointed arbitrator)

### Headnotes
**PLANT RULES**

**Discharge — Absenteeism — Unilateral promulgation of rule—Management right ▶118.02 ▶118.25 ▶118.6361**

Under contract reserving to employer right to "adopt and enforce reasonable rules and regulations," employer had right unilaterally to promulgate rule

**Page 1066**

providing for discharge of employee who is absent for five consecutive workdays without approval. Rule is reasonable and does not conflict with contract or any other rule. (J. Whyte)—Aro, Inc., 47 LA 1065.

**Absenteeism — Discharge — Refusal to cross picket line—Application of rule ▶118.6361 ▶118.6605 ▶118.67**

Application of rule providing for discharge of employee who is absent for five consecutive workdays without approval to employee who refused to cross other union's picket lines during eight days of other union's strike was not unreasonable or discriminatory. (1) Rule is reasonable. (2) Fact that it was not applied to members of another union who refused to cross picket line does not establish discrimination, since employer believed in good faith that it had no contract with that union. (3) While other employees were not disciplined for refusal to cross picket lines, grievant was the only employee who did not report for work during entire period of strike. (J. Whyte)—Aro, Inc., 47 LA 1065.

**DISCHARGE**

**Refusal to cross picket line—Unauthorized absence from work ▶118.6361 ▶118.6605 ▶118.03**

Employer had just cause for discharge of employee who refused to cross other union's picket line for violation of plant rule providing for discharge of employee who is absent without approval for five consecutive workdays. Grievant was not justified in refusal to cross picket line, it appearing that his union's contract with employer contains no-strike clause, and there was no violence or threat of violence associated with picket line. Arbitrator is without power to modify penalty, despite grievant's good 10-year work record, since to do so would be to modify unambiguous contract provisions. (J. Whyte)—Aro, Inc., 47 LA 1065.

### Attorneys
Appearances: For the union—G. W. Lockwood, international representative; Clyde R. Caldwell, business manager. For the company—Richard C. Robertson and Walter M. Haynes, attorneys; James M. Rutland, manager, labor relations branch.

### Opinion Text
**Opinion By:**
WHYTE, Arbitrator:

### REFUSAL TO CROSS PICKET LINE
**Background**

The labor agreement which this Award is to interpret is between the Company and a council of thirteen unions (including the International Association of Machinists which did not sign an amendment effective January 23, 1966). Among the signatory unions is the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, District 57. Grievant, X—, is a member of this Union.

In the fall of 1965, the IAM petitioned for a severance of the Boilermakers. The severance was unsuccessful; unfair labor practice charges were filed (the disposition of which are irrelevant to the subject of this arbitration); and the IAM later commenced a strike, establishing picket lines in the

course of events. The strike lasted eight days, ending May 12, 1966. Members of the IAM returned to work May 13, 1966.
While a few Company employees, not members of the IAM but members of other Unions belonging to the Council, initially refused to cross the picket lines established by the IAM, these refusals were short-lived and within two days all employees, except for IAM members and as hereafter noted, were back at work. Included in those employees crossing the IAM picket was Grievant's Chief Steward.
Grievant, however, did not report for work during the course of the IAM picketing and strike. While he did not communicate with any supervisory personnel directly or personally, he sent word by a fellow employee that he would not cross the picket line because he feared personal harm and harm to his family. No incidents of violence or personal harm to others, however, were reported from the picketing.
Because Grievant missed five consecutive days of work without approval, being absent during the eight days of the strike, his employment with the Company was terminated on May 10, 1966. The reason given for his termination was, "Quit without notice — absent five working days (May 4, 5, 6, 9, & 10, 1966) without authorization". When discharged Grievant was a veteran of 10 years employment with the Company and had a work record free from disciplinary action. He had been an apparently satisfactory employee, although at the time of the strike his facility was working on a high-priority project, in which he may or may not have been directly involved, and overtime was being accumulated.
No disciplinary action was taken against those employees who initially

