**74 LA 171**
**CURTIS MATHES MFG. CO.**
**Arbitration**
FMCS Case No. 79K/20335
December 31, 1979

**In re CURTIS MATHES MANUFACTURING COMPANY and UNITED FURNITURE WORKERS OF AMERICA, LOCAL 376**

## Arbitrator(s)

Arbitrator: Barnett M. Goodstein, selected by parties through procedures of Federal Mediation & Conciliation Service

## Headnotes

**DISCIPLINE**
**-- Advising female employee not to do 'man's job' -- Union steward ▶ 118.303**

Page 172

Employer properly suspended union steward for telling female inner-pack assembler who had been assigned to fill-in job of absent packer on packing line, "You don't need to be doing no man's job," despite fact that no female employee previously had worked job required to be performed, since (1) there is no "man's job" as such at plant but only jobs that require lifting heavier objects than other jobs and, as union representative, grievant had obligation to advise female employee to work first and to grieve later, (2) grievant's advice resulted in loss of job for female employee and also stoppage of production line and contract requires union to cooperate with management in producing efficiently, and (3) fact that grievant had no disciplinary record does not permit arbitrator to fashion system of progressive discipline.

## Attorneys

Appearances: For the company: Robert S. Jones, Sr., vice president and general counsel. For the union: Roger Williams (Wilson, Menaker, Morgan & Williams), attorney.

## Opinion Text

**Opinion By:**
Barnett M. Goodstein

**Decision of Arbitrator**

**UNION STEWARD'S ADVICE**

**Background**

-- The Company is located at Athens, Texas, where it is engaged in the manufacture and the sale of television receivers, which are distributed nationwide. The Grievant, P , is a Union Steward who was working on the production line on March 19, 1979, at which time a fellow employee of the Grievant requested permission to leave the Plant on personal business for a short period of time. The line Foreman then called to another employee working on the line, who was an inner-pack assembler, to fill in on the packing line for the employee who had to leave. The employee called to the packing job is a female. When she saw the job she was required to perform, she either thought, or was led to believe by the Grievant, that the job in question was a man's job and she, being a female, should not be required to perform the heavy duties required by this particular packer's job. The Foreman advised the female employee that she would either work that position or be terminated. She continued to refuse to work in place of the absent packer, and was terminated by the Foreman for insubordination. After one additional work day at the Plant, following the termination of the female employee, the Plant was shut down for inventory. When the Grievant returned to the closed Plant on Friday, March 23, 1979, to pick up his payroll check, he was then informed that he was being suspended for a period of ten work days, three of which had passed already in the period during which the Plant was shut down for inventory. The reason given by the Company for the Grievant's suspension was that he gave another employee improper instructions with regard to insubordination. The Grievant filed a Grievance over his temporary suspension, requested immediate reinstatement to his job, back pay for the time missed during the suspension, and 10% interest on the wages withheld during the period of suspension. The Company denied the Grievance, and it was processed through to arbitration.

As a result of a disagreement concerning the Cost of Living provision of the Contract that was negotiated and would have been in effect on the date of the Grievance and arbitration hearing, the Agreement between the parties was not signed by the parties. As a result, it was not introduced by the parties as the Collective Bargaining Agreement in effect and binding upon the parties. However, those portions of that Agreement that the parties agreed control the question of the Grievance before

the arbitrator were introduced into evidence as governing the arbitration hearing, and being binding upon both parties to the arbitration.

**Issue**

Did the Company violate the provisions of the "Agreement" introduced into evidence as Joint Exhibit "A" in its suspension without pay of the Grievant, P ? If so, what shall be the remedy therefor?

**Pertinent Contract Provisions**

**ARTICLE II Union Responsibility**

SECTION 1. The Union recognizes the responsibilities imposed upon it . . . and realizes that in order to provide maximum opportunities for continuing employment, good working conditions and fair wages, the Company must be in a strong market position, which means that it must produce efficiently. The Union, through its bargaining agency, assumes responsibility for cooperating in the attainment of this goal and agrees that it will actively combat absenteeism and any other practices which restrict production or lead to inefficient operation.

**ARTICLE III Rights of Management**

SECTION 1. . . . Management of the Company plants and the direction of its working force, including the right to suspend, discipline, or discharge, shall be vested exclusively in the Company, subject to the provisions of this Agreement.