**Page 1067**

refused to cross the picket line because they reported for work as soon as they were notified by the Company to do so and upon learning that members of the Council had determined to respect the labor agreement's no-strike clause.
Nor was disciplinary action taken against striking members of the IAM. At the time of the strike, while a contract was in process of negotiation, the Company did not believe it had an agreement with the IAM. However, the NLRB subsequently obtained an injunction against the IAM picketing on the basis, in part, that the contract with the Council was a bar to negotiation of a separate contract with the IAM, this contract covering the employees sought to be severed by the IAM.
Discipline was, however, temporarily awarded to a group of apprentice machinists because they had failed to attend required classroom instruction on May 5, 9 and 12, 1966 (Union Exhibit No. 2). Subsequently, however, this discipline was rescinded (Union Exhibit No. 3) by action of the Company. The reason for rescinding the discipline was that the apprentices were young employees and otherwise inexperienced. In any event, the Supervisor of Apprentices is responsible for apprentices, not the Chief of the Engineering Support facility who had jurisdiction over Grievant.
Evidence was also given by an employee having the classification of Electrical Operator, a member of the IBEW, one of the signatory unions, who testified that he had once been merely reprimanded for refusal to cross a picket line. This witness could not remember, however, when this incident took place or whether the reprimand was for failure to cross a picket line or for failure to work. In any event, he was absent from work only for about six hours on this occasion.
Subsequent to his discharge, Grievant applied for unemployment compensation with the Tennessee Department of Employment Security. His claim was denied because his failure to report for work for five consecutive days constituted a voluntary quit of his employment.
Grievant also filed unfair labor practice charges because of his discharge with the National Labor Relations Board. The Regional Director denied Grievant's claim on the ground that the no-strike clause in the labor agreement prevented Grievant's refusal to cross the picket line from being justified. Grievant's appeal of the Regional Director's decision was denied for the same reason.
The Company also submitted evidence of another arbitration award between the same parties involved in this case. This award, written by Impartial Arbitrator R. G. Carson, Jr., sustained Company's discharge of an employee who refused to work behind picket lines in 1960. Unlike the picketing in the present case, not all gates to Company property were then picketed. Also in contract to the present case, the 1960 picketing was conducted by employees of a contractor's subcontractor, not by Company employees.
**Contract and Rules**
The portions of the labor agreement applicable to this case are:
Article II. Recognition. Section 4, Company Recognition. The Union recognizes that the Company shall exercise the exclusive responsibility for the management, operation and maintenance of facilities and related utilities at the Arnold Engineering Development Center, and the selection, assignment and direction of the working forces. Such responsibility shall include the right to determine job content and qualifications of employees to perform work, and the right to adopt and enforce reasonable rules and regulations for efficient operations; provided that the Union rights set forth in this contract, including

the use of the Grievance Procedure and Arbitration, shall not be abridged, curtailed, or modified by this clause.

Article IV. Arbitration. Section 1, Arbitration Procedure. Any controversy which has not been satisfactorily adjusted under the Grievance Procedure and which involves [(a)] the discharge of an employee . . . (may be submitted to arbitration) . . .

The Arbitration Committee shall not have the power to add to, to disregard, or to modify any of the terms of this agreement.

Article XI. Continuity of Operations. Section 1, Continuity of Operations. There will be no strikes, lockouts, or work stoppages of any nature. The Union guarantees to support the Company fully in maintaining operations in every way. Participation by any Company employee or employees in an act violating this provision in any way will be complete and immediate cause for discharge by the Company.

If it is contended that the discharged employee did not violate this section of the contract, the Union may, within two (2) days after the employee is discharged, contest the discharge by filing a grievance initially in the third step of the Grievance Procedure; the grievance shall be subject to arbitration under Article IV.

By virtue of the language in Article II, Section 4, the Company has, from

**Page 1068**

time to time, promulgated rules and regulations. Such is the Payroll and Timekeeping Manual F-2, dated October 11, 1965 which states:

9. An employee will be terminated if he is absent for five consecutive days without approval, or if he fails to return to work within five days after the expiration of an excused absence, unless acceptable cause is shown.