SECTION 3. The parties agree that the efficiency of any industrial enterprise requires clear management authority and freedom to make decisions. It is further understood and agreed that this contract constitutes the whole Agreement of the parties concerning wages, hours, and working conditions, and that all decisions on matters not expressly provided for in this Agreement are reserved to the Company.

**ARTICLE IX Settlement of Grievances**

SECTION 1. Grievances shall be limited to matters concerning the provisions of this Agreement. Only grievances concerning the following matters are subject to Step E of the grievance procedure: rates of pay, wages, hours of work, layoff and recall, discipline and discharge, seniority and safety and health conditions.

**SECTION 2 * * ***

The arbitrator may consider and decide only the particular issue presented in writing, and his decision must be based solely on the interpretation of the provisions of this Agreement. The arbitrator shall not have any authority or power to add to, subtract from or modify the terms of this Agreement or any agreement supplemental hereto.

**ARTICLE XIV No Discrimination**

**Page 173**

SECTION 1. The provisions of this Agreement shall be applied to all employees without discrimination on account of age, sex, marital status, race, color, creed, national origin, looks, or personal likes or dislikes. The Union shall share equally with Management legal and moral responsibilities in the application of no-discrimination agreement.

**Position of the Company**

Foreman Swann directed Carolyn Smith, an inner-pack assembler, to take the place of a packer on the packing line who had to leave the Plant on personal business. The Grievant overheard the order to Ms. Smith, and he directed that she not follow the Foreman's instructions. Ms. Smith was directed several times to take her position on the production line and do the work of the absent packer. Each time she refused, on instructions from the Grievant. P told Ms. Smith that the job was a man's job and she was not required to do it. The lead person who advised the Foreman of the need for a packing line replacement, and was present throughout the entire discussion with Ms. Smith and P , was present at the arbitration hearing, but was not called by the Union to refute anything stated by management witnesses concerning the conduct of the Grievant on March 19, 1979.

It is the responsibility of the Union to share equally with management to produce efficiently and to guarantee that there is no discrimination. Secondly, the Grievant, a Union Steward, should have advised Ms. Smith to do the work required by the Company, and to file a Grievance concerning the said work as soon as possible thereafter. Improper conduct of any employee, and especially a Union Steward, that interferes with production standards of management, is unacceptable conduct and subject to discipline. In his actions, the Grievant violated his obligations as an employee. Moreover, as a shop steward, he had an even higher duty to adhere to all of the provisions of the Agreement, and to actively instruct each employee to do so as well. He should set an example for all the Union members within his jurisdiction by showing his loyalty to the Agreement between the parties negotiated by his Union with the employer.

There are no jobs in the Athens Plant that have been limited to male or female only, because of a bona fide occupational qualification. The Grievant interfered with the carrying out of a proper direction

by a foreman. Production was disrupted as a result thereof. Therefore, the length of the suspension was fully justified by the facts of the case.

## Position of the Union

The Union's position is two-fold: first, there was no just cause to suspend the Grievant and the suspension, therefore, was arbitrary and capricious; secondly, the Union's version of the disputed facts is more credible and, therefore, there was no just cause to suspend the Grievant, and the suspension was arbitrary and capricious.

The Grievant was suspended for saying nothing more than, "Don't need to be doing a man's job." There is no evidence that the Grievant was given any warning whatsoever before disciplinary action was taken against him. On the other hand, Ms. Smith was given 3 warnings before any action was taken against her. The Foreman admitted that he had fired Ms. Smith for listening to her Union Steward. Thus, disciplinary action was taken against the Grievant for expressing his opinion, and disciplinary action was taken against Carolyn Smith because she listened to the steward expressing an opinion. She admitted that she acted upon the opinions alone, and not as a result of something someone else advised her to do.

The issue before the arbitrator is essentially a question of credibility and fact finding. The Foreman had his version of what happened, and what the Grievant said. Carolyn Smith had her own version of what happened, that boiled down to the fact that she believed the Grievant was in some way telling her not to do the work in question. Finally, the Grievant's own version was that he did not say anything, and that it was Carolyn Smith's decision not to do the work in question. All three versions support the Union's position that the Grievant was unjustly suspended in an arbitrary and capricious manner.

There was no testimony of any previous violations on the part of P . Moreover, P has long tenure with the Company, and has a good previous work record. That, taken together with the circumstances of this case, all show that the suspension of the Grievant cannot reasonably be related to his actions on March 19, 1979 and, therefore, his suspension was unjust.