Another such statement of rules is Employee Relations Division Procedure E200-1, issued under the same date which, in part, states:

D. *An employee being discharged for cause* will be advised of the reason(s) for the action at the time of termination.

On August 17, 1966 (after Grievant's discharge) the Company issued Inter - Facility/Division Procedure No. E100-1 which in material part states:

d. *Discharge:* (1) An employee may be discharged for repeated minor offenses; for unsatisfactory work performance, for excessive absenteeism, and for other serious offenses.

When issued such rules and regulations are posted on all bulletin boards. Admittedly, it is difficult to keep them posted, but there are some 30 bulletin boards for Union use. These rules and regulations are also given to supervisors who are expected to inform employees of their contents, but they are not given individually to employees or to Union Stewards.

The Union does not assist in the formulation of the rules and regulations, and from time to time has made general protests concerning them. The Union has requested copies of all rules and regulations issued by the Company, but has not yet received them because they are in the process of being revised. The rules and regulations are applicable to all employees not only those covered by the labor agreement.

## Contentions

*Union.* 1. The discipline awarded Grievant was too severe because: (a) the Company has no set policy for discipline, (b) the discipline awarded apprentice machinists was rescinded, (c) the striking members of the IAM were not disciplined at all, and (d) Grievant's work record is good.

2. The rules under which Grievant was disciplined are unreasonable because (a) there is no policy for the adoption of rules, (b) there is no distribution of rules to employees, (c) there is no consultation with the Union on adoption of the rules, and (d) the rules are not made part of the Contract.

3. The determinations made relevant to Grievant by the NLRB and the Tennessee Department of Employment Security are irrelevant to this arbitration.

*Company.* 1. Grievant's absence from work because of refusal to cross the IAM picket line was a breach of Art. XI, Sec. 1 in that his absence constituted a strike or work stoppage. Grievant had no right to refuse to cross this picket line, his fear of personal violence being unfounded.

2. Art. II, Sec. 4 gives the Company the right to promulgate rules and regulations pertaining to work requirements. The Company has done so and has posted them for Union and employee observance.

3. The disciplinary action taken against Grievant was not discriminatory. All employees but Grievant, except for the striking machinists, were back at work within two days after the picket line was established. Grievant neither called supervision for permission to remain away from work nor did he personally inform supervision of the reasons for his absence.

4. Art. XI, Sec. 1 does not allow a grievance to test the severity of disciplinary punishment. The only question that may here be raised is whether or not this section is violated and, if so, the punishment prescribed is discharge.

5. While the Company bears the initial burden of proof in disciplinary cases, once the Company has established reason for discharge, the burden of proof shifts to the Union to show the penalty imposed was improper. This the Union has failed to do.

6. Under the circumstances of this case, an Award for the Union would constitute substitution of the Board of Arbitration's judgment for that of the Company—something the Board does not have the power to do.

**Issues**

There was no stipulation of issues prior to or at the hearing. But statements in both Company and Union post-hearing briefs raise these questions:

1. Does the Company have the power under Art. II, Sec. 4 unilaterally to issue rules and regulations pertaining to work attendance and provide for disciplinary action when those rules are disobeyed?

2. If so, were the rules and regulations under which Grievant was

**Page 1069**

disciplined reasonable and were they reasonably applied?

3. Was Grievant justified in absenting himself from his employment because of refusal to cross the picket line of another Union?

4. Was, considering all facts and circumstances, the punishment of discharge awarded Grievant overly severe?

**Discussion**

I. The formal reason given for Grievant's discharge was that he. in violation of Company rules, missed five consecutive days of work without approval. The fact that Grievant incurred such absenteeism is not disputed, nor is it disputed that such absenteeism is directly prohibited by Company rules promulgated in the Payroll and Timekeeping Manual F-2 dated October 11, 1965. The Company's right to promulgate such rules has, however, been challenged.