On the morning of March 19, 1979, the Grievant was working as a Packer on the production line. Across from him, as his partner-packer, was Learshie (Hog) Herndon. The job of packer at the glue station on the line requires the services of two individuals because, at that point, the television set is in an open carton to be packed, is off the rollers on the line, and must be pushed by hand across the metal plates

**Page 174**

that permit the carton to be closed, glued and stapled shut, before it gets back on the rollers and continues to the end of the line. For this reason, the job is rated with an "H", meaning a heavy classification, and is higher paid than non-H-rated jobs. It was necessary that Mr. Herndon leave his job position, and leave the Plant itself on personal business, and he so informed his Leadman, Mr. Williams. Mr. Williams advised the Foreman for that line, Mr. Swann, that a replacement would be needed for Mr. Herndon, temporarily, while he was away from the Plant, since one person could not operate the glue station alone. The Foreman and the Leadman agreed that Ms. Carolyn Smith, an Inner-pack Assembler, who prepared corrugated strips to be used by the packers to hold the television set firmly in the carton, should be diverted to the job of Mr. Herndon, temporarily, while he was away from the Plant. No female employee ever before had worked the glue station on the packing line, and Ms. Smith was reluctant to attempt it, since it required more strength than the part of the line controlled by rollers. The Foreman told her to go to Mr. Herndon's place on the packing line and, when she hesitated, P , the Grievant, said to Ms. Smith, "You don't need to be doing no man's job." Since the Grievant is a Shop Steward, Ms. Smith took her cue from him, backed off from the job and refused the direct order of her Foreman. She testified at the hearing that, since P is her Steward, she felt he was advising her and, as a result of his telling her she did not have to do a man's job, she refused to do the job. The Foreman asked her the second time and, when she continued to refuse, the Foreman told Ms. Smith that he was going to his office to write out a termination notice for her if she continued to refuse to do the job as ordered. The Foreman soon returned with the termination notice -- the production line having been shut down completely since Mr. Herndon's departure -- and again asked Ms. Smith if she would do the assigned job. When she again refused, the Foreman gave Ms. Smith her termination notice, and told her to go clock out. At that point, the Grievant advised Ms. Smith that, if she was discharged, she did not have to go clock herself out, but that the Foreman should do so. Again, she listened to her Union representative, and the Foreman was required to clock out for Ms. Smith. She then was asked to wait outside by the gate if she were waiting for a ride, but not to wait on the Company premises. She obeyed and left the Plant.

The next day, Tuesday, the Plant operated, but the balance of the week it was closed down for inventory, and the production line did not work. On Friday, pay day, the Grievant returned to the Plant to pick up his pay check, at which time he was informed that he had been suspended without pay for

a period of two work weeks (part of which had already passed) "for giving another employee improper instructions with regard to insubordination." The Grievant then filed his written Grievance, requesting immediate reinstatement to his job with full back pay and interest on the lost pay. The Company denied the Grievance, answering that, "P was suspended for two weeks for advising another employee, Carolyn Smith, to be insubordinate and refusing to perform necessary work her foreman instructed her to do. P declared the work 'to be man's work' and would not show her how to do the work upon her request." . . . "He also refused to co-operate in showing her how to operate across the line from him. He told her to return to her previous work station."

The Union contends that the Grievant merely expressed an opinion, but did not cause Ms. Smith to refuse to do the work in question; the Union argues that the decision not to work was that of Ms. Smith alone. The Grievant himself testified that he did not make the statement to Ms. Smith, or to anyone, that such work was man's work. He further testified that he said nothing during the entire time that the Foreman was attempting to get Ms. Smith to do Mr. Herndon's job during his absence. This arbitrator cannot, and does not, accept the version of this incident as expressed by the Grievant. The Leadman, Mr. Williams, was present during the entire incident, and overheard all the conversation between and among all the participants. Mr. Williams is a Union member, and a member of the Bargaining Unit; he was present during the arbitration hearing. However, the Union never called Mr. Williams to give his version of the incident, to refute the Foreman's version, to refute Ms. Smith's version, or to corroborate the version given by the Grievant. In fact, the only refutation of the incident above-described was given by the Grievant alone, who denied saying anything to the Foreman or to Ms. Smith.