Art. II, Sec. 4, notwithstanding, clearly reserves to the Company the right to "adopt and enforce reasonable rules and regulations" subject to the use of the grievance procedure and arbitration. Where such clauses exist in labor agreements, it is well-recognized that the Company may promulgate rules pertaining to orderly conduct of Company business and work attendance and provide discipline for their non-observance, so long as such rules are reasonable and not in conflict with the Contract, without negotiating them with the Union. See, eg., Electric Storage Battery Corp., 16 LA 118 (Baab, 1951); Columbus Coated Fabrics Corp., 26 LA 638 (Stouffer, 1956); Dayton Steel Foundry Co., 31 LA 865 (Bradley, 1958); Sylvania Electric Products, Inc., 32 LA 1025 (Wallen, 1958); Rapids-Standard Co., 40 LA 790 (Mittenthal, 1962).

The evidence in this case shows, further, that the rules under which discipline was awarded Grievant were posted on bulletin boards provided for Union and employee use although they were not distributed to each employee personally. While it is questionable whether or not a Company need publish rules as a prerequisite to disciplining employees for their breach, See, Ross Gear & Tool Co., 35 LA 293 (Schmidt, 1960), no claim has here been made by the Union that employees were unaware of the existence and import of these rules. It must be concluded that the Company was not per se in violation of Art. II, Sec. 4 in unilaterally establishing rules for employee attendance and providing discipline for their breach.

II. While Art. II, Sec. 4 empowers the Company to establish rules for employee attendance, this power is conditioned by the requirement that such rules be reasonable. At the outset it should be noted that there is nothing unreasonable about a rule which, in general, governs attendance at work. Even without power in the Company to establish rules, one employee responsibility to be inferred from the Contract as a whole is faithful work attendance. Cf., Sylvania Electric Products, Inc., supra; Cannon Electric Company, 46 LA 481 (Kotin, 1965).

Nor is a provision providing discharge as discipline for an employee who is absent five consecutive days without approval unreasonable. See, eg., Union Carbide Corp., 46 LA 265 (Teple, 1965) where a similar proviso contained a three-day limitation. Five days constitutes the normal workweek [Art. VII, Sec. 1(b)]. An employee who simply takes a week off from work, without excuse or for some contractually recognizable reason, has in effect voluntarily terminated his employment. If a company is to conduct its business with efficiency, it must be able to depend upon its employees coming to work with regularity. It cannot produce its goods or services if it cannot depend on its employees to do the work for which they were hired. These considerations are especially important in this case, for during Grievant's absence his faculty was engaged in high-priority work and overtime was being accumulated. He was needed on the job. It may safely be presumed his absence certainly had at least a constructively adverse effect upon the Company's work.

If the rules promulgated by the Company were in conflict with the Contract or in conflict with each other, it could, of course, be said they were unreasonable. But such is not the case in this arbitration. The Contract is silent as to discharge except for Art. IV, Sec. 1 making discharge subject to arbitration

and Art. XI, Sec. 1 making discharge the penalty for breach of the no-strike clause. Nothing stated in the Contract relates to absenteeism as grounds for discipline. Thus the Company is free, by virtue of the rule-making power granted in Art. II, Sec. 4, to promulgate disciplinary rules pertaining to absenteeism subject, of course, to the grievance procedure.

**Page 1070**

Nor is there conflict between the various rules promulgated by the Company relating to discipline for absenteeism. Payroll and Timekeeping Manual F-2 (Company Exhibit No. 10) under which Grievant was discharged in no way conflicts with Employee Relations Division Procedure E200-1. The latter, issued concurrently with the former, merely provides discharged employees shall be informed of the reasons for their discharge at the time of termination. It in no way deals with the nature of the reasons for discharge as does Company Exhibit No. 10, and there was compliance with Union Exhibit No. 1 in this case.