The Grievant is Ms. Smith's shop steward, her Union representative in the Plant. The steward represents the employee at the initial stage of the grievance procedure; it is his advice at that point that either solves the immediate problem, or causes it to be carried to the next step in the grievance procedure. Although the steward has the responsibility of policing the contract, he also has the responsibility of advising the employee of his/her obligations under that contract. On the other hand, the employee has a right to listen to his/her steward, and to take his advice

**Page 175**

concerning an interpretation of the contract.

Although it is true that no female employee ever before had worked the glue station on the production line at the Plant, neither is there any written job classification at the Plant that differentiates a man's job from that of a woman. In other words, there is no "man's job" as such at the Plant but, rather, there are some jobs that require lifting heavier objects than other jobs require. For that reason, those jobs are marked with an "H", pay more than other jobs, and may be bid or not by the affected employee. The fact that Ms. Smith did not bid, or even ask for, this particular job is of no consequence. If she were afraid of getting hurt while doing the job, she did not say so; neither did her steward, the Grievant. She should have attempted to do the job; if she then found that it was too heavy for her, she could at that time advise her Leadman and/or her Foreman to that effect. If she then were forced to continue the work, she could file a grievance against the Company for such action. In other words, she had an obligation to work first and grieve later. And the Grievant, being her Union representative at the Plant, had an obligation to advise her of this obligation. He did not. In fact, even if we were to accept the Grievant's version of the incident, he still was wrong in not advising Ms. Smith to at least try the job to see whether she could do it, or whether it was too hard for her.

Not only did the Grievant advise Ms. Smith improperly -- thus causing her to lose her job -- but, after she was terminated, he subsequently advised her to refuse to punch out on the clock, and forced the Foreman to punch her card for her. The Agreement between the parties, introduced as Joint Exhibit 1, requires the Union to cooperate with management in producing efficiently. Stopping the production line entirely does not evidence the kind of cooperation envisioned by the parties in their Agreement. The Agreement in question also requires the Union to "actively combat absenteeism and any other practices which restrict production or lead to inefficient operation." The Grievant, as shop steward, violated this provision of the Agreement. Article III of the Agreement gives management the right to suspend, discipline or disccharge employees, "subject to the provisions of this Agreement." There is nothing in the Agreement introduced that delineates the degree of punishment for various breaches of the Agreement.

The Union argues in its Brief that the Grievant had a perfect attendance record, and that there was no testimony regarding any previous violations on the part of P . The conclusion drawn by the Union from this is that the Grievant's suspension "surely cannot be reasonably related to his actions on March 19, 1979 and that his suspension was unjust." The record of the hearing contains no history of the Grievant's previous disciplinary punishment, although an illusion was made to his perfect attendance record. Neither does the record indicate that the Company follows a pattern of progressive discipline or, if so, just what that pattern is. This arbitrator is not authorized to devise his own system of

progressive discipline for the Company. In fact, the Agreement between the parties so restricts the power of this arbitrator. "The arbitrator shall not have any authority or power to add to, subtract from, or modify the terms of this Agreement or any agreement supplemental hereto."

The arbitrator must take the Agreement between the parties just as he finds it, and make his award within the framework of that Agreement. The fact that the Company subsequently reinstated Ms. Smith, and punished her with a lesser period of suspension than that given the Grievant, cannot affect the ruling of this arbitrator in this matter. The Agreement provides that, "The arbitrator may consider and decide only the particular issue presented in writing, and his decision must be based solely on the interpretation of the provisions of this Agreement."

The issue before the arbitrator requests a ruling concerning the suspension of the Grievant, and whether such suspension violates the Agreement of the parties. This arbitrator is limited to an analysis of the conduct of the Grievant and the Company (and including any provocation by any other employee) on March 19, 1979, as that conduct is governed by the Agreement of the parties. In a determination of these questions, the arbitrator finds that the Grievant did give the Company cause for suspending the Grievant for his actions on the day in question. Since there is insufficient evidence before the arbitrator to determine the proper degree of punishment for such violation by the Grievant, the arbitrator is unable to set aside the punishment levied by the Company and substitute his own therefor. The punishment set by the Company must needs be permitted to stand in the absence of suitable or established criteria by which it can be set aside by the arbitrator.

**AWARD**

The Issue: "Did the Company violate the provisions of the 'Agreement' introduced into evidence as Joint Exhibit 'A' in its suspension without pay of the Grievant, P ? If so, what shall be the

**Page 176**

remedy therefor?" is answered in the negative. The Company acted within the framework of the subject Agreement in its suspension of the Grievant. Therefore, the Grievance is hereby denied.

- End of Case -