Inter-Facility / Division Procedure No. E100-1 (Union Exhibit No. 4), like Company Exhibit No. 10, does relate to absenteeism as grounds for discharge. But since Union Exhibit No. 4 was not in existence when Grievant was discharged under Company Exhibit No. 10, there can, for the purposes of this arbitration, be no conflict between them. And while it can form no part of this Award, it might here be noted that even had Union Exhibit No. 4 been current when Grievant was discharged, it does not necessarily conflict with Company Exhibit No. 10. Reading these two rules together admits of the conclusion that the Company may discharge for excessive absenteeism, and that five days consecutive absence is excessive. In short should the question ever arise, it could be argued that Company Exhibit No. 10, being specific, merely defines and limits the generality of Union Exhibit No. 4.

The Union has also argued that the presence of a number of rules relating to discipline is indicative of an absence of Company policy on this subject. It is then further argued that the lack of Company policy makes Grievant's discharge overly severe. In support of these arguments the Union has cited the Warren Co., Inc., 62-2 ARB P8405 (Williams, 1962). In this case the arbitrator set aside a discharge, restoring the grievant to his job without back pay, because, in part, Warren did not have an adequate disciplinary program. While concepts of corrective (in contrast to punitive) discipline have merit, it is an arbitrator's function to interpret collective bargaining agreements, not advise company and union what should be in them. It is one thing to determine whether or not a contract permits discharging an employee under given circumstances. It is entirely another matter for an arbitrator to conclude that an employee's discharge violated a contract because of something not in the contract. The latter approach has the effect of rewriting the contract for the parties or, if not that, of adding something to the contract. While it is entirely possible the contract interpreted by Arbitrator Williams permitted the approach adopted in the Warren case, Art. IV, Sec. 1 of the Contract here under consideration specifically denies the Board of Arbitration power to add to, disregard or modify any of the terms of the agreement. In any event, the Warren award can be distinguished from the case under consideration in that an additional reason for setting aside that discharge was that the evidence was most hazy as to whether or not the grievant had been properly instructed concerning compiling the records he allegedly falsified.

Grievant's discharge is also said to be overly severe because other employees who did not cross the IAM picket line were not disciplined. This appears to be true. Yet the Company's action in not disciplining those other employees was not arbitrary or capricious. The striking machinists were not disciplined because, at the time, the Company thought it had no contract with them. The machinists had not signed the January 23, 1966, amendment. Under these circumstances the Company did not believe the IAM action violative of Art. XI, Sec. 1. While the Company may not have been legally correct in this belief, there is no evidence whatever of the Company's acting in bad faith in failing to discipline IAM members.

What has been said about the Company's lack of action concerning IAM members in general applies also to the apprentice machinists. Additionally, it was not arbitrary or an act not taken in good faith for the Company to treat the apprentices differently because of their youth and inexperience. Art. XX, Sec. 3, in describing the apprenticeship program sufficiently distinguishes apprentices from other employees to allow them to be treated with considerations not applicable to other employees.

Nor was Grievant the object of discrimination because he was disciplined when other employees, including the IBEW member who testified, who temporarily refused to cross the IAM picket line were not. Except for those on strike, Grievant was the only employee who did not report for work during the entire period of the strike. When the picket line was

**Page 1071**

established, there was no doubt a great deal of confusion concerning respecting it. But as soon as it was made known that all non-striking members of the Council would respect Art. XI, Sec. 1, all other employees crossed the picket line and reported for work. Grievant certainly knew his Union was at work—his decision to remain absent was entirely of his own choosing.

Not only did Grievant choose to remain absent from work, he neither obtained permission for his absence nor did he inform the Company in an acceptable manner of the reasons for his absence. It is true Grievant sent word by a fellow employee as to why he was not coming to work, but this method of reporting reasons for absence is not acceptable. It can cause only confusion, for it eliminates that communication necessary between Company and employee to evaluate the acceptability of excuses for absence. See, eg., Electric Storage Battery Corp., supra. This is especially true in this case. If Grievant had communicated personally with supervisory personnel, there is a good chance the situation might have been explained to him satisfactorily enough to convince him to come to work. Grievant's experience with the NLRB and the Tennessee Department of Employment Security are in large measure irrelevant to the question of whether or not his discharge was according to the terms of the Contract. Company Exhibits 4-8 tend to corroborate the fact of why Grievant was terminated, but they have not been considered as evidence that his discharge was in accord with the Contract. Much of the same must be said for Company Exhibit No. 9 Previous arbitration awards involving the same parties and the same issues certainly are to be given weight, but since Company Exhibit No. 9 involves stranger picketing, and less than full picketing, it is distinguishable from the events giving rise to this arbitration.

All circumstances considered, then, it must be concluded that the rule under which Grievant was discharged was reasonable and that it was reasonably applied to him.

III. While the Union has not made the claim that Grievant was justified in not coming to work because he had a right to refuse to cross the IAM picket line, the fact remains that this is the reason for his absence. This, coupled with the Union's claim that discharge is too harsh a punishment for Grievant's absenteeism, justifies discussion of this matter. At the outset it should be noticed that nothing in the Contract permits absenteeism because of picketing. On the contrary, Art. XI, Sec. 1 not only contains a no-strike clause but also provides that violation of the no-strike proviso is complete and immediate cause for discharge. This portion of the Contract would apply had Grievant's own Union, the Boilermakers, been on strike. Yet had the Boilermakers been on strike, Grievant's not appearing for work would be at least understandable. Under the circumstances, then, Grievant was on a one-man strike or work stoppage. This conduct was directly contrary to his union's decision to work. Art. XI, Sec. 1 unequivocally provides discharge will result from breach of the no-strike clause. The fact that the strike was by a union other than Grievant's strengthens the reason for his discharge. See, eg., Pilot Freight Carriers, Inc., 22 LA 761 (Maggs, 1954); Hess Oil & Chemical Corp., 66-1 ARB P8036 (Hoel, 1965); Union Carbide Corp., supra.

Notwithstanding, refusal to cross any picket line because of fear of personal harm or harm to one's family may provide justification for resulting absenteeism. In this case, however, there was no violence or even threat of violence associated with the IAM picket line. The employee who brought Grievant to the plant entrance, and by whom Grievant informed the Company of his reason for not crossing the picket line, crossed the line without incident after returning Grievant home. And all other non-striking employees likewise crossed the line within a reasonable time after it was known non-striking Council members were respecting Art. XI, Sec. 1. The conclusion is inescapable that Grievant's fear of crossing the IAM picket line was without foundation and that his failure to cross the line provided no justification for his absence.

IV. Since Grievant's ten-year work record with the Company is unmarred by past discipline, it is understandable the Union should argue that discharge is an overly severe penalty for his absenteeism. While it is within the power of an arbitrator to modify or mitigate a Company's disciplinary actions, such modification or mitigation should follow only from the determination that the Company's action was

**Page 1072**

unreasonable, excessive or a clear abuse of discretion under the terms of the Contract. See, eg., Bauer Bros. Co., 23 LA 696 (Dworkin, 1954); Farm Bureau Services, 63-2 ARB P8502 (Howlett, 1963). In this case the rules properly promulgated by the Company provide five consecutive days' absence without approval is grounds for discharge. Grievant was absent for five consecutive days without approval and without reason for which approval could be given. Additionally, he breached Art. XI, Sec. 1 which, under the terms of the Contract, provides complete and immediate cause for discharge. These contractual provisions are unambiguous. Modification of the discharge would directly contravene express terms of the labor agreement, and constitute modifying the Contract in a manner upon which the parties have not bargained.

**AWARD**

For the foregoing reasons, the grievance is denied.

Throughout this Award, other arbitration awards have frequently been cited. It is recognized that such awards are not precedent in a legal sense—that they are not binding on either Company or Union. Yet

they are useful in identifying general industry practice and in distinguishing methods of approach. It is in this sense such awards have been used.

- End of Case